**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **TALIA N. HARRISON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **No. 4:21-cv-00607-ALM** |
| **vs.** | : | |
| | : | |
| **TYLER TECHNOLOGIES, INC.,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

---

**DEFENDANT TYLER TECHNOLOGIES, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

---

There is no genuine issue of material fact that the two positions held by Plaintiff Talia Harrison ("Plaintiff") with Defendant Tyler Technologies, Inc. ("Tyler") as a Senior Project Manager and as an Implementation Analyst are exempt under the Fair Labor Standards Act ("FLSA").  The Senior Project Manager position satisfies both the administrative and the executive exemptions and the Implementation Analyst role satisfies the administrative exemption. Accordingly, Plaintiff's lawsuit should be dismissed in its entirety and with prejudice.  In addition, Plaintiff has no evidence that any alleged misclassification by Tyler was willful.

## I.      STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      Tyler Technologies, Inc. and ExecuTime

Tyler provides integrated software and technology services (including software implementation services) to the public sector—e.g., agencies, states, cities, counties, and school districts.[1]  In June 2016, Tyler acquired ExecuTime.[2]  ExecuTime is a leading time and attendance software solution that empowers employees via self-service functionalities and allows supervisors to closely manage overtime, job costing, and labor data through reduced expenses.[3]

### B.      Overview of the ExecuTime Implementation Process

The process of transitioning a Tyler client from their old timekeeping processes to ExecuTime involves a detailed and carefully coordinated implementation process.[4] Implementations typically are staffed with an implementation consultant and a project manager, one of the positions held by Plaintiff, although other resources such as development and technical support also are involved.[5]  Project managers such as Plaintiff are in charge of preparing a high-

---

[1] TYLER TECHNOLOGIES, https://www.tylertech.com/about-us (last visited Feb. 10, 2022).
[2] Ex. 1, Pl. Dep. 15:6-8.
[3] *See id.*, Ex. 3 (PM job description).  Plaintiff acknowledged the job description was an accurate reflection of her job duties.  *Id.* 92:11-13.
[4] Ex. 2, Burns Decl. at ¶ 4.
[5] *Id.*

**Defendant's Motion for Summary Judgment – Page - 1**

level project plan, conducting initial post-contract meetings with the client, setting up a project schedule, and tracking the progress of the implementation against that schedule.[6]  After the project manager creates the project plan for the framework of the implementation based upon the client's needs and existing operations, the day-to-day responsibility for the implementation shifts from the project manager to the implementation consultant.[7]  However, the project manager remains involved, regularly responding to client concerns or issues that arise during an implementation.[8]

Ultimately, the implementation culminates in a "go live" date during which the client is transitioned from their old timekeeping system to ExecuTime to run its payroll functions, which includes tracking employees' hours and overtime, scheduling employees, and managing employees' time off.[9]  Given the fixed timing of payroll cycles and the absolute necessity of a payroll system to facilitate those cycles, it is critical that a scheduled go live date be met, as it is set to coincide with a specific payroll cycle.[10]  Moving a go live date typically would result in a delay of transitioning to the ExecuTime software of three to six months.[11]

    **C.**    <u>**Plaintiff's Employment with Tyler**</u>

        1.    <u>Plaintiff's Role as a Senior Project Manager</u>

In August 2013, Plaintiff began working as a Project Manager/Trainer for ExecuTime.[12] After Tyler's acquisition of ExecuTime, Plaintiff's job title changed to Senior Project Manager.[13]

---

[6] *Id*. at ¶ 5.
[7] *Id*. at ¶ 6.
[8] *Id*. at ¶ 7.
[9] *Id*. at ¶ 8.
[10] Ex. 3, Wagner Decl. at ¶ 5.
[11] *Id*.
[12] Ex. 1, Pl. Dep. 14:15:5, Ex. 1 (Plaintiff's offer letter).
[13] *Id*. at 16:7-23.  Also after the acquisition, Tyler split the Project Manager/Trainer role into the implementation consultant and project manager roles.  *Id*. at 106:14-19, 107:8-13.

Both before and after the acquisition, Plaintiff's role was classified as exempt.[14]  Plaintiff worked remotely and reported to the Implementation Manager, Jamie Burns and then Hillary Pasch.[15]

a.  *Implementation Duties as a Senior Project Manager*

As a Senior Project Manager, Plaintiff was responsible for nineteen (19) to twenty-three (23) implementations at a time.[16]  Given her experience with ExecuTime, Plaintiff managed more implementations than other project managers.[17]  Plaintiff described her role as "[r]responsible for completion of projects on time, on budget, on specification" and "[p]erform[ing] a variety of tasks including, but not limited to, scheduling all resources; setting deadlines; assigning responsibilities; and monitoring and summarizing and communication the progress of the process."[18]

Plaintiff would start an implementation by reviewing a questionnaire completed by the client and the sales contract to obtain an understanding of the implementation.[19]  Plaintiff would then use that information to create two documents in anticipation of a kickoff call with the client—an implementation timeline and a solution design.[20]

Tyler has created several different implementation timeline templates that outline the tasks to be completed during an implementation.[21]  Plaintiff would review the client questionnaire and contract and would modify the implementation timeline template she had selected to reflect the specific client and implementation.[22]  Plaintiff would then select a project kick-off date that informed the remaining dates in the timeline as a starting point for the project schedule.[23]

---

[14] *See id.*, Ex. 1 (Plaintiff's offer letter).
[15] *Id*. 25:24-26:1, 26:25-27:5; *Id*. at 17:18-24.  Plaintiff only went into the office if she was in town and wanted to go into the office.  *Id*. at 18:15-24.
[16] *Id*. at 65:1-2.
[17] *Id*. at 126:4-127:2.
[18] *See id.*, Ex. 2 (Plaintiff's resume).
[19] *Id*. 20:14-21:21, 22:20-23:8.
[20] *Id*.
[21] *Id*.  20:14-21:21, 22:20-23:8, Exs. 5 & 6 (implementation timelines created by Plaintiff).
[22] *Id*. 20:14-21:21, 22:20-23:8.
[23] *Id*. 30:17-31:21.  Depending on the number of implementation consultants employed, project managers may be assigned two implementation consultants.  *Id*. at 26:11-24.  Plaintiff testified she was permanently assigned one

After creating the project plan, Plaintiff would be required to adjust the implementation timeline for various reasons.  For instance, Plaintiff would adjust dates that conflicted with other implementations.[24]  Plaintiff would also adjust the timeline to reflect the implementation resources available to her—e.g., if Plaintiff assessed an implementation consultant would not be capable of completing certain tasks, Plaintiff would assign herself those tasks.[25]  Depending on the type of training the client wanted, Plaintiff might adjust the implementation timeline to reflect a longer training period.[26]  Plaintiff also might adjust the timeline to include "buffer room" for additional training if Plaintiff believed the implementation was particularly complex.[27]  Plaintiff also could adjust the go-live date in an implementation timeline after advising her supervisor that the date—given its criticality to the project and the client's experience—needed to be changed.[28]

The solution design document served as a synopsis of the deliverables for the client, identified the client's users for the software, and the phases of the implementation.[29]  In order to complete the solution design, Plaintiff needed to understand the client's current payroll practices.[30]  Depending on the client's answers, Plaintiff would configure rules in the ExecuTime software that would be triggered based on the client's practices.[31]  When drafting the solution design, Plaintiff would have calls with the client to get more detailed answers and to validate information in the

---

implementation consultant, but worked with other implementation consultants in addition to her assigned implementation consultant. *Id*. at 26:11-13. 116:17-118:15, 73:11-19, 137:5-11, *Id*. at 153:7-11.
[24] *Id*. at 30:31:21.
[25] *Id*. at 115:17-116:7.
[26] *Id*. at 37:14-20.  The adjustment to training could occur when Plaintiff initially prepared the timeline, if she knew in advance the client wanted all users trained, or Plaintiff may have to adjust the timeline ad hoc, if the client realized after the implementation began that they wanted Tyler to train all their users.  *Id*. at 37:24-38:8.
[27] *Id*. at 44:14-20.
[28] *Id*. at 119:15-121:16, Ex. 7 (email re: go live).
[29] *Id*. at 20:14-21:21, 22:20-23:8; *See* J. Ex. 2, Burns Decl., Ex. A (solution design drafted by Plaintiff).
[30] Ex. 1, Pl. Dep. 28:4-22.  Specifically, Plaintiff needed to understand: whether users typically clock in and out or do manual entry or handwritten timesheets; how the client handled overtime; the hours threshold for employee overtime; whether the client offered shift pay and if so, the start and end hours; and whether the client tracked grants or work orders.  *Id*.
[31] *Id*.

