IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **TALIA N. HARRISON,** | |
| **Plaintiff,** | |
| **vs.** | Civil Action No. 4:21-cv-607-ALM |
| **TYLER TECHNOLOGIES, INC.,** | |
| **Defendant.** | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Talia N. Harrison, through the undersigned counsel, hereby responds in opposition to Defendant Tyler Technologies, Inc.'s Motion for Summary Judgment, showing the Court as follows:

**1.   INTRODUCTION**

This is an FLSA action brought by a former "Senior Project Manager" and "Implementation Analyst" against her former employer for unpaid overtime wages. Defendant Tyler Technologies has moved for summary judgment on the basis of the FLSA's Executive and Administrative exemptions and on the question of willfulness. None of its arguments have any merit. Tyler has simply chosen to ignore massive factual disputes that doom each of its arguments.

This is not Defendant's first time defending FLSA claims brought by its employees. In 2008, Tyler was sued in this Court by an implementation consultant for FLSA violations. *Beall et al. v. Tyler Technologies, Inc. et al.*, 2:08-cv-422 TJW (E.D. Tex. 2008). The case settled confidentially after briefing but prior to issuance of the Court's summary judgment order. *See* Dkt. 215.

In 2020, Judge Amy Totenberg of the Northern District of Georgia rejected Defendant's administrative exemption defense and granted summary judgment to a former ExecuTime Implementation Consultant (who, incidentally, worked with Ms. Harrison) on Tyler's exemption defense. *Greene v. Tyler Techs*., 526 F. Supp. 3d 1325, 1329 (N.D. Ga. 2021).[1] The case settled quickly thereafter. *Greene v. Tyler Techs*., 1:19-cv-01338-AT, Dkt. 87 (N.D. Ga. April 14, 2021). Exhibit 1 hereto.

Last year it settled another single-plaintiff FLSA claim brought by an implementation consultant in Arkansas. W*right v. Tyler Techs*., No. 4:20-cv-00454 KGB, 2021 U.S. Dist. LEXIS 177028, at *2 (E.D. Ark. Sep. 17, 2021). Additionally, in 2019, a collective action brought on behalf of Defendant's ExecuTime workers was filed in California; that case recently settled for **$3.26 million**. *Kudatsky et al. v. Tyler Techs.*, No. 3:19-cv-07647-WHA, Dkt. 137 (N.D. Cal. Nov. 17, 2021). Exhibit 2 hereto. So it's safe to say Tyler Technologies is pretty familiar with the FLSA.

In *Greene*, the only case Tyler allowed to get through summary judgment, the district court berated Tyler and its counsel—who are also its current counsel—at length for their blatant dishonesty in their summary judgment briefing. *Greene*, 526 F. Supp. 3d at 1331 n.5 ("it is exasperating that Tyler advances this argument when, throughout its briefing, it misrepresents and stretches Plaintiff's testimony. . . . To characterize this as 'undisputed evidence' . . . is disingenuous. Similarly, Defendant mischaracterizes Plaintiff's brief . . . . The Court has discovered other examples of this stretching of the actual testimony, as well. These slanted and inaccurate representations are not appreciated. The Court expects better.").

---

[1]    In its summary judgment brief, Tyler studiously avoids discussing Judge Totenberg's extensive discussion of the administrative exemption in *Greene*. As shown below, Judge Totenberg's observations doom Tyler's current argument on the administrative exemption issue.

Tyler will no doubt argue in its Reply that Ms. Harrison's role as a Senior Project Manager and Implementation Analyst were completely different from Ms. Greene's Implementation Consultant role, and that *Greene* is thus inapplicable. That can only be maintained by ignoring Ms. Harrison's own evidence and accepting Tyler's purported facts and characterizations at face value, which is not permitted at summary judgment. As Ms. Harrison will show, in both roles she overwhelmingly performed essentially the same type of work that IC's did: she taught people how to correctly use ExecuTime software. For this reason, it is worth examining the *Greene* court's reasoning in detail.

The *Greene* court—only considering the administrative exemption—found that:

- Greene's "work was clearly production rather than administrative." Implementation and training on ExecuTime software "was . . . *always* provided to customers purchasing the ExecuTime software" and thus "the ExecuTime training was an output of the business." *Greene*, 526 F. Supp. 3d at 1340 (quotation omitted).

- "Tyler's contention that Ms. Greene's work was 'critical' to its own business operations because her failure to perform would leave Tyler vulnerable and at reputational risk is an argument that could be applied to nearly any employee in any workplace and is legally without merit. Whether or not an employee is indispensable is insufficient to prove that her primary duties are administrative." *Id.* (citing cases)

- "a reasonable jury could not find that Ms. Greene['s] primary duties involved *advising* [Tyler's] government customers on matters involving running a component of the government or determining the overall course and policies of the government." *Id.* at 1342 (emphasis in original).