**Defendant's Motion for Summary Judgment – Page 4**

client questionnaire.[32]  No one else from the Tyler team would be on those client calls.[33]  The information Plaintiff learned during these solution design calls enabled her team to customize the client's trainings.[34]  The solution design would be edited by the client and there would be multiple drafts exchanged with Plaintiff before reaching a final version.[35]

After obtaining client approval on the solution design and implementation timeline, Plaintiff would coordinate an hour-long kickoff call with the client and the implementation consultant assigned to the project.[36]  Once the implementation consultant became involved, Plaintiff expected the implementation consultant to keep her in the loop and to come to her to verify information before giving definitive answers to the client.[37]

During the implementation, Plaintiff was responsible for ensuring the implementation stayed within budget.[38]  Tracking hours worked was necessary because, if a client exceeded the amount of hours set out in their contract and a substantial amount of work remained, the client would need to purchase additional hours.[39]  Plaintiff would use her judgment to assess when she needed to start a dialogue about purchasing additional hours.[40]

---

[32] *Id*. at 29:1-3, 29:19-30:5.

[33] *Id*. at 30:6-7.

[34] *Id*. at 32:5-20, 36:9-37:13.

[35] *Id*. at 163:10-164:2.

[36]*Id*. at 20:14-21:21, 22:17-23:8, 52:19-23.

[37] *Id*. at 159:8-25.

[38] *Id*. at 23:9-12, 123:24-124:2.  Plaintiff also maintained a section on the implementation timeline that tracked the hours billed to the project.  *Id*. at 107:14-109-6, Ex. 5 (sample implementation timeline).  Plaintiff would review the tickets completed in Jira, Tyler's project tracking software and enter the task and time from the Jira tickets into the implementation timeline.  *Id*. at 107:14-109:6.

[39] *Id*. at 110:19-112:2.  When working with a smaller client, Plaintiff made sure the implementation consultant understood the hours purchased and what tasks should be assigned to the client in order to not exceed the budgets.  *Id*. at 69:22-70:7.  Plaintiff also frequently checked in with the implementation consultant about the hours they billed and made sure they were careful when the allotted hours on a project were close to being exhausted.  *Id*. at 123:24-124:15.  On occasion, Plaintiff would assess and then escalate concerns regarding the hours billed by an implementation consultant to her supervisor so the implementation consultant's hours could be reviewed and potentially written off as "non-billable.  *Id*. at 124:16-125:16.  Whether an item would be billable or not would be determined on a case-by-case basis based on discussions between Plaintiff and her supervisor.  *Id*. at 109:12-14, 110:3-18.

[40] *Id*. at 236:11-23.

**Defendant's Motion for Summary Judgment – Page 5**

Plaintiff also conducted client trainings.[41]  When conducting trainings on-site at a client, Plaintiff typically would be the only Tyler employee present.[42]  Before a training session, Plaintiff would configure the client's software specific to the training material to be covered.[43]  Frequently, Plaintiff would have to adjust the solution design after a training to reflect the client's customized configuration.[44]  Plaintiff also prepared a custom document for the client that reflected the client's custom configuration that the client could reference after go-live.[45]

During an implementation, Plaintiff held weekly client calls.[46]  For clients that, in Plaintiff's estimation, "needed a little bit more attention," Plaintiff would have calls more than once a week.[47]  During client calls, Plaintiff discussed client concerns and made recommendations to the client about how they should configure ExecuTime.[48]

Plaintiff also managed, monitored, and motivated a "cross-functional team" that included the implementation consultant, a software deployment team, a technical configuration team, and Plaintiff's supervisor.[49] Depending on issues that might arise during an implementation, Plaintiff would work with other Tyler employees to ensure the problem was resolved, if she could not

---

[41] *Id*. at 33:7-9.

[42] *Id*. at 46:4-8.

[43] *Id*. at 46:17-23, 49:21-50:1.  Specifically, Plaintiff would import the necessary employee data and then would build security walls or security permissions depending on the client's practices.  *Id*. at 47:17-48:20.  For example, Plaintiff might build overtime rules and shift differential rules to enable the client to choose certain options for their ultimate configuration.  *Id*.

[44] *Id*. at 49:2-11.

[45] *Id*. at 51:21-52:3.

[46] *Id*. at 42:9-16, 42:21-43:3.

[47] *Id*. at 52:11-18.

[48] *Id*. at 65:11-67:16.  For example, Plaintiff made recommendations regarding security profiles for users or building different configurations for groups of employees based on their practices.  *Id*.  In her resume, Plaintiff described her duties as "[c]ontinuously consults with Stakeholders regarding their specific company operations in order to recommend best utilization and customization of ExecuTime configuration."  *See id*., Ex. 2 (job description).

[49] *Id*. 56:21-57:25, 71:7-13.  Plaintiff testified that on certain occasions, she would escalate an issue to her manager and would work with her manager to create an action plan for moving forward.  *Id*. at 23:12-17.  For example, she would involve her manager to discuss a resolution if an issue involved a go-live date, client complaints regarding an implementation consultant, a client request for Plaintiff to conduct training instead of the implementation consultant, or a change from remote to on-site training.  *Id*. at 41:2-11.

**Defendant's Motion for Summary Judgment – Page 6**

resolve it directly.[50]   As the team member in direct contact with the client, Plaintiff knew the client's expectations and worked with the cross-functional team to ensure the implementation was completed on schedule and within scope.[51]   Plaintiff accomplished this task by assigning the implementation consultant certain parts of the implementation and making sure they knew their responsibilities and the deadlines; ensuring the team was in sync; ensuring support tickets were resolved in a timely manner; and promoting a healthy team morale.[52]

Plaintiff's supervisor relied on Plaintiff to assess the client's temperament so issues could be prioritized appropriately.[53]   Plaintiff sometimes resolved client issues on her own by relying on her ExecuTime experience or by consulting the cross-functional team.[54]   Plaintiff ensured that any issues that may hinder project milestones or that might impact a scheduled go-live date were resolved.[55]   It was Plaintiff's responsibility to ensure the client felt "comfortable and confident with moving forward" with ExecuTime.[56]

b.   *Non-Implementation Related Duties as a Senior Project Manager*

Plaintiff's duties also included training new implementation consultants and project managers.[57]   As a Senior Project Manager, Plaintiff trained five or six new implementation consultants.[58]   Plaintiff also held one-on-one training meetings with new project managers.[59]

---

[50] *Id*. at 71:7-13.
[51] *Id*. at 57:16-59:9.
[52] *Id*. at 57:16-59:9, 69:10-70:7, 132:4-15, Ex. 9 (Plaintiff email to IC with tasks).
[53] *Id*. at 84:15-25.
[54] *Id*. at 82:24-84:1.
[55] *Id*. at 23:18-24:4, 98:7-99:20.
[56] *Id*. at 101:9-15.
[57] *Id*. at 24:5-10, 61:4-62:1.  Only Plaintiff and one other Senior Project Manager for ExecuTime had the requisite experience to train new project managers and implementation consultants.  *Id*. at 24:10-15, 25:9-11.  Given her experience with ExecuTime, Plaintiff was also tasked with working with sales to answer questions from potential clients about the options and functionality of ExecuTime.  *Id*. at 53:2-18.
[58] *Id*. at 24:10-15, 26:11-13.
[59] *Id*. at 94:15-95:13.