- "[Tyler's] argument that Ms. Greene's work of 'troubleshooting' for the government customers renders her exempt is not supported by the DOL regulations, the legal authority, or the facts. The Wage & Hour Division has explained that IT support work, such as work involving "installing, configuring, testing, and troubleshooting computer applications, networks and hardware" does not qualify for the administrative exemption under Section 13(a)(1) of the FLSA. *Id.* at 1344 (citing cases).

For these reasons, as well as others shown below, Tyler's administrative exemption argument must also fail in this case. Its arguments regarding the executive exemption and willfulness should fare no better based on the actual record and not on Tyler's obfuscation.

The long and short of this case's facts—seen in the light most favorable to the Plaintiff—is that Ms. Harrison spent a large majority of her time helping people—both Tyler employees and customers—understand how to use Tyler's ExecuTime software. She was very good at her job, but that doesn't make her exempt. And Tyler recklessly classified her as exempt long after it was formally on notice of its widespread FLSA violations, creating—at a minimum—a jury issue as to willfulness.

## 2.   RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS[2]

Plaintiff Harrison was hired by ExecuTime as a Project Manager/Trainer in August 2013 and was promoted the next year to the position of Manager of Implementation Services. Exhibit 3 (Harrison Declaration), ¶ 2. In 2016, exhausted by the excessive demands of that position, she requested to be *demoted* into the position of Project Manager (PM), which had fewer responsibilities and less authority, and required less travel. Ex. 1, ¶ 3. When Tyler Technologies

---

[2]   Plaintiff does not attempt to restate all relevant facts in full and instead focuses on areas of Defendant's purported facts that are false or require clarification.

acquired ExecuTime, it split the PM role into (1) the Project Manager and (2) the new Implementation Consultant (IC) positions. Ex. 1, ¶ 4. Tyler chose to refer to her as a "Senior" PM, with no explanation of the significance of that designation. Ex. 1, ¶ 5.

As an SPM, Harrison did the same job duties as other PM's, but typically handled far more implementations, not because of her position, but because she had been working with ExecuTime software longer than anyone else and was simply better at her job. Ex. 1, ¶ 6. Both ExecuTime and Tyler had very high turnover and thus few if any employees ever became as familiar with the software as she was. Ex. 1, ¶ 7.

During her time as an SPM, Harrison reported directly to an Implementation Manager (IM). She worked in Tyler's offices, although her direct supervisor was remote. However, other managers were in the same office, including Jamie Burns, with whom she frequently interacted. Harrison was in contact with her IM on a daily basis, typically several times every day, and was closely supervised by her IM at all times. Ex. 1, ¶ 8.

As an SPM, Harrison had a quota of billable hours she was required to meet. These hours were billed to customers who had purchased a package of implementation hours (referred to as a "budget") along with the ExecuTime software itself. Ex. 1, ¶ 9.

Tyler claims that Harrison was "in charge of preparing a high-level project plan" as an SPM, but in reality that merely meant that she used a template prepared by Tyler that listed all the steps required in an implementation of ExecuTime software. She would omit certain steps in the implementation that corresponded to functionalities that had not been purchased by a given customer, and which were not required for the customer's existing payroll practices (e.g., omitting steps relating to comp. time if the customer did not issue comp. time to its employees). Ex. 1, ¶ 10. Harrison would also modify the project plan based on blackout dates provided by the customer

(e.g., dates when the customer's IT personnel or HR director were on vacation and unavailable to participate in the implementation). Ex. 1, ¶ 11.

Harrison had absolutely no discretion about what went into a project plan. She would simply input data gathered from the client on a questionnaire provided by the sales team and then the Excel Workbook they used would generate the plan. Harrison would modify dates in the plan as instructed by the client. Ex. 1, ¶ 12.

Tyler claims that Harrison would "conduct[] initial post-contract meetings with the client."  In these meetings, she would reiterate how the implementation process worked so that the customer could plan accordingly (e.g., make sure that necessary employees were available for training at specific times in the implementation). Her role was simply to convey information to the client in these meetings and had no discretion how the implementation process would proceed. Ex. 1, ¶ 13.

What Tyler refers to as "setting up a project schedule" means simply that Harrison would use Excel Workbook to automatically generate a schedule based on a "kick-off date" chosen by Tyler management in consultation with the customer. She made no significant decision in connection with the schedule beyond making minor adjustments to dates based her own pre-existing schedule and that of the IC assigned to her. Ex. 1, ¶ 14.

Tyler claims that the "day-to-day responsibility for the implementation shifts from the project manager to the implementation consultant" after the plan was completed. But this was not always the case, and Harrison frequently performed the role of IC herself. Harrison recalls projects in Seattle, Oak Harbor, American Samoa, Grand Fork, Bozeman, and Baton Rouge where she worked on the implementation alone, without an IC. Ex. 1, ¶ 15.