Plaintiff held weekly check-in calls with her assigned implementation consultants (sometimes daily if the implementation consultant needed more hand-holding) and provided regular counseling and feedback to help them improve their performance.[60]  In addition to verbal coaching and feedback, Plaintiff would send coaching emails to implementation consultants that addressed performance issues.[61]  Plaintiff also created implementation task lists for her implementation consultants to ensure they knew how to handle certain tasks—e.g., whether a particular task could be worked on simultaneously with another task.[62]  Sometimes Plaintiff would work with her supervisors to develop a performance action plan to get address performance issues of an implementation consultant.[63]

Plaintiff also participated in recruiting and interviewing new hires.[64]  During her tenure, Plaintiff referred several candidates to Tyler, five of whom were hired.[65]  Plaintiff also participated in second-level roundtable interviews of candidates.[66]  After the roundtable interviews, Plaintiff would rank the candidates and provide her feedback.[67]  On more than one occasion, Plaintiff's supervisor hired an implementation consultant because of Plaintiff's feedback.[68]

---

[60] *Id*. at 103:6-20, 130:17-19, 132:19-133:2, 146:6-11, 155:1-3, 164:23-165:2, Ex. 11 (Plaintiff email with IC coaching).
[61] *Id*. at 133:3-17, 135:17-20, 149:6-151:16, Exs. 9 (Plaintiff email to IC with tasks), 10 (Plaintiff email with implementation tracker), & 12 (Plaintiff coaching/task email to IC).
[62] *Id*. at 95:14-96:11, Ex. 4 (Plaintiff email with checklist for IC).
[63] *Id*. at 130:5-16, 152:5-17, 158:3-22, 159:4-7, Ex. 13 (Plaintiff email with client complaints re: IC) & 16 (Plaintiff email with feedback re: IC).
[64] *Id*. at 75:19-78:9.
[65] *Id*. at 76:6-14.
[66] *Id*. at 76:15-77:4.
[67] *Id*. at 77:12-78:1.
[68] Ex. 2, Burns Decl. at ¶ 20.  Plaintiff also helped roll out new ExecuTime functionalities.  After the development team created a new functionality, Plaintiff would review it to determine if it made sense and provide feedback.  Ex. 1, Pl. Dep. 64:5-13.  Then, after the new functionality was released, Plaintiff would train implementation consultants and project managers on the new functionality.  *Id*. at 62:18-64:13.  Similarly, Plaintiff would also facilitate modifications to ExecuTime for clients.  Plaintiff would receive an enhancement request from a client and relay it to management.  *Id*. at 78:10-79:7.  If the modification was created, Plaintiff would review it and make recommendations, if needed.  *Id*.

**Defendant's Motion for Summary Judgment – Page 8**

c.     *Allocation of Senior Project Manager duties*

Plaintiff estimates that she spent the majority of her time, more than 50% in her estimation, "[r]amping up new hires, getting them prepared to be able to conduct trainings on their own, and helping them through understanding tasks and the timeliness of that."[69]   The new hires Plaintiff "ramped up" included both implementation consultants and project managers.[70]  Plaintiff estimates that she spent approximately 30% of her time on client calls, creating implementation timelines and ensuring the availability of the resources (i.e., implementation consultants, development, and tech support) needed for an implementation.[71]  The remaining roughly 20% of Plaintiff's time was spent following up on support issues, managing project tickets, and conducting client trainings.[72]

Plaintiff's job duties that were the most important to Tyler involved ensuring the success of client implementations.[73]   As discussed above, Plaintiff accomplished that by driving the implementation and navigating any road-blocks during an implementation.[74]   Road-blocks could include missed deadlines, reworking the implementation timeframe, product issues, resolving client concerns, managing implementation consultants' performance and assignments.[75]

2.     Plaintiff's Role as an Implementation Analyst

Around October 2019, Plaintiff applied for a transfer to an Implementation Analyst position with Tyler.[76]  Plaintiff was hired into the role and started on November 18, 2019.  She

---

[69] *Id.* at 179:6-21; 182:3-10 ("Spending one-on-one time with them; you know; training them on the application to increase their knowledge; you know, assisting them with troubleshooting issues with support that they'd run into that I'm not able to, you know, address right off the bat; creating cheat sheets, just Word document cheat sheets to help them, you know, stay organized and keep up with action items that came up to ensure they follow up.").
[70] *Id.* at 179:16-21.
[71] *Id.* at 179:22-180:18, 181:15-21.
[72] *Id.* at 180:19-181:11.
[73] Ex. 2, Burns Decl. at ¶ 12.
[74] *Id.*
[75] *Id.*
[76] Ex. 1, Pl. Dep. 183:8-11.

**Defendant's Motion for Summary Judgment – Page 9**

remained in that role until she resigned on June 17, 2021.[77]  Plaintiff worked remotely and reported to Kayla Wagner, Manager, Implementation Analysts.[78]

Plaintiff moved into the Implementation Analyst role with the goal of helping project managers and implementation consultants with less ExecuTime experience than Plaintiff.[79]  The ExecuTime Implementation Analyst position was a new role for Tyler.  As the only Implementation Analyst for the ExecuTime product, Plaintiff supported the entire ExecuTime implementation team.[80]  The Implementation Analyst's role paired project managers and implementation consultants with a subject matter expert—Plaintiff—who could assist with implementations by resolving issues and/or answering questions that arose during the implementation that required a higher degree of expertise to assess and address.[81]

Plaintiff's primary responsibility as an Implementation Analyst was to ensure that issues that arose during an implementation did not disrupt the implementation schedule.[82]  As an example, on one occasion in May 2021, Plaintiff traveled to a client to help with an implementation that was off schedule to ensure the client would go-live on time.[83]  In order to accomplish this, Plaintiff hosted multiple training sessions and reconfigured ExecuTime in several areas where calculations were incorrectly done.[84]

On other occasions, Plaintiff worked directly with clients to resolve implementation issues and to assist with highly complex applications or processes.[85]  In those instances, Plaintiff would

---

[77] *Id*. at 183:12-14, 226:15-17.
[78] *Id*. at 187:18-20, 210:12-15, Ex. 3, Wagner Decl. at ¶ 2.
[79] Ex. 1, Pl. Dep. at 184:23-185:5, Ex. 19 (Plaintiff's application for IA role).
[80] *Id*. at 194:7-12, 233:23-25.
[81] *Id*. at 194:21-195:17; Ex. 3, Wagner Decl. ¶¶ 3-4.
[82] Ex. 1, Pl. Dep. 202:19-22, 215:3-15, 233:21-23 ("You know, we couldn't have ICs canceling training because they weren't getting what they needed from me.").
[83] *Id*. at 188:2-10, 188:20-191:7.
[84] *Id*.
[85] *Id*. at. 199:6-15, 200:17-201:1.