Tyler falsely claims that "[m]oving a go live date typically would result in a delay of transitioning to the ExecuTime software of three to six months." In reality, if a go-live date had to

be moved, it would delay the implementation by only one or two pay periods. The exact length of time depended on the length of the customer's pay period, but the delay would rarely if ever be more than one month. Ex. 1, ¶ 16.

The term "budget" as used by Tyler means simply the amount of IC and PM billable hours the customer had purchased for a given implementation. Managing that budget refers simply to being efficient with billable time. If the time spent by Harrison or her IC was more than anticipated by Tyler during the contract negotiation stage, she was required to inform her IM about the excessive hours. Ex. 1, ¶ 17.

Tyler refers to Harrison "scheduling resources" and "setting deadlines." The term "resources" refers to the IC assigned to her, as well as the tech and development teams. If a customer needed assistance from the IC or those other teams, Harrison would schedule that assistance in Outlook based on the published availability of the IC or other team members. Then, if the client or other teams had a problem with the scheduling, they would tell her and she would move the date as needed. If there was a conflict, she would send it to her IM for resolution. Harrison did not resolve such conflicts herself. Deadlines (a/k/a "milestones") were set out in the initial project plan, and she could not independently change them. Ex. 1, ¶ 18. "Assigning responsibilities" was a duty specific to tasks that were to be handled by other teams. For example, if a customer needed help with overtime not being calculated correctly, then that had to be addressed by the technical team. Harrison had no discretion about who to assign responsibilities to, and it was always obvious who the appropriate person or team was to handle it. Ex. 1, ¶ 19.

Harrison disputes Tyler's assertation that she would "adjust the timeline to reflect the implementation resources available to her—e.g., if she assessed an implementation consultant would not be capable of completing certain tasks, she would assign herself those tasks." On the

contrary, her IM would make that decision. She did give feedback to her IM if they asked her about an IC's capabilities, but can recall only one instance in which that happened. Ex. 1, ¶ 20.

Harrison also disputes Tyler's claim that she "might adjust the timeline to include 'buffer room' for additional training if she believed the implementation was particularly complex." Instead, if a customer had an unusually large number of employees to be trained, she would tell her IM who would then decide whether to add "buffer room." Ex. 1, ¶ 21.

Harrison also disputes Tyler's claim that she "could adjust the go-live date in an implementation timeline after advising her supervisor that the date . . . needed to be changed." The *customer* decided if a go-live date needed to be changed, not Harrison. If the customer requested that, she would inform her IM of the request. Ex. 1, ¶ 22.

Tyler's allegation that Harrison "worked with other implementation consultants in addition to her assigned implementation consultant" is highly misleading. She was assigned a single implementation consultant at a time. However, given that she had far more experience and competence with ExecuTime software than other IC's and PM's, other PM's and IC's frequently came to her for help with how the software worked. But Harrison did not work on their projects with them or assign them work. She would often spend half her day assisting other ExecuTime team members with various questions about the software. Ex. 1, ¶ 23.

Harrison ultimately requested to move into the Implementation Analyst position, where she would no longer be responsible for entire implementations and would instead spend all her time assisting others with the software. Ex. 1, ¶ 24.

Tyler's claim that "[w]hether an item would be billable or not would be determined on a case-by-case basis based on discussions between Plaintiff and her supervisor" is also misleading. The IM would approach Harrison about any billed items that were questionable, she would provide

requested information to her IM, and the IM would determine whether the time was billable or not, perhaps based on discussion with Harrison, perhaps not. Ex. 1, ¶ 25.

The vast majority of the time it was entirely clear based on long-established practices whether certain time Harrison spent on a task was billable to the client or not and did not involve any significant discretion. Her billed hours were always reviewed at a higher level and she had no say in the determination whether recorded time would be written off or not. Ex. 1, ¶ 26.

Tyler claims that Harrison "prepared a custom document for the client that reflected the client's custom configuration that the client could reference after go-live." In reality, this entailed merely arranging the relevant parts of a pre-existing template provided by Tyler. The relevance of specific parts of the template was determined solely by what software functionalities the customer had purchased. Harrison had no discretion in deciding what to include and what to omit. Ex. 1, ¶ 27.

Tyler alleges that Harrison would have calls with client calls to "discuss[] client concerns and made recommendations to the client about how they should configure ExecuTime." In reality, what she did was explain how the functionalities present in ExecuTime could be used to reflect the customer's existing payroll practices. If a customer had no need for a functionality (e.g., comp. time), then she would show them how to eliminate that functionality from the menu display. She did not advise the client whether they should do that or not. Ex. 1, ¶ 28.