**Defendant's Motion for Summary Judgment – Page 10**

work to resolve the issue herself or would pull in the appropriate resources (e.g., development team or technical services management team) to resolve the client's issue.[86]  To ensure that issues were resolved efficiently, Plaintiff used her leadership skills to improve communication and coordination among the team.[87]

Plaintiff also resolved implementation issues by responding to tickets submitted by project managers and implementation consultants.[88]  Plaintiff worked through tickets based on priority.[89] If an issue was "critical" and required immediate attention (e.g., an issue during go-live or training), an implementation consultant or project manager would reach out to Plaintiff directly.[90]

Plaintiff was able to resolve complex tickets based on her deep experience with the ExecuTime software.[91]  Other ways Plaintiff would resolve issues included researching internal articles posted by other departments and teams, logging into the system to try to re-create the issue herself, and talking to development and technical services management.[92]  If Plaintiff had involved the development team to help resolve a ticket and they needed to see a client's data to help resolve the issue, at the time, Plaintiff had the authority to go into the client's system and capture a database backup.[93]  Plaintiff would then use the backup to write a development ticket that would enable development team to create an improvement for the product to resolve the issue.[94]  The ability to capture a database backup and write a development ticket was not something that implementation

---

[86] Id. at 201:2-16.

[87] Id. at 224:5-225:20.

[88] Id. at 195:1-9.

[89] Id. at 195:7-9.

[90] Id. at 207:20-209:1.  While non-critical tickets were supposed to be submitted through a ticketing system or to an Implementation Analyst email, implementation consultants and project managers who knew of Plaintiff's experience with ExecuTime would sometimes contact her directly.  Id. at 203:18-204:5.

[91] Id. at 204:6-205-10, 207:8-15, Ex. 21 & 22 (sample tickets).  If the client's system was in a test environment, Plaintiff would make the configuration change herself to resolve the issue.  Id. at 205:11-206:9.  If the system was in a production environment, Plaintiff would relay the steps to the project manager or the implementation consultant.  Id.

[92] Id. at 222:23-223:10.

[93] Ex. 3, Wagner Decl. at ¶ 7.

[94] Id.

teams could do, but was a function reserved for a subject-matter expert, like Plaintiff.  If Plaintiff was not able to assist development by creating this kind of software fix, the implementation would have to be put on hold, which would then cause delays to the implementation schedule.[95]

Plaintiff also conducted training for Tyler's project managers and implementation consultants.[96]  The training included a three-day project management summit in Texas.[97]  During the Texas trainings, Plaintiff answered questions, drawing on her ExecuTime experience, and discussed issues that project managers and implementation consultants experienced during their ExecuTime implementations.[98]

Plaintiff also conducted trainings in Maine on ExecuTime for newly hired project managers and implementation consultants.[99]  The training was the new hires' first exposure to ExecuTime.[100]  The training spanned four days and provided an exhaustive overview of the ExecuTime implementation process.[101]  It was Plaintiff's responsibility to ensure that the new hires received adequate training to enable them to perform implementations in the field.[102]  If Plaintiff did not perform her training duties, Tyler's newly hired implementation consultants would not be able to perform implementations.[103]  Plaintiff was selected to perform the new hire training because of her expertise with ExecuTime.[104]

---

[95] *Id.*
[96] Ex. 1, Pl. Dep. 188:13-19; Ex. 3, Wagner Decl. at ¶¶ 9-10.
[97] Ex. 3, Wagner Decl. ¶10.
[98] Ex. 1, Pl. Dep.  193:19-194:2, 194:3-6, Ex. 3, Wagner Decl. at ¶ 10.
[99] Ex. 1, Pl. Dep. 188:14-19, 192:11-20; 221:5-9. Ex. 3, Wagner Decl. ¶ 9.
[100] Ex. 3, Wagner Decl. ¶ 9.
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.* Plaintiff also hosted quarterly "ExecuTime 101" training sessions for implementation consultants and project managers that lasted up to an hour and addressed a variety of ExecuTime topics.  Ex. 1, Pl. Dep. 221:10-222:7.

**Defendant's Motion for Summary Judgment – Page 12**

Plaintiff also created knowledge transfer materials.[105]  These materials included "how to" guides for ExecuTime configurations, knowledge-based standard ("KBS") articles, and Confluence pages.[106]  KBS articles summarized an issue Plaintiff encountered and the steps she took to resolve it using her experience with ExecuTime.[107]  When implementation consultants or project managers encountered an issue with an implementation, they could consult the KBS articles to see if the article provided a resolution.[108]  Similarly, the Confluence pages would be updated by Plaintiff to address different implementation issues as they arose and could be consulted by implementation analysts and project managers.[109]

## II.     ISSUES TO BE DECIDED BY THE COURT

1.     Whether there is a genuine issue of material fact that Plaintiff's role as a Senior Project Manager was properly classified as exempt under the FLSA's administrative and executive exemptions.

2.     Whether there is a genuine issue of material fact that Plaintiff's role as a Senior Project Manager was properly classified as exempt under the FLSA's executive exemption.

3.     Whether there is a genuine issue of material fact as to whether Tyler willfully violated the FLSA.

## III.    ARGUMENTS AND AUTHORITY

### A.     Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *see Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993).  A fact dispute is "genuine" if there is evidence

---

[105] Ex. 1, Pl. Dep. at 197:8-18.
[106] *Id*.
[107] *Id*. at 197:25-198:17.
[108] *Id*.
[109] *Id*. at 211:22-213:11.

**Defendant's Motion for Summary Judgment – Page 13**

in the record that would permit a reasonable jury to find for the non-movant.  *See Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 628 (5th Cir. 2013). Where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgement is appropriate.  *Templet v. HydroChem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004).

### B.    FLSA Exemptions

Under the FLSA, certain employees are exempt from overtime, including those who work in a bona fide administrative or executive capacity.  *See* 29 U.S.C. § 213(a).  When determining if an FLSA exemption applies, the United States Supreme Court has clarified that courts should give the exemptions "a fair reading," as opposed to a narrow interpretation previously applied by certain federal courts.  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

To qualify for the administrative or executive exemption, the employee's job duties must satisfy a primary duties test specific to the exemption.   29 C.F.R. §§ 451.200(a)(1)-(3), 541.100(a)(2).[110]  The Department of Labor ("DOL") regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs."   29 C.F.R. § 541.700(a).  Factors to consider when determining the primary duty of the employee include: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  *Id.*

---

[110] The parties do not dispute that Plaintiff satisfied the salary basis test portion of the FLSA exemptions.  As a Senior Project Manager, Plaintiff received a salary of $64,400/year.  *Id.* at 18:5-8.  As an Implementation Analyst, Plaintiff received a salary of $72,500.  *Id.* at 187:5-7.

**Defendant's Motion for Summary Judgment – Page 14**

A.   **Plaintiff's Primary Duties as a Senior Project Manager**

Plaintiff's most important duties to Tyler as a Senior Project Manager were managing ExecuTime implementations.[111]  Plaintiff, on the other hand, testified that she spent the majority of her time as a project manager training and managing implementation consultants.[112]  Any inconsistency in the evidence as to Plaintiff's primary duties as a Senior Project Manager is immaterial as both of the functions described above, as well as most or all of the other duties Plaintiff acknowledges she performed, involved exempt duties under the FLSA.[113]

B.   **Plaintiff's Primary Job Duties as a Senior Project Manager Satisfy the Executive Exemption**

    1.   Legal Standard for the Executive Exemption

To qualify as a bona fide executive, an employee must: (1) be primarily responsible for management duties; (2) customarily and regularly direct the work of two or more other employees; and (3) have hiring and firing authority, or whose suggestions about promotion and termination are given "particular weight." 29 C.F.R. § 541.100.