In her résumé, Harrison used a great deal of language that was inapplicable to the positions of SPM and Implementation Analyst (IA). According to Harrison, it is not accurate to state that she "managed, monitored, and motivated a 'cross-functional team' in the positions she held while employed by Tyler. She *did* do that in her former position as Manager of Implementation Services prior to Tyler's acquisition of ExecuTime. Harrison's résumé conflates many different positions she held at both ExecuTime and Tyler over more than 8 years. She listed only the job title "Senior

Project Manager" in her résumé because it sounded most impressive. Unlike for most employees, she had more responsibilities and authority early in her employment than later due to her "self-demotion." Ex. 1, ¶ 29. As SPM, Harrison did interact with the "cross-functional team," including the implementation consultant, software deployment team, and technical configuration team, but it is not accurate to state that she "managed" them in her position as SPM. She had no authority over members of other teams whatsoever. Her authority with respect to her assigned IC was limited to simply assigning implementations given his or her existing workload. And even that decision was reviewed by her IM. Ex. 1, ¶ 30.

Tyler alleges that Harrison "made recommendations regarding security profiles for users or building different configurations for groups of employees based on their practices." According to Harrison, she would merely explain to the client that it would be more efficient and user-friendly to set up ExecuTime's security functions by groups of employees rather than having each employee have their own customized security profile. She did not advise the customers on how they should organize those groups, but simply explained to the customers how they could create security profiles in the ExecuTime software matching the levels of access they wanted to assign each group. Ex. 1, ¶ 31.

Harrison does not dispute that her job duties included "ensuring the team was in sync; ensuring support tickets were resolved in a timely manner; and promoting a healthy team morale. But that was equally true for every other employee on the ExecuTime team. Ex. 1, ¶ 32.

In both the SPM and IA positions, Harrison was responsible for training customers, other PM's, and IC's. This training could be both formal or informal. Much of her day was spent on non-billable work "training" other ExecuTime employees on how to use the software. This was a constant need because of the high turnover rate at ExecuTime and because, as the team member

with the longest ExecuTime experience, she had a more accurate understanding of how the software worked. Ex. 1, ¶ 33. Training—whether for a Tyler employee or for a customer—always entailed conveying factual information about how the ExecuTime software operated. In other words, she taught them how to use it. Ex. 1, ¶ 34.

While Tyler alleges that Harrison "created knowledge transfer materials" including knowledge-based standard (KBS) articles for other implementation consultants or project managers to consult when they encountered an issue with an implementation, it conveniently omits the fact that this was also true of approximately 30 other Tyler employees, including IC's and customer support personnel. Such KBS articles simply described in detail how to correctly fix known problems. Ex. 1, ¶ 35.

Harrison did not make recommendations about how customers should organize their own payroll structure. She taught them how the settings in ExecuTime could be used to match their needs, whether it was turning on or off the comp. time function, setting pay periods to weekly, bi-weekly, or semi-monthly, or any other ExecuTime function that was available and applicable to their payroll structure. Ex. 1, ¶ 36.

Tyler points to an email exchange Harrison had with Jamie Burns regarding a talk she had with an IC who was assigned to her regarding negative client feedback he had received. The subject matter and content of that discussion was based on previous conversations she had with her own superiors and their recommendations for what to say to him. The substance of her feedback was determined by Harrison's supervisors. Harrison did not typically provide her IC's with her own evaluation of their performance. Instead, she merely conveyed information and made recommendations whose substance had already been provided or approved by her supervisors. Ex. 1, ¶ 37.

Harrison did occasionally participate in interviewing potential new hires, but these were invariably group interviews and Tyler would solicit impressions from all team members who were present for the interviews. Harrison did not lead the interviews and her participation in the interviews and feedback provided was no greater than that of any other team members below the level of IM. Ex. 1, ¶ 38.

Over the years, Harrison put several interested friends and acquaintances in contact with management when IC positions became available. This was not a part of her job duties at Tyler. Ex. 1, ¶ 39.

In October 2019, Harrison requested to be put into the newly created position of Implementation Analyst and started in that role the following month. That position consisted of training both customers and Tyler employees in how to use the ExecuTime software, both formally and informally. This is the exact same work that she had been spending half her days on already as an SPM. Ex. 1, ¶ 40. But as an IA, Harrison was no longer responsible for her own implementations or for working with an assigned IC. Ex. 1, ¶ 41.

Tyler's claim that Harrison conducted training at "a three-day project management summit in Texas" is misleading. Over three days, she made four identical 30-minute presentations explaining what the new role of Implementation Analyst was and how they approach her for help. Harrison did not even draft the presentation text. Tyler provided it to her. Ex. 1, ¶ 43.

Tyler also claims that Harrison "conducted trainings in Maine on ExecuTime for newly hired project managers and implementation consultants." But she did this only twice, once in Maine and once over the phone. The training was basically a souped-up version of the basic functionality training that she or an IC would do with clients in a normal training session. In other words,

Harrison just showed them how the ExecuTime software worked. And the script for the training session was provided to her by Tyler. Ex. 1, ¶ 44.

Harrison did not "manage" any Tyler employees. The only minor supervision she did of the IC's assigned to her was to delegate implementations to them based on their existing workload. And Harrison was never assigned to work with more than one IC at a time. Ex. 1, ¶ 45. Harrison did not have management or supervisory duties relating to any customarily recognized department or subdivision of Tyler Technologies. She worked with other team members of the ExecuTime Division, but had no supervisory duties except the delegation duty described above with respect to a single IC at a time. Ex. 1, ¶ 46.