    2.   Plaintiff's Primary Duties as a Senior Project Manager Satisfy the Executive Exemption

        a.   *Plaintiff's primary duties involved managing a customarily recognized subdivision of Tyler*

As a Senior Project Manager, Plaintiff's primary duties involved managing an ExecuTime implementation team.   The ExecuTime implementation team constitutes a "recognized subdivision" under the FLSA.  *See* 29 C.F.R. § 541.103 (defining a recognized department or

---

[111] Ex. 2, Burns Decl. at ¶ 12.
[112] Ex. 1, Pl. Dep. 179:6-21; 182:3-10 ("Spending one-on-one time with them; you know; training them on the application to increase their knowledge; you know, assisting them with troubleshooting issues with support that they'd run into that I'm not able to, you know, address right off the bat; creating cheat sheets, just Word document cheat sheets to help them, you know, stay organized and keep up with action items that came up to ensure they follow up.").
[113] *See* 29 C.F.R. § 541.708 (stating that employee whose primary duties involve a combination of exempt administrative and exempt executive work may qualify for exemption so long as the other requirements, such as the salary basis test, are met).  "Tacking" of exemptions is permissible when (1) an employee performs more than one type of work that would be exempt that (2) neither type of work alone can be termed the employee's primary duty, but (3) all of the putatively exempt work taken together constitutes the employee's primary duty.  29 C.F.R. § 541.600.

**Defendant's Motion for Summary Judgment – Page 15**

subdivision as a unit with "permanent status and a continuing function. For example, a large employer's human resources department might have subdivisions for labor relations, pensions and other benefits, equal employment opportunity, and personnel management, each of which has a permanent status and function."); *see also Cobb v. Finest Foods, Inc.*, 755 F.2d 1148, 1150 (5th Cir. 1985) (holding that an employee who manages the hot foods section of various cafeterias was exempt in part because the sections were recognized subdivisions of the cafeterias); *Villegas v. Dependable Constr. Servs.*, No. 4:07-cv-2165, 2008 U.S. Dist. LEXIS 98801, at *47 (S.D. Tex. 2008) (finding construction projects are a customarily recognized department or subdivision).

With respect to the executive exemption, "management" activities include:

> ***interviewing,*** selecting, and ***training of employees***; setting and adjusting their rates of pay and hours of work; ***directing the work of employees***; maintaining production or sales records for use in supervision or control; ***appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status***; handling employee complaints and grievances; disciplining employees; ***planning the work***; determining the techniques to be used; ***apportioning the work among the employees***; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; ***planning and controlling the budget***; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102 (emphasis added).

Plaintiff's duties as a Senior Project Manager constitute management activities under the FLSA.  Plaintiff testified she spent more than 50% of her time training implementation consultants and other project managers.[114]   Plaintiff also testified she: interviewed implementation consultants;[115] provided detailed task lists to implementation consultants;[116] prepared performance

---

[114] Ex. 1, Pl. Dep. 179:6-21; 182:3-10.
[115] *Id*. at 75:19-78:9.
[116] *See id*., Ex. 9 (Plaintiff email to IC with tasks).

**Defendant's Motion for Summary Judgment – Page 16**

evaluations for implementation consultants;[117] escalated implementation consultants' performance to her supervisor so the issues could be addressed;[118] and managed the budget to ensure an implementation did not exceed the allocated hours.[119]  Plaintiff even emailed her manager "to discuss some pointers on how to ***manage*** IC's. I'm just trying to get ahead of the issues I'm seeing within ***my team***."[120]  The resume Plaintiff prepared for the Senior Project Manager role establishes her management activities.  In one bullet, Plaintiff listed "Manages, monitor, and motivates the cross-functional team assigned to each project."[121]  Plaintiff's job duties as a Senior Project Manager thus align with exempt managerial duties.  *See King v. Stevenson Beer Distrib. Co*, 11 F. Supp. 3d 772, 782-83 (S.D. Tex. 2014) (finding managerial duties where plaintiffs trained employees, provided employees with daily assignments and instruction, documented employees' performance, and coached employees on how to improve their performance); *Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 630 (E.D. Tex. 2008) (finding managerial duties when plaintiffs supervised, trained, and directed/apportioned the work of other employees and ensured achievement of production goals, despite the fact the plaintiffs could not discipline the employees).

> b. *Plaintiff's primary duties involved customarily and regularly directing the work of at least two or more other full-time employees at Tyler*

The Senior Project Manager role involves customarily and regularly directing the work of at least two or more implementation employees.[122]  The DOL regulations do not specify that an employee must direct the work of two or more employees *at the same time*.  And courts have held that an employer can satisfy the requirement by viewing the work of subordinates in the aggregate.

---

[117] *Id*. 155:11-156:25; Ex. 2, Burns Decl. at ¶ 19.
[118] *See* Ex. 1, Pl. Dep. Ex. 16 (Plaintiff email with feedback re: IC).
[119] *Id*. 23:9-12, 123:24-124:2.
[120] *Id*. Ex. 8 (emphasis added).
[121] *Id*. 56:3-57:25, Ex. 2 (Plaintiff's resume).
[122] All of the implementation consultants and project managers were full time employees.  Ex. 2, Burns Decl. at ¶ 2.

**Defendant's Motion for Summary Judgment – Page 17**

*In re Family Dollar FLSA Litig.*, 637 F.3d 508, 513-14 (4th Cir. 2011) (holding employee "customarily and regularly" directs the work of two or more employees if, in aggregate, the "subordinates work 80 hours or more per week," and the supervision is "greater than occasional" but "may be less than constant," without identifying a requirement of simultaneous supervision); *Scalia v. Sofia & Gicelle, Inc.*, No. TDC-19-0934, 2020 U.S. Dist. LEXIS 244645, at *53 (D. Md. 2020) (finding chef/kitchen manager-plaintiff satisfied the requirement of regularly directing the work of two or more employees because during the relevant time period the employer employed seven total cooks and generally employed two cooks in any given time period).

Plaintiff testified that the majority of her time was spent training implementation consultants and project managers.[123]   Moreover, Senior Project Managers (including Plaintiff) handled a higher number of implementations and were actually assigned more than one implementation consultant at a time.[124]   In fact, Plaintiff specifically asked her manager to be assigned more than one implementation consultant because Plaintiff needed assistance and wanted managerial responsibilities.[125]   Plaintiff also testified that, in addition to the implementation consultant she was assigned, she would work with other implementation consultants depending on project need or the availability of resources.[126]   Project managers and implementation consultants were frequently cross-staffed, and Plaintiff would provide management—in the form of training, feedback/coaching, and directing/apportioning work—for all of the implementation consultants she supervised.[127]   As a result, Plaintiff customarily and regularly directed the work of at least two or more implementation team members.

---

[123] Ex. 1, Pl. Dep. 179:6-21; 182:3-10
[124] Ex. 2, Burns Decl. at ¶¶ 15, 21.
[125] *Id*. at ¶ 15.
[126] Ex. 1, Pl. Dep. 73:11-19, 137:5-11, 153:7-11.
[127] Ex. 2, Burns Decl. at ¶¶ 16-17.

**Defendant's Motion for Summary Judgment – Page 18**

c.    *Plaintiff's suggestions and recommendations as to the hiring, firing, advancement, promotion of other employees were given particular weight*

Factors that establish that an employee's suggestions and recommendations as to the hiring, firing, advancement, or promotion of other employees are given "particular weight" include: "(1) whether it is part of the employee's job duties to make such suggestions and recommendations; (2) the frequency of which such suggestions are recommendations are made or requested; and (3) the frequency with which such suggestions and recommendations are relied upon."  29 C.F.R. § 541.105.  An employee's suggestions can "still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision."  *Id.*; *see also Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1083 (E.D. Tex. 2011).