Harrison did not have the authority to hire or fire other employees. She gave feedback following group interviews on occasion, but her participation in those group interviews was no different than that of any of the other employees present. She was never informed that her feedback was given special weight and has no reason to believe that was the case. Those group interviews and feedback were occasional and hardly her primary duty. Ex. 1, ¶ 47.

Harrison did not have the authority to set or adjust other employees' rates of pay or hours of work. Ex. 1, ¶ 48. She did not direct the work of other employees beyond delegating implementations to my assigned IC as described above. Ex. 1, ¶ 49. And she did not perform any of the other duties described in 29 CFR § 541.102 ("Management") beyond delegating implementations to her assigned IC as described above. Ex. 1, ¶¶ 50–54.

Both as an SPM and as an IA, Harrison did not have discretion to do any of the actions described in § 541.202 ("Discretion and independent judgment") and did not perform work that affected Tyler's business operations to a substantial degree more than any employee whose work must be performed correctly and on time. Ex. 1, ¶¶ 55–69.

In short, Harrison had no role or input into the structure of Tyler's business or of its customers' operations. Ex. 1, ¶ 62. As both an SPM and as an IA, her primary duty was the same: to show people (both customers and other Tyler employees) how to correctly operate ExecuTime software. Ex. 1, ¶ 70. Harrison's work as an IA was almost entirely work that she had already been performing as a SPM, simply with fewer responsibilities. Ex. 1, ¶ 71.

There was virtually no difference between the actual job duties of an Implementation Consultant like Suzi Greene and those of a Senior Project Manager like Ms. Harrison except for: (1) Harrison delegated work to her IC based on their workload, and (2) she conveyed messages to her IC from management. Beyond that, their jobs were identical: they taught people how to use ExecuTime software. Ms. Harrison was very good at her job and lots of people in the ExecuTime division asked her for help when they ran into problems. Ex. 1, ¶ 72.

As an IA, there was even less difference between Ms. Harrison's duties and those of an IC. She did exactly what an IC did except that she wasn't assigned to specific implementations. She was a resource for everyone in the ExecuTime division to rely on because she understood how the software worked better than almost anyone else outside upper management. She taught them how to use it correctly. And she also continued to do customer training as needed. Tyler had massive turnover and few people could stand working for Tyler for very long, so there were always people who needed her assistance. Ex. 1, ¶ 73.

Harrison is currently employed as a Project Manager and classified as FLSA overtime exempt. In this position she has many duties that she did not have as a SPM for Tyler, including approving and rejecting employee timesheets, reviewing and editing invoices before they are sent out to clients, writing change orders and estimating additional time needed to complete implementations, and selecting my preferred resources to work with on each implementation, among other more

administratively significant duties. Ex. 1, ¶ 74. Tyler's reliance on the label "Project Manager" is just obfuscation.

3. **ARGUMENT**

   A. **Plaintiff Was Not an Exempt Administrative Employee**

The Fair Labor Standards Act requires that covered employees must be compensated at one-and-one-half times their regular hourly rate for each hour worked over 40 in a given workweek. 29 U.S.C. § 207(a)(1). Numerous exceptions to this requirement exist, most notably the three "white collar" exemptions for employees working in "a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). The employer has the burden of proving an overtime-pay exemption. *Tyler v. Union Oil Co. of Cal*., 304 F.3d 379, 402 (5th Cir. 2002).

The Department of Labor defines "employed in a bona fide administrative capacity" as an employee who is: (1) compensated on a salary or fee basis at a rate of not less than $455 per week; (2) has as a primary duty the performance of office or non-manual work **directly related** to the **management or general business operations** of the employer or the employer's customers; and (3) has as a **primary duty** the **exercise of discretion and independent judgment** with respect to **matters of significance**. 29 C.F.R. § 541.200(a) (emphasis added).

As shown below, in neither of the positions at issue in this case did Plaintiff Harrison have any duties *directly* related to the general business operations of either Tyler or its governmental customers. She did not exercise any meaningful discretion or independent judgment; instead, she showed others how to correctly operate a piece of software. And as important as that software was to Tyler's bottom line, that is not the kind of "matters of significance" that the FLSA's governing regulations anticipate for the administrative exemption.

### 1.     Plaintiff performed *production* work, not administrative work

Per DOL regulations, to meet the requirement that an employee perform work "directly related to the management or general business operations," an employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a) (emphasis added); *see also Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990) ("the relevant distinction is between those employees whose primary duty is administering the business affairs of the enterprise [and] those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market.") (quotation omitted).