Plaintiff acknowledges that Tyler relied on her suggestions and recommendations as to the hiring, firing, advancement, and promotion of implementation consultants were given particular weight.  During her deposition, Plaintiff testified that she: (1) essentially wrote a performance evaluation for an implementation consultant;[128] (2) interviewed implementation consultants and provided her feedback as to hiring;[129] (3) regularly provided feedback to her manager regarding the job performance of implementation consultants;[130] and (4) coached her implementation consultants on how they could improve their job performance.[131]  Plaintiff's manager relied on Plaintiff's insight and feedback regarding the implementation consultants in order to make employment decisions like hiring or discipline.  Specifically, Tyler hired multiple implementation

---

[128] Ex. 1, Pl. Dep. 155:11-156:25; *see also* Ex. 2, Burns Decl. at ¶ 19.
[129] Ex. 1, Pl. Dep. at 75:19-78:9.
[130] *Id.* at 130:5-16, 152:5-17, 158:3-22, 159:4-7, Ex. 13 (Plaintiff email with client complaints re: IC) & 16 (Plaintiff email with feedback re: IC).
[131] *Id.*  at 103:6-20, 130:17-19, 132:19-133:2, 146:6-11, 155:1-3, 164:23-165:2, Ex. 11 (Plaintiff email with IC coaching).

**Defendant's Motion for Summary Judgment – Page 19**

consultants based on Plaintiff's feedback.[132]   In addition, Plaintiff's feedback resulted in implementation consultants being reassigned and receiving performance improvement plans.[133]

### C.   Plaintiff's Primary Job Duties as a Senior Project Manager and as an Implementation Analyst Satisfy the Administrative Exemption

#### 1.   Legal Standard for the Administrative Exemption

The primary duties test for the administrative exemption requires: (1) the performance of office or non-manual work directly related to the management policies or general business operations of the employer or the employer's customers; and (2) the exercise of discretion and independent judgment on matters of significance.  29 C.F.R. § 541.200(a)(2)-(3).

a.   *The performance of office or non-manual work directly related to the management policies or general business operations of the employer or the employer's customers*

To meet the requirement that an employee perform work "directly related to the management or general business operations" of the employer or the employer's customers, an employee "must perform work directly related to assisting with the running or servicing of the employer's or the employer's customers' business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  The DOL regulations provide examples of work that is considered "directly related to management or general business operations," including: "budgeting; auditing; . . . quality control; . . . research; . . . personnel management; . . . computer network, internet and database administration . . . ."  29 C.F.R. § 541.201(a), (b).

---

[132] Ex. 2, Burns Decl. at ¶ 20.
[133] *Id*. at ¶ 18.

**Defendant's Motion for Summary Judgment – Page 20**

Work may also be "directly related" if it is of substantial importance to the employer's business operations, in that it involves major assignments in conducting operations of the business or affects business operations to a substantial degree. *See* 29 C.F.R § 541.203(c). For example:

> [A] lead auditor who oversees an audit team in an auditing agency and who is assigned responsibility for leading a major audit requiring the use of substantial agency resources. This auditor is responsible for proposing the parameters of the audit and developing a plan of action and milestones to accomplish the audit. Included in the plan are the methodologies to be used, the staff and other resources required to conduct the audit, proposed staff member assignments, etc. When conducting the audit, the lead auditor makes on-site decisions and/or proposes major changes to managers on matters of significance in accomplishing the audit, including deviations from established policies and practices of the agency.

5 C.F.R. § 551.206(i). "An employee who leads a team of other employees assigned to complete major projects for the employer . . . generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team." 29 C.F.R. § 541.203(c).

With respect to employees whose primary duty is the performance of work directly related to the management or general business operations of the employer's customers, "employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." 29 C.F.R. § 541.201(c).

b.   *The exercise of discretion and independent judgment on matters of significance*

The DOL regulations define the exercise of independent judgment as "involv[ing] the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Matters of significance refers "to the level of importance or consequence of the work performed." *Id*. The DOL provides a *non-exhaustive* list of factors to consider when determining whether an employee exercises discretion and independent judgment on matters of significance:

(1) whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; (2) whether the employee carries out major assignments in conducting the operations of the business; (3) whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; (4) whether the employee has authority to commit the employer in matters that have significant financial impact; (5) whether the employee has authority to waive or deviate from established policies or procedures without prior approval; (6) whether the employee has the authority to negotiate and bind the company on significant matters; (7) whether the employee provides consultation or expert advice to management; (8) whether the employee is involved in planning long- or short-term business objectives; (9) whether the employee investigates and resolves matters of significance on behalf of management; and (10) whether the employee represents the company in handling complaints, arbitrating disputes, or resolving grievances.

29 C.F.R § 541.202(b).  "'[D]iscretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." *Id*.

The exemption does not, however, "require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."  29 C.F.R § 541.202(c).  Rather, "decisions made as a result of the exercise of independent judgment may consist of recommendations for action rather than the actual taking of action." *Id*.

2. <u>Plaintiff's Primary Duties as a Senior Project Manager Satisfy the Administrative Exemption</u>

a. *Plaintiff's primary duties included performing work directly related to assisting with the running or servicing of Tyler's and its customers' business*

(1) Plaintiff's primary duties involved office or nonmanual work, not production work

Plaintiff's most important duties were ensuring the success of an implementation from start to finish.[134]  Such duties are not production duties, but relate to assisting with the running or servicing of Tyler' business.  The product Tyler makes is its software that it sells to its government

---

[134] *Id*. at ¶ 12.

**Defendant's Motion for Summary Judgment – Page 22**

clients.[135]   Plaintiff did not develop the software or sell it to customers.[136] However, Tyler's software cannot be operationalized, and Tyler cannot secure the recurring revenues of maintenance and support, without the software being implemented and put into live production by its implementation teams, led by project managers such as Plaintiff.[137]   As discussed below, case law holds that this type of role is ancillary to Tyler's principal production activity and is administrative.

Plaintiff's primary job duties are analogous to the plaintiffs in *Cowart v. Ingalls Shipbuilding, Inc*., 213 F.3d 261, 263 (5th Cir. 2000).   In *Cowart*, the plaintiffs were senior production planners for ship construction projects and were responsible for overseeing the projects and ensuring the projects were on schedule.   *Id*.   The plaintiffs "took production drawings and planned when each component of those drawings would be fabricated and installed."   *Id*.   They also "created work bills and tied the scheduled installation to particular work bills. They planned when, where, and by whom particular work would be performed, and integrated that work into Ingalls's work bill and scheduling system."   *Id*.   The Fifth Circuit held that the employees' duties were primarily intellectual in nature and did not involve manual or mechanical work.   *Id*.

Like *Cowart*, Plaintiff planned out the implementation schedule, accounting for the client's specific implementation needs;[138] Plaintiff assigned implementation consultants (and on occasion, other teams) tasks and the deadlines for completing those tasks;[139] and Plaintiff ensured that all of the tasks and progress was captured in the implementation timeline.[140]   Plaintiff was also

---

[135] *Id*. at ¶¶ 11-12.
[136] *Id*. at ¶ 12.
[137] *Id*. at ¶ 11.
[138] Ex. 1, Pl. Dep. 20:14-21:21, 22:20-23:8.
[139] *Id*. at 57:16-59:9, 69:10-70:7, 132:4-15, Ex. 9 (Plaintiff email to IC with tasks).
[140] *See id*., Exs. 5 & 6 (implementation timelines created by Plaintiff).

**Defendant's Motion for Summary Judgment – Page 23**

responsible for resolving the myriad of issues that could arise during an implementation.[141] Plaintiff's job duties were "intellectual" in the same sense as the plaintiffs in *Cowart*.