Courts addressing the issue of whether an employee engages in work directly related to management or general business operations often find the "production versus administrative dichotomy helpful. This concept is intended to distinguish between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself." *Greene*, 526 F. Supp. 3d at 1339. And just this year, the Eleventh Circuit extensively discussed the administration-production dichotomy and relevant case law as applied to a service-sector (rather than manufacturing) position. *See Swans v. OSP Prevention Grp., Inc.*, 38 F.4th 103, 114 (11th Cir. 2022) ("Fowler and Swans engaged in OSP's core function of damage investigations. Given the nature of their employer's business, their investigative factfinding duties amounted to production work. Those duties did not involve 'work directly related to [OSP's] management or general business operations.' 29 C.F.R. § 541.200(a)(2).").

Virtually all of the court's reasoning in *Greene* is applicable to this case. Plaintiff Harrison had a few marginal duties that differed from those of IC's, but the overwhelming majority of her work

as both a SPM and IA was training customers and other Tyler employees—who were in turn working on implementations for Tyler customers—in how to use ExecuTime software. The fact that she delegated duties to an IC and conveyed messages from management to the IC that she collaborated with does not change the analysis.

Tyler sold its ExecuTime software to customers and a part of that sale *always* involved the implementation of the software and a set number of IC and PM hours in furtherance of that implementation. Exhibit 4 (Pasch Deposition) at 55:22 to 56:18. When Ms. Harrison was an SPM she even billed the customers by the hour just like Greene did. And as an IA she assisted other ExecuTime team members in their implementations. The fact that her time was no longer directly billable to a client is beside the point; as a production employee she was furthering the implementation process, which was a major part of Tyler's marketplace offerings, just as the court in *Greene* already found as a matter of law.

### 2. Plaintiff's work was not directly related to the management or general business operations of Tyler's customers

Work "directly related to management or general business operations" includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. 29 CFR 541.201(b).

All administrative employees have in common that they "perform work directly related to assisting with the running or servicing of the business." 29 C.F.R. § 541.201(a) (emphasis added). Thus, the administrative employee "engages in running the business itself or determining its

overall course or policies, not just in the day-to-day carrying out of the business' affairs." *Cotten v. HFS-USA, Inc.*, 620 F. Supp. 2d 1342, 1343 (M.D. Fla. 2009) (quotation omitted). For example, if delegated sufficient discretion and authority, insurance claims adjusters, executive assistants, human resources managers, and purchasing agents may be properly categorized as administrative. 29 C.F.R. § 541.203.

In its motion, Tyler *appears* to contend that Ms. Harrison's primary duties relating to general business operations and management (enumerated in 29 C.F.R. § 541.201(a), (b)) were: "budgeting, auditing, quality control, research, personnel management, and computer network, internet and database administration . . . ." Dkt. 14, pg. 20. It also argues that the implementations that Ms. Harrison worked on—presumably *all* of them—constituted "major projects" and thus related to general business operations. Dkt. 14, pg. 25. *See* 5 C.F.R. § 551.206(i). If that were the case, the Suzi Greene would have been an administrative employee working on "major projects" too. But she wasn't.

Just like Greene, Ms. Harrison did not consult municipal governments about how to compensate their employees or how to track their time. Rather, she assisted them by teaching them how to use their new time and pay software and how to configure its functionalities—a fancy way of saying "changing the settings." How the customers used the software was based on their own needs, which were determined long before Ms. Harrison ever became involved.

Simply acting as a conduit for information about how ExecuTime software works does not even arguably constitute the "general business operations" of Tyler's local government clients, or of Tyler itself, for that matter. Plaintiff simply taught Tyler's customers how to use the software that they had purchased, explaining its functionalities. All decisions about the type of software package to purchase, whether it would be hosted remotely or locally, whether timeclocks would

be purchased, the kind of training plan that would be used (i.e., daily, hourly, milestone, etc.) were made by other Tyler employees.

And helping her co-workers figure out problems they encountered in their own implementations also cannot constitute administrative work. Helping a production employee do their production work correctly is not administrative in character. It is simply a further facet of the very same production work identified by the *Greene* court. Production work is not administrative and this Court's analysis of the administrative exemption defense can end here.

### 4. Plaintiff did not have a *primary duty* requiring any significant discretion with respect to matters of significance.

Even if Ms. Harrison had a primary duty directly related to the management or general operations of Tyler or its customers, she would nonetheless fall outside the scope of the administrative exemption because her primary duties did not include "the exercise discretion and independent judgment with respect to matters of significance" as required by 29 C.F.R. § 541.200(a)(3).

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs. "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). "Factors to consider when determining an employee's primary duty include, but are not limited to, the relative importance of the exempt duties in relation to the other types of duties, the amount of time the employee spends performing exempt work, and the employee's relative freedom from direct supervision." *Id.*

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 CFR § 541.202(a). "The term 'matters of significance'

refers to the level of importance or consequence of the work performed." 29 CFR § 541.202(a).

An employee does not exercise discretion and judgment in matters of significance merely because

the employer will experience financial losses if the employee fails to properly perform his or her

job. 29 C.F.R. § 541.202(f). The phrase "discretion and independent judgment" must be applied in

the light of all the facts involved in the particular employment situation in which the question

arises. 29 C.F.R. § 541.202(b).