        (2)    <u>Plaintiff's primary duties involved major projects for Tyler</u>

Like the lead auditor in the DOL regulations, Plaintiff performed major projects, i.e., implementations, for Tyler. [142] *See* 5 C.F.R. § 551.206(i). Implementations last several months, if not more than a year.[143] The success of an implementation has a major impact on Tyler's operations.[144] If a product is not successfully implemented, the client cannot use the product.[145]

Managing an implementation from start to finish was Plaintiff's primary duty.[146] When managing an implementation, Plaintiff would adjust the scope and timing of an implementation based on the nuances of the particular client.[147] Plaintiff also ensured all milestones were achieved by delegating assignments to implementation consultants, ensuring implementation consultants' successful completion of assigned tasks, and bringing in other resources as needed.[148] Plaintiff secured an implementation's success by relying on her expertise to resolve issues that would arise during the implementation.[149] Plaintiff's successful performance of her job duties was directly linked to the successful implementation of Tyler's products on its clients' systems.[150]

        (3)    <u>Plaintiff's primary duties involved management</u>

Part of ensuring an implementation was successful from start to finish involved managing the implementation consultants assigned to Plaintiff's implementations.[151] Such "management"

---

[141] Ex. 2, Burns Decl. ¶¶ 7, 12; Pl. Dep. 71:7-13.
[142] Ex. 2, Burns Decl. at ¶ 11.
[143] *Id.*
[144] *Id.*
[145] *Id.*
[146] *Id.* at ¶ 12.
[147] Ex. 1, Pl. Dep. 20:14-21:21, 22:20-23:8.
[148] *Id.* at 57:16-59:9, 69:10-70:7, 132:4-15, Ex. 9 (Plaintiff email to IC with tasks)..
[149] *Id.* at 81:20-84:1; Ex. 2, Burns Decl. at ¶ 12.
[150] Ex. 2, Burns Dec. at ¶¶ 9, 11.
[151] Ex. 1, Pl. Dep. 95:14-96:11, Ex. 4 (Plaintiff email with checklist for IC); Ex. 2, Burns Decl. at ¶¶ 17-19.

functions are exempt duties.  For example, in *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326 (5th Cir. 2000), the Fifth Circuit held that duties similar to those performed by Plaintiff constituted nonmanual work directly related to the running or servicing of the employer's business. Specifically, in *Lott*, the plaintiff's duties included coordinating the work of other employees, disciplining employees, evaluating the employees' job performance, conducting employees' annual performance reviews, making recommendations to her supervisor regarding the hiring of new employees and discharging of present employees, and supervising the orientation and training of new office employees.  *Id*. at 332.

Here, Plaintiff testified that she assigned specific implementation tasks to implementation consultants;[152] provided coaching and feedback to the implementation consultants;[153] escalated performance issues and client complaints regarding the implementation consultants to her supervisor;[154] completed a performance evaluation, at her supervisor's request, for an implementation consultant;[155] and trained new project managers and implementation consultants to ensure they were up to speed and able to perform an implementation.[156]  The similarity of Plaintiff's duties and the *Lott* plaintiff's duties demonstrate the exempt nature of her role.

> (4)  Plaintiff's primary duties involved the performance of work directly related to the running of Tyler's clients' businesses

Plaintiff's primary duties also included performing work directly related to assisting with the running or servicing of Tyler's clients' businesses.  As part of managing an implementation, Plaintiff drew on her ExecuTime expertise to advise Tyler's clients' on how to modify their payroll practices to align with ExecuTime.  For example, Plaintiff testified that after consulting with her,

---

[152] Ex. 1, Pl. Dep. 95:14-96:11, Ex. 4 (Plaintiff email with checklist for IC);
[153] *Id*. at 103:6-20, 130:17-19, 132:19-133:2, 146:6-11, 155:1-3, 164:23-165:2, Ex. 11 (Plaintiff coaching email).
[154] *Id*. at 130:5-16, 152:5-17, 158:3-22, 159:4-7, Ex. 13 (Plaintiff email with client complaints re: IC) & 16 (Plaintiff email with feedback re: IC).
[155] *Id*. 155:11-156:25; *see also* Ex. 2, Burns Decl. at ¶ 19.
[156] Ex. 1, Pl. Dep. 179:6-21; 182:3-10.

**Defendant's Motion for Summary Judgment – Page 25**

clients would change from requiring manual clocking in/out to prepopulating a time card for certain employees based on their job duties.[157]  In other instances, clients would change how they ran payroll, shifting the timing to reflect the change in processing time with ExecuTime.[158] Plaintiff also used her expertise with ExecuTime to resolve issues during an implementation and to structure the implementation to align with the client's needs.[159]

Plaintiff's primary job duties are similar to the plaintiffs in *Zannikos v. Oil Inspections (U.S.A.), Inc*., 605 F. App'x 349, 353 (5th Cir. 2015).[160]  In *Zannikos*, the plaintiffs oversaw the transfer and blending of petroleum products and provided the employer's customers with operation support services.  *Id*.  The Fifth Circuit held the employees' duties were not production services, but involved "technical expertise" provided by the employer to its customers.  *Id*.  Similarly, Plaintiff's technical expertise with respect to ExecuTime, and her utilization of that expertise during the implementation process, establishes the exempt nature of her duties.

        b.    *Plaintiff's primary duties involved exercising discretion and independent judgment on matters of significance*

Plaintiff's primary duties also involved the exercise of discretion and independent judgment on matters of significance.[161]  As the main point of contact for clients, Plaintiff was responsible for resolving clients' concerns during implementations.[162]  When product issues arose during an implementation, Plaintiff was responsible for ensuring the issues were resolved.  She would either used her expertise to resolve the issue herself or would determine the appropriate

---

[157] *Id*. at 85:13-89:1.

[158] *Id*. at 85:13-89:1.

[159] *Id*. at 20:14-21:21, 22:20-23:8, 82:24-84:1.

[160] The Fifth Circuit rejected the argument that the employees' duties were not related to the management of their employer's customers because the employees performed the same services offered by their employer.  *Zannikos,* 605 F. App'x at 354.  The court noted that most consultants perform the "perform the precise services offered to customers by the accounting and consulting firms for which they work."  *Id*.

[161] Indeed, Plaintiff's performance evaluations ranked her decision making skills and noted that Plaintiff needed little oversight.  *See* Ex. 1, Pl. Dep., Ex.  25 at p. 11 (Plaintiff's performance evaluations).

[162] *Id*. 42:9-16, 42:21-43:3; Ex. 2, Burns Decl. ¶ 7.

internal resources and engage with those resources to reach a resolution.[163]   Plaintiff also maintained the implementation timeline and the solution design—the documents that dictated the course of the implementation—and would adjust them based on her discussions with the client, her experience with ExecuTime, and as issues arose during the implementation.[164]   Plaintiff's testimony is clear that she heavily customized implementation timeline and the solution design.[165] As a result, the fact that the documents started out as templates does not preclude an exempt finding.   *See Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (holding that consulting manuals or guidelines does not preclude the exercise of discretion and independent judgment); *Self v. Meritage Homes Corp.*, No. G-11-0070, 2014 U.S. Dist. LEXIS 70941, at *20 (S.D. Tex. 2014) (rejecting argument that plaintiffs did not exercise discretion and independent judgment because scheduling software created deadlines because the deadlines set by the software were adjusted based on input from plaintiffs).

Implementations also constitute matters of significance for Tyler and Tyler's clients.   As discussed above, if an implementation failed, the client would be unable to use Tyler's product to process its employee payroll.[166]   Plaintiff's job duties and the importance of a successful implementation demonstrate Plaintiff's discretion and independent judgment and comport with the factors set out in the DOL regulations.   *See* 29 C.F.R § 541.202(b).

---

[163] Ex. 1, Pl. Dep. 71:7-13, 81:20-84; Ex. 2, Burns Decl. ¶ 12.
[164] Ex. 1, Pl. Dep. 30:31:21, 37:14-20 163:10-164:2; Ex. 2, Burns Decl. ¶ 13.
[165] *See id.*
[166] Ex. 2, Burns Decl. ¶ 11.