"Generally, 'matters of significance' include responsibilities dealing with matters of broad

scope and significant detail that have a profound effect on the employer's business," such as:

"matters that have significant financial impact, negotiating and binding the company on significant

matters; and planning long- or short-term business objectives." *Greene v. Tyler Techs.*, 526 F.

Supp. 3d 1325, 1348 (N.D. Ga. 2021) (citing cases).

Tyler argues that Ms. Harrison's duties related to matters of significance because,

> [a]s the main point of contact for clients, Plaintiff was responsible for resolving clients' concerns during implementations. When product issues arose during an implementation, Plaintiff was responsible for ensuring the issues were resolved. She would either used her expertise to resolve the issue herself or would determine the appropriate internal resources and engage with those resources to reach a resolution. Plaintiff also maintained the implementation timeline and the solution design—the documents that dictated the course of the implementation—and would adjust them based on her discussions with the client, her experience with ExecuTime, and as issues arose during the implementation.

Dkt. 14, pg. 26. This is just a rehashing of the failed arguments that Tyler made about Ms. Greene's

duties, when it claimed that she "assessed client protocols and procedures, managed competing

client deadlines and priorities, [and] created custom training agendas based on client feedback."

*Greene v. Tyler Techs.*, 526 F. Supp. 3d 1325, 1348 (N.D. Ga. 2021). And just as in *Greene*, "this

characterization devoid of any specifics and unsupported by record evidence . . . ." *Id.* In fact, it is

directly contradicted by Ms. Harrison who has testified that she had no discretion, that her trainings

were based on templates provided by Tyler, and that the important decisions about the scope and timing of customer implementations were made at the sales level before she ever became involved.

The types of minor decisions Ms. Harrison was able to make were "not indicative of any duties emblematic of discretion and independent judgment in matters of significance: that is, actions that 'involve[] the comparison and the *evaluations of possible courses of conduct*, and *acting or making a decision* after the various possibilities have been considered.' " *Id.* (emphasis in original) (quoting 29 C.F.R. § 541.202(a). At the very least, Tyler has utterly failed to point to *specific evidence* proving that such discretion existed as a matter of law. For that reason, its administrative exemption defense is not appropriate for summary adjudication.

**B.      Plaintiff Was Not an Exempt Executive Employee**

Four factors must be met for an employer to meet its burden of proving the applicability of the FLSA's executive exemption. 29 C.F.R. § 541.100. Of these factors, numbers two, three, and four are at issue here: namely, whether Plaintiff was an employee "(2) [w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) [w]ho customarily and regularly directs the work of two or more other employees; and (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. 541.100(a); *see also Kelly v. Healthcare Servs. Grp., Inc.*, 106 F. Supp. 3d 808, 828 (E.D. Tex. 2015).

The FLSA's governing regulations enumerate the types of duties that constitute "management" within the meaning of the executive exemption:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of

> recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102; *see also Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1079–80 (E.D. Tex. 2011).

As Ms. Harrison's testimony establishes, she performed *none* of these duties with the singular exceptions of (1) occasionally participating in group interviews along with many other ExecuTime team members, and (2) apportioning work to a single other employee (not "employees" as the regulation requires). Even if her participation in group interviews were a qualified as "management," Tyler has utterly failed to show that it constituted a "primary duty," and Ms. Harrison has testified that such group interviews were merely occasional. Tyler has likewise failed to present evidence that would allow this Court to determine that her allocation of implementation work to her single assigned IC was a "primary duty" as a matter of law.

And of course, the regulation requires that an exempt executive employee directs the work of "two or more employees." But Ms. Harrison's testimony is unequivocal: she worked with a single IC at a time. Her interactions with other team members were informal and there is not the slightest indication that she directed their work within the meaning of the regulation. The burden to prove that is on Tyler and it has utterly failed to do so.

Finally, Tyler's executive exemption defense is not entitled to summary adjudication because it has failed to show as a matter of law that her "recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [was] given particular weight." Dkt. 14, pg. 20. On the contrary, Ms. Harrison has established that she merely participated

-22-

in group interviews with prospective new hires and filled out questionnaires after those interviews along with all the other ExecuTime line employees. Tyler conveniently claims now, out of nowhere, that her recommendations were given particular weight, but it failed to ever give Ms. Harrison any indication of that alleged fact. Given Tyler's history of making factual misrepresentations in support of its summary judgment arguments and the lack of any contemporaneous evidence of that Ms. Harrison played a significant role in hiring decisions, a jury is entitled to determine whether Tyler is being honest about those hiring roundtables, or whether Ms. Harrison's participation was as insignificant as she was led to believe.

Without *undisputed* evidence clearly proving each element of the executive exemption, it cannot seriously be maintained that Tyler is entitled to summary adjudication of that defense. It is entitled to present its arguments to a jury, but that is all.