3.    <u>Plaintiff's Primary Duties as an Implementation Analyst Satisfy the Administrative Exemption</u>

        a.    *Plaintiff's primary duties included work directly related to assisting with the running or servicing of Tyler's business*

Plaintiff's primary duty as an Implementation Analyst was to resolve issues that were challenging and often are critical to the success of a particular implementation project.[167]  As the sole Implementation Analyst for the ExecuTime implementation team, Plaintiff's Implementation Analyst role was integral to Tyler.[168]  Without Plaintiff providing her critical subject-matter expertise to the implementation team, ExecuTime implementations would not have proceeded on track.[169]  *See Koppinger v. American Interiors, Inc.*, 295 F. Supp. 2d 797, 801 (N.D. Ohio 2003) (finding plaintiff who resolved employee's computer problems exempt because plaintiff was responsible for the computer system that was integral to the employer's business operations).

Moreover, Plaintiff's duties involved more than addressing routine trouble tickets.  Plaintiff conducted new-hire training for implementation consultants and trained implementation teams on new ExecuTime functionalities.[170]  Like Plaintiff's issue resolution skills, Plaintiff's training of implementation consultants and project managers was directly tied to successfully implementing the ExecuTime product.[171]  Such duties are not production duties that relate to the development or the sale of the ExecuTime software, but are ancillary duties that relate to the running or servicing of Tyler's ExecuTime business.  *See Rogers v. AT&T Sers., Inc.*, No. 11-C-5550, 2014 WL 4361767 (N.D. Ill. Sept. 3, 2014) (finding problem determination managers who assisted with outage calls involving employer's software application performed duties related to the employer's business operations because they did not sell phones or install network services).

---

[167] Ex. 1, Pl. Dep. 202:19-22, 215:3-15, 233:21-23; Ex. 3, Wagner Decl. at ¶¶ 4-5.
[168] Ex. 1, Pl. Dep. 194:7-12, 233:23-25; Ex. 3, Wagner Decl. at ¶¶ 4-5.
[169] Ex. 1, Pl. Dep. 194:7-12, 233:23-25; Ex. 3, Wagner Decl. at ¶¶ 4-7,
[170] Ex. 1, Pl. Dep. 188:13-19; Ex. 3, Wagner Decl. at ¶¶ 9-10.
[171] Ex. 3, Wagner Decl. at ¶ 9.

b.    *Plaintiff's primary duties involved exercising discretion and independent judgment on matters of significance*

Plaintiff also exercised discretion and independent judgment as an Implementation Analyst.  Plaintiff did not follow a proscribed checklist when resolving issues.  Rather, Plaintiff, as the ExecuTime subject-matter expert, was responsible for resolving issues in real time and creating reference documents for resolving implementation issues.[172]  Moreover, Plaintiff was not passive in the resolution of implementation issues, but rather was actively involved in bringing in the correct resources to reach a resolution if she could not resolve an issue independently.[173]  And, when a particular issue came in, Plaintiff determined whether the issue was critical and needed to be prioritized and addressed before other issues.[174]

Plaintiff's duties as an Implementation Analyst also involved matters of significance. The significance of her role is exemplified by Plaintiff being hand selected by a Vice President of Implementation to travel to a client site to salvage an implementation for a key client.[175]  It was critical the client go live on time, and Tyler selected Plaintiff to make that happen.[176]

**D.    Plaintiff Has Not and Cannot Establish a Willful Violation**

Generally, there is a two-year statute of limitations for an unpaid overtime claim under the FLSA.  29 U.S.C. § 255(a).  However, if the claim results from a willful violation, the statute of limitations is extended to three years.  *Id*.  To establish a willful violation of the FLSA, the employee must prove that the employer knew its conduct was prohibited under the FLSA or showed a reckless disregard as to whether it was prohibited.  *Reich v. Tiller Helicopter Servs*., 8 F.3d 1018, 1036 (5th Cir. 1993).  Reckless disregard is defined as the "failure to make adequate

---

[172] Ex. 1, Pl. Dep. 197:8-18, 202:19-22, 215:3-15, 233:21-23.; Ex. 3, Wagner Decl. at ¶¶ 6-7
[173] Ex. 1, Pl. Dep. 222:23-223:10; Ex. 3, Wagner Decl. at ¶ 7.
[174] Ex. 1, Pl. Dep. 195:7-9.
[175] *Id*. at 188:2-10, 188:20-191:7; Ex. 3, Wagner Decl. at ¶ 6.
[176] *Id*.

inquiry into whether conduct is in compliance with the FLSA."  5 C.F.R. § 551.104.  Mere knowledge of the FLSA and its potential applicability is insufficient to establish willfulness, and conduct that is merely negligent or unreasonable does not satisfy that standard, either.  *Zannikos v. Oil Inspections (U.S.A.), Inc*., 605 F. App'x 349, 360 (5th Cir. 2015).

The Fifth Circuit has ruled that a finding of willfulness is appropriate when the evidence demonstrates that an employer actually knew its pay structure violated the FLSA or ignored complaints that were brought to its attention.  *See Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ*., 579 F.3d 546, 553 n.24 (5th Cir. 2009).  Here, there is no such evidence.  Project managers are regularly classified as exempt across companies.[177]  When Tyler acquired ExecuTime, the project manager role was classified as exempt.[178]  Plaintiff, who currently works as a project manager at another company, testified that her current position as a project manager is exempt.[179]  Moreover, there has been no prior litigation or DOL investigation involving the positions Plaintiff held at Tyler.[180]  In light of the above, all of which Tyler would consider during its regular reviews of exemptions,[181] Tyler did not willfully misclassify Plaintiff.

## IV.    **CONCLUSION**

Plaintiff cannot establish a genuine issue of material fact that Tyler misclassified her as an exempt employee and failed to pay her overtime in violation of the FLSA.  Therefore, Tyler respectfully requests that the Court grant its request for summary judgment and dismiss Plaintiff's lawsuit with prejudice.  Further, even if there is a genuine issue of material fact, Plaintiff cannot establish a willful violation of the FLSA.

---

[177] Ex. 4, Diaz-Pedrosa Decl. at ¶ 4.
[178] *See* Ex. 1, Pl. Dep., Ex. 1 (Plaintiff's offer letter).
[179] *Id*. 227:4-10.
[180] Ex. 4, Diaz-Pedrosa Decl. at ¶ 3.
[181] *Id*. at ¶ 5.

Dated:        February 10, 2022              */s/ Paulo B. McKeeby*
                                             Paulo B. McKeeby (Lead Attorney)
                                             TX State Bar No. 00784571
                                             pmckeeby@reedsmith.com
                                             Amanda E. Brown
                                             TX State Bar No. 24087839
                                             aebrown@reedsmith.com
                                             Reed Smith LLP
                                             2850 N. Harwood St., Suite 1500
                                             Dallas, TX 75201
                                             Telephone:     +1.469.680.4200
                                             Facsimile:     +1.469.680.4299

                                             **ATTORNEYS FOR DEFENDANT**


## CERTIFICATE OF SERVICE

        The undersigned hereby certifies that on February 10, 2022, a true and correct copy of the above was filed using the Court's CM/ECF system that caused notice to be served upon the following:

Charles R. Bridgers                          Melinda Arbuckle
Matthew W. Herrington                        Shellist Lazarz Slobin LLP
DeLong  Caldwell  Bridgers  Fitzpatrick  &   11 Greenway Plaza
Benjamin, LLC                                Suite 1515
101 Marietta St.                             Houston, TX 77046
Ste. 2650                                    marbuckle@eeoc.net
Atlanta, GA 30303
charles.bridgers@dcbflegal.com
matthew.herrington@dcbflegal.com


                                             */s/ Paulo B. McKeeby*
                                             Paulo B. McKeeby


**Defendant's Motion for Summary Judgment – Page 31**