### C.    Willfulness

An employer willfully violates the FLSA if the employer "knew or showed reckless disregard for ... whether its conduct was prohibited by the [FLSA.]" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677 (1988). The regulations implementing the FLSA define "reckless disregard" as "failure to make adequate inquiry into whether conduct is in compliance with the act." 5 C.F.R. § 551.104. Evidence that an employer previously litigation a closely related overtime issue is itself enough for a jury to find a willful violation. *Sealey v. Emcare, Inc.*, No. 2:11-CV-00120, 2013 U.S. Dist. LEXIS 5536, 2013 WL 164040, at *4 (S.D. Tex. Jan. 14, 2013).

Since 2008, Tyler has been sued repeatedly for FLSA violations with respect to IC's whose job duties overwhelmingly overlap with those of Ms. Harrison. Yet Tyler continued to classify Ms. Harrison as exempt in her position as an SPM and later as an IA until the end of her

employment. And in the 2008 *Beall* case, Tyler actually settled the litigation after summary judgment briefing in an obvious attempt to prevent an adverse ruling from being issued.

As the *Greene* court noted in rejecting Tyler's summary judgment argument on willfulness, "other courts have determined that prior settlements are relevant to the willfulness determination." *Greene v. Tyler Techs.*, 526 F. Supp. 3d 1325, 1351-52 (N.D. Ga. 2021) (citing *Seward v. Midwest Commc'n Servs., Inc.*, No. 020CV00093JRTKMM, 2020 U.S. Dist. LEXIS 248415, 2020 WL 8256362, at *1 (D. Minn. Dec. 15, 2020); *Sims v. Event Operations Grp., Inc.*, No. 2:17-CV-01489-HE, 2019 U.S. Dist. LEXIS 46899, 2019 WL 1301959, at *5 (N.D. Ala. Mar. 21, 2019) (finding that defendants' objective reasonableness in relying on their policies is undermined by a motion for approval of a settlement agreement in a prior FLSA lawsuit.)).

In written discovery Tyler argued that its good faith (or lack of willfulness) was based on (1) Plaintiff's previous exempt classification by ExecuTime prior to its acquisition by Tyler, (2) industry practice, and (3) the tautology that Plaintiff is exempt as a matter of law. But Plaintiff did not work for ExecuTime in the same position then. And industry practice is hardly any shield when the company has actually been put on notice of its potential FLSA obligations by litigation brought by employees with highly similar job duties.[3] The third argument is not serious and need not be addressed.

What's more, while Defendant has previously asserted that it relied on advice of counsel in its misclassification of Ms. Greene, it admits in this case that it did not rely on the advice of counsel in its classification of Ms. Harrison as FLSA exempt. Exhibit 5 (Tyler Interrogatory Responses), ¶ 6 ("Tyler's contention that it acted in "good faith" is not based on legal advice from outside

---

[3]   As a reminder, Ms. Harrison insists that the overwhelming bulk of her work in both SPM and IA positions was the same thing that IC's did.

counsel.").[4] Perhaps a jury can make sense of why it would ask for a legal opinion as to an IC but not as to an SPM or IA—especially given Tyler's litigation history. At the very least, the question must go to a jury and is not subject to summary adjudication.

**5.  CONCLUSION**

Based on the factual disputes clearly identified above, summary judgment is inappropriate. Plaintiff respectfully requests that the Court DENY Defendant Tyler's Motion for Summary Judgment and set this case for trial.

This 5th day of September 2022,

Respectfully submitted,

**SHELLIST LAZARZ SLOBIN LLP**

*s/ Melinda Arbuckle*
Melinda Arbuckle
Texas Bar No. 24080773

11 Greenway Plaza
Suite 1515
Houston, Texas 77046
Tel: 713.621.2277
Fax: 713.621.0993
marbuckle@eeoc.net

**DELONG CALDWELL BRIDGERS FITZPATRICK & BENJAMIN, LLC**

*/s/Matthew W. Herrington*
Charles R. Bridgers
Georgia Bar No. 080791
(admitted *pro hac vice*)
Matthew W. Herrington
Georgia Bar No. 275411
(admitted *pro hac vice*)

101 Marietta Street NW
Suite 2650
Atlanta, Georgia 30303
(404) 979-3171
(404) 979-3170 (f)
charlesbridgers@dcbflegal.com
matthew.herrington@dcbflegal.com

Counsel for Plaintiff

---

[4]  Plaintiff mistakenly referred to the Implementation Consultant position rather than the Senior Project Manager or Implementation Analyst in her interrogatories to Defendant. This inadvertent error was later addressed in correspondence between counsel. No amended responses were ever provided.

**CERTIFICATE OF SERVICE**

On September 5, 2022, I filed the foregoing document with the Clerk of Court for the Eastern District of Texas using the CM/ECF method of the Court. I certify that I have served all counsel of record electronically thereby.

*s/ Melinda Arbuckle*
pMelinda Arbuckle
