PLAINTIFF'S
EXHIBIT

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|   |   |   |
|---|---|---|
| SUZANNE GREENE, | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:19-cv-1338-AT |
| TYLER TECHNOLOGIES, INC., | : | |
| Defendant. | : | |

## ORDER

Plaintiff Suzanne Greene brings this suit against her former employer, Defendant Tyler Technologies, Inc. ("Tyler"), alleging that Tyler misclassified her as an exempt employee and failed to pay her legally required overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207 and 215(a)(2). Both Parties move for summary judgment as to whether Ms. Greene, an "implementation consultant," was subject to the FLSA's administrative exemption. Tyler also moves for summary judgment that any alleged FLSA violation was not willful, and Plaintiff moves for summary judgment that Tyler is a successor in interest of ExecuTime Software, LLC ("ExecuTime"). For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment [Doc. 57] is **GRANTED**, and Defendant's Motion for Summary Judgment [Doc. 56] is **DENIED**.

## I.    Background[1]

### Defendant Tyler's ExecuTime Software:

Defendant Tyler is the largest company in the United States providing software and technology services to public sector agencies like local and state governments. (Plaintiff's Statement of Material Facts ("SOMF"), Doc. 57-7 ¶¶ 1-2; Defendant's Response to Plaintiff's SOMF, Doc. 67-1 ¶¶ 1-2.) In June 2016, Tyler acquired the software company ExecuTime. Tyler has described ExecuTime as follows:

> ExecuTime™ is a leading time and attendance solution that empowers employees via self-service functionalities and allows supervisors to closely manage overtime, job costing, and labor data through reduced expenses. ExecuTime time assists organizations with the most complex time and seamlessly integrates with payroll software solutions.

(*Id.* ¶¶ 5, 13.)[2] The ExecuTime software that government customers purchase generally consists of "time and attendance" and/ or "advanced scheduling" modules. (Deposition of Suzanne Greene ("Greene Dep.") p. 48:16-25; 49-5.) The more basic time and attendance software is focused on clocking in, clocking out, requesting time off, or checking a time card. (*Id.* p. 20:17-24; 25:8-10; *see also*, Training Video, Doc. 57 Ex. 3 at 11:00.) Advance scheduling affords clients "more robust scheduling capabilities" such as a "wheel offering" that allows supervisors

---

[1] This statement does not represent actual findings of fact. *In re Celotext Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

[2] After the acquisition, however, ExecuTime generally did the same thing that it did prior to the acquisition. (Deposition of Hillary Pasch, Doc. 46 p. 49:12-14.)

to post open shifts on a wheel that employees can sign up for or a "trade board" that allows employees to swap shifts themselves. (Deposition of Hillary Pasch ("Pasch Dep."), Doc. 46, p. 37:4-25.)

**Process for Purchasing and Implementing ExecuTime:**

Typically, after a government customer decides to purchase ExecuTime software, it consults with a Tyler sales representative, who creates a contract, which is later reviewed by Tyler's legal department. (Deposition of Hillary Pasch ("Pasch Dep."), Doc. 46 p. 35:11-16.) During this process, the client determines what type of contract to purchase—daily, hourly, milestone, or paid in full, for example. (*Id.* p. 36:9-13.) The customer also consults with the Tyler sales representative to determine what additional features to include in the contract, such as whether it wants the "advance scheduling" module (*id.* p. 39:3-8), and how many physical timeclocks will be included (*id.* p. 44:2-11). Another purchase decision the customer may make in conjunction with the sales representative is whether to purchase a "mobile module" which allows user access though a general web browser on a desktop or mobile phone. (*Id.* p. 44:15-20; 45:7-14.) At this contracting stage, the customer and sales representative may also discuss "funded development" which occurs when a customer wants to add something to the software that does not yet exist, and the contract provides for the customer to fund it. (*Id.* p. 61:4-22; 62:7-9.)

After these decisions have been made and a contract has been signed, the sales representative sends the contract to a team at ExecuTime that includes the

3

director of ExecuTime, a "manager of implementation," and a different "manager of implementation and support." (*Id*. p. 40:6-24.) After this team of individuals reviews the contract at issue, it assigns resources to the project, specifically a project team consisting of a project manager and an implementation consultant. (*Id*. p. 42:1-16.) The project manager is the supervisor of the implementation consultant. (*Id*. p. 68:12-14.) When a project manager is assigned to a project, she first reviews the contract to understand whether the contract is daily or hourly, what hardware will be provided (such as how many physical timeclocks), where the hardware will be installed, and other details provided by the contract. (*Id*. p. 60:14-25; 61:1-3.) The project manager then sends a welcome packet and schedules a date with for the installation of the software done by a "deployment team." (*Id*. p. 62:17-25; 63:1-5.)

In addition, the project manager drafts a "project plan" for the implementation, which includes project objectives, as well as a checklist and deadlines for user training and integration. (Greene Dep. p. 69:18-25; 70:1-11.) This project plan and timeline also lays out dates and details for trainings, including whether training will be in-person or remote and when the eventual "go live" date will be. (Pasch Dep. p. 68:15-19.) "Going live" occurs after all of the user training is completed and the customer has successfully completed "parallel testing," which involves using both ExecuTime and any previous time-tracking method at the same time to ensure that the ExecuTime software was accurately reflecting time and attendance. (Greene Dep. p. 62:1-8.) After the "go live" date,

the customer uses only ExecuTime for clocking in, clocking out, requesting time off, and other functions. (*Id.* p. 62:9-11.)

In addition to this project plan, the project manager also works with the customer to complete a questionnaire and a solution design. (Greene Dep. p. 78:19-21.) These two documents include information concerning the customer's existing time and attendance policies, such as whether the locality/ agency uses comp time. (*Id.* 79:7-25.) These documents also indicate whether a customer will have weekly or bi-weekly check-in calls with the implementation consultant. (*Id.* p. 117:12-18.)

After the project manager has completed these initial aspects of the implementation process, there is a "handoff" to the implementation consultant. (Greene Dep. p. 32:15-17.) This handoff typically takes the form of a phone call where the project manager introduces the customer[3] to the implementation consultant and they all discuss next steps. (*Id.* p. 76:4-14.) After the "handoff," the project manager supervises the implementation consultant in her duties. (Pasch Dep. p. 68:12-14.)

### Ms. Greene's Role as an Implementation Consultant:

Plaintiff Suzanne Greene was employed by ExecuTime beginning in February 2016 but became employed by Tyler when Tyler acquired ExecuTime in June 2016. (Pl. SOMF; Def. Response to SOMF ¶¶ 4-5, 10.) During Ms. Greene's first six months with ExecuTime, before the acquisition, she was employed as a

---

[3] As the customers are local and state governments, the representative dealing with the implementation of ExecuTime software would typically be a local project manager, HR manager, payroll supervisor, or a similar title. (Greene Dep. p. 76:15-25.)

"project manager," working with the advanced scheduling software primarily used in local police and fire departments. (*Id.* ¶¶ 5-6.) In this capacity, Ms. Greene's duties involved "building schedules," which did not involve programming the software but instead meant, in part, setting configurations so that the correct schedules would populate in the software for the local departments. (*Id.* ¶¶ 7-8.)

Shortly after ExecuTime was acquired by Tyler, Ms. Greene's title was changed to "implementation consultant." (*Id.* ¶ 11.) Around this time, Ms. Greene stopped working on the advance scheduling software and switched over to work on the time and attendance side. (Greene Dep. p. 23:2-7.)[4] Tyler's job description for the implementation consultant role states in relevant part:

> The Implementation Consultant is responsible for delivering high quality knowledge training to clients allowing them to use Tyler software products efficiently and effectively to achieve daily operations. The incumbent consults and partners with clients to gain a comprehensive understanding of workflow, business/ technical requirements and needs to ensure that the knowledge transfer addresses clients' needs. The Consultant ensures that the transition to Tyler software is completed according to predetermined timelines and establishes a positive baseline for the new relationship between the client site and Tyler Technologies.

(Pl. SOMF ¶¶ 5, 13; Def. Resp. to SOMF ¶¶ 5, 13.) Broadly speaking, as an implementation consultant, Ms. Greene's job duties consisted of preparing for and training the employees of Tyler's government customers on how to use its ExecuTime time and pay software. (Second Declaration of Suzanne Greene

---

[4] The Parties dispute the extent to which Plaintiff's job duties changed with this new title and dispute whether she still had scheduling responsibilities but agree that Ms. Greene began working with a different software. (Pl. SOMF; Def. Response to SOMF ¶ 12.)

("Second Greene Decl."), Doc. 69-1 ¶ 2.)[5] In this capacity, she reported to a supervisor that had the title of project manager. (Declaration of Suzanne Greene ("Greene Decl."), Doc. 57-2 ¶ 5.)[6] Ms. Greene typically communicated with her project manager daily by phone or email, and often several times a day. (Second Greene Decl. ¶ 13.) Ms. Greene explained that, during her employment, the number of implementation consultants working with ExecuTime software at any given time fluctuated but that there were never more than ten and at one point

---

[5] In their reply brief (Doc. 71 at 3-4), Tyler argues that Ms. Greene's Second Declaration is a "sham affidavit" and asks the Court not to consider this testimony. Simply put, the Court finds Defendant's argument on this point entirely without merit. The Court has thoroughly reviewed Ms. Greene's deposition testimony and does not find it inconsistent with her Second Declaration. Moreover, it is exasperating that Tyler advances this argument when, throughout its briefing, it misrepresents and stretches Plaintiff's testimony. On multiple instances, Defendant emphasizes that Ms. Greene "testified that she recommended that a client's 'go live' date be delayed because the client's employees had a difficult time grasping the technology," that the "project manager accepted Plaintiff's recommendation," and that therefore it was "undisputed that Plaintiff's recommendations shaped the course and trajectory of any given implementation assigned to her— including whether the client could 'go live' with Tyler's software." (Def. Mot. at 6-7, 18.) But Ms. Greene's deposition testimony does not reflect that she made any recommendation or decisions about whether to delay a "go live" date. Instead, she explains that on one occasion she "let [her project manager] know" that the employees she was training were "seasoned" and having a harder time using the software, and then that ultimately resulted in a delay of the go-live date and the project manager's determination that she should conduct on-site training. (Greene Dep. p. 73:11-25; 73:6-10.) To characterize this as "undisputed evidence" that she made recommendations is disingenuous. Similarly, Defendant mischaracterizes Plaintiff's brief to suggest that she admitted that Ms. Greene would occasionally extend training sessions by asking clients to work through lunch or remain on-site longer than scheduled (Def. Resp. to Pl. Mot. at 6). But Plaintiff made no such admission and indeed it was Tyler's own corporate representative who stated generally that an unspecified implementation consultant *might* decide to tell the client to stay longer or work through lunch. (Pasch Dep., Doc. 46 at 73:1-15.) The Court has discovered other examples of this stretching of the actual testimony, as well. These slanted and inaccurate representations are not appreciated. The Court expects better.

[6] This Tyler project manager role is different from Ms. Greene's previous role as project manager before Tyler acquired ExecuTime. Prior to Tyler's acquisition, there was only one person (the project manager) assisting with the implementation of the software for a government client. (Deposition of Suzanne Greene ("Greene Dep."), Doc. 56-4 p. 33:19-24.) However, after the acquisition, Tyler began assigning at least two people to work on the project of implementing the software with a particular client: a project manager and an implementation consultant. (Defendants' SOMF, Doc. 56-1 ¶ 4; Pl. Resp. to Def. SOMF, Doc. 69-2 ¶ 4.)

there were fewer than four. (Greene Dep. 36:2-10.) As of October 2019, Tyler employed eight implementation consultants working with ExecuTime software. (Pasch Dep. p. 52:20.)

As described above, any contract with a government customer would go through the sales team, the legal team, the ExecuTime director team, and then a project manager before the "handoff" to the implementation consultant, Ms. Greene. Once Ms. Greene received the "handoff," she would review the questionnaire and solution design that the project manager put together with the client (Greene Dep. p. 78:5-11) in order to do a "generic setup" of the ExecuTime application (*id.* p. 80:7-12). Reviewing these documents allowed Ms. Greene to determine which preferences she should turn on in the application: for example, if a customer used comp time, she could go into the preferences and check a box to allow them to actually use comp time. (*Id.* p. 79:10-19.) After reviewing these materials and completing the generic setup, Ms. Greene would conduct the trainings, beginning with a "power user training." (*Id.* p. 80:15-18.) Power user trainings are the trainings with the "higher-ups" like the local government's project manager, or the head of their payroll, possibly the HR manager. (*Id.* p. 83:21-25; 84:1-4.) This training was sometimes done on-site and sometimes remotely, depending on what the client and project manager discussed. (*Id.* p. 80:19-22.)

For most of Ms. Greene's employment, when power training was done on-site, it lasted for three full days from 8:00 a.m. to 5:00 p.m. (Greene Dep. p. 129:19-22.) In contrast, the remote power training was only a single day for 3 to 3.5 hours;

however, near the end of Ms. Greene's employment, it was spread out into 3 separate trainings of 3 hours each, for a total of 9 hours. (*Id.* p. 130:3-9.) During these power user trainings, Ms. Greene would walk through the different aspects of the software and its functionalities (*id.* p. 125:13-17) and the power users were essentially watching Ms. Greene show them where everything is located. (*Id.* p. 127:8-12.) An example of Ms. Greene conducting a remote power user training is attached to Plaintiff's Motion for Partial Summary Judgment. (Training Video for Hendersonville, TN Timeclock Training, Doc. 59, Ex. 3.) The video shows Plaintiff sharing her screen with the power users, and showing them where certain functions are located in the software related to system administrator settings[7] and also walking through the process for a fictional employee, "Joe Hourly," clocking in and out, and requesting time off for vacation or sick leave. (*Id.* at 10:30.)



---

[7] For example, in the training, Ms. Green shows the power users where they can click a button in the software to "hide keypad entries" so that employees clocking in and out with their badge numbers can either see the actual numbers or alternatively whether the numbers will show up on the screen as stars, such as ****, for confidentiality purposes. (*Id.* at 0:50-1:12.)

During this training, the power users asked questions to clarify the software's offerings and capabilities and where they could find certain functions. (*See e.g., id.* at. 15:23.)

After the power user training was completed, Ms. Greene would conduct training with "super users" which were supervisors in the local government and "end users" which were the everyday local employees. (Greene Dep. p. 86:13-19.) Ms. Greene did not ask questions of the super users or end users during training. (*Id.* 125:20-25.) Sometimes, a city or department would split the in-person and remote training and do some training (say, for power users) in person but then conduct super user and end user training remotely. (*Id.* p. 81:2-6.) After the end user and super user trainings, the "parallel testing" occurs (*id.* p. 83:13-20), which, as described above, involves the end and super users utilizing both the previous time-tracking method and ExecuTime software at the same time to ensure that the ExecuTime software is accurate. (Greene Dep. p. 62:1-8.) After this testing is successfully completed, the customer "goes live." After that point, Ms. Greene no longer has involvement, as the customer is passed to Tyler's technical support team. (Greene Dep. p. 63:6-12.)

Throughout the implementation process — after the handoff to Ms. Greene and before the customer is passed to the support team — Ms. Greene would ensure that the customer followed the checklist deadlines in the project plan that was created by the Tyler project manager. (Greene Dep. p. 94:15-19.) Ms. Greene did not set any deadlines but she had to be aware of them. (*Id.* p. 94:20-22.) Also

throughout, Ms. Greene would have weekly or bi-weekly calls with the client to go over progress. (Greene Dep. p. 59:20-21.) Sometimes during these calls, or at other times, Ms. Greene would engage in "troubleshooting" when the software was not functioning properly: for example, if overtime was not properly populating. (Greene Dep. p. 133:15-22.) For something like overtime failing to populate, Ms. Greene could fix the problem by adjusting the preferences "on the back end" (*id*. p. 135:11-17), however, if the problem was technical, Ms. Greene would escalate the problem to her project manager and then it would go to the support team. (*Id*. p.135:3-11); (Second Greene Decl. ¶ 4.) Ms. Greene declares that she was reprimanded on the single occasion when she attempted to send a ticket to the support group directly without going through her project manager first. (*Id*. ¶ 5.)

Typically, Ms. Greene dealt with multiple implementation projects at once, and managed her workload to ensure that the deadlines in multiple concurrent project plans were met. (Pl. SOMF ¶ 25; Def. Resp. to SOMF ¶ 25.) She handled between 5 and 20 projects at a time. (Greene Dep. p. 93:24.) She spent approximately 30-40 percent of her work time conducting ExecuTime training sessions with customers and 30-40 percent of her time preparing for ExecuTime training sessions. (Pl. SOMF ¶ 38; Def. Resp. to SOMF ¶ 38.) She spent about 20 percent of her time on weekly or bi-weekly check-in calls with customers, (Second Greene Decl. ¶ 20), and helped with troubleshooting throughout (Greene Dep. p. 93:5-13.). Ms. Greene performed her implementation consultant duties from either her home or at a client site. (Def. SOMF ¶ 9; Pl. Resp. to Def. SOMF ¶ 9.)

11

During her employment, Ms. Greene received a salary of between $45,000 and $48,500 per year (Greene Dep. p. 30:23-25; 31:1-3; 40:17.). She was paid bi-weekly. (Def. SOMF ¶ 35; Pl. Resp. to Def. SOMF ¶ 35.) At no point in her employment did she supervise anyone or have the authority to hire or fire any other employee. (Second Greene Decl. ¶ 8.) Tyler classified Ms. Greene as exempt under the FLSA in part based on advice of outside legal counsel. (Def. SOMF ¶ 36; Pl. Resp. to Def. SOMF ¶ 36.) Tyler was sued in a putative collective action in 2008 for alleged misclassification and overtime violations with respect to implementation consultants. (Pl. SOMF ¶ 48; Def. Resp. to Pl. SOMF ¶ 48) (citing *Patty Beall et al. v. Tyler Technologies, Inc., and EDP Enterprises, Inc*., 2:08-cv-422 TJW (E.D. Tex. 2008)). That case settled after full briefing on summary judgment but before the court ruled. *Patty Beall et al.,* 2:08-cv-422 TJW, Doc. 215.

Plaintiff ultimately resigned her employment with Tyler after taking leave in spring 2019. (Def. SOMF. ¶¶ 32-33; Pl. Resp. to Def. SOMF ¶¶ 32-33.) A source of some contention, Ms. Greene's post-Tyler resume reads:

Employer: Tyler Technologies
Title: Implementation Consultant
Duration:   February 2016 – Present
Job Duties
- Manage multiple client implementations simultaneously, while meeting all project plan deadlines.
- Build, lead and direct project teams to meet project objectives
- Strong leadership and delegation skills
- Set clear expectations and goals for project teams. Track progress against timeline, milestones and budget, revise as needed
- Hold regularly scheduled meetings with the client to ensure that milestones are met
- Provide software application training using a variety of delivery methods including web-based and on-site training
- Coordinate new customer implementations, providing effective training to maximize use the software
- Excellent communication (written and oral) and interpersonal skills
- Effective at engaging with people from all backgrounds and work industries

(Greene Dep., Ex. 2.) Plaintiff Greene filed this action on March 26, 2019 asserting a single claim for failure to pay overtime pursuant to 29 U.S.C. §§ 207 and 215(a)(2), alleging that Tyler's failure to pay her time-and-a-half for overtime hours worked was not done in good faith within the meaning of 29 U.S.C. § 260.

## II.   Legal Standard

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting the Advisory Committee's note to FED. R. CIV. P. 56). "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to establish, by going beyond the pleadings, that there is indeed a genuine issue as to the material facts its case. *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1583 n.16 (11th Cir. 1991); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). A dispute of material fact "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a

verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita*, 475 U.S. at 587.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992); *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). The Court must avoid weighing conflicting evidence. *Liberty Lobby*, 477 U.S. at 255; *McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *Pepper v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989). But where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir. 1989). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United*

*States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555-56.

## III. Discussion[8]

The FLSA, which was enacted to protect the health, efficiency and welfare of workers in the United States, requires employers to pay overtime (time and a half) to employees who work more than forty hours per week. 29 U.S.C. § 207(a)(1). However, Section 213(a)(1) exempts from this requirement "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Keeping in mind the comprehensive remedial purposes of the FLSA,[9] the Court interprets its provisions neither liberally nor narrowly, but

---

[8] Plaintiff moves for summary judgment on the issue of successor liability, arguing that Tyler is the successor in interest of ExecuTime Software, LLC under the federal standard's flexible considerations. (Plaintiff's Motion for Partial Summary Judgment, Doc. 57-6 at 12-14.) Defendant does not oppose this portion of Plaintiff's Motion. For the reasons stated in Plaintiff's Motion (*id.* at 12-14), the Court finds that Ms. Greene has established that Tyler is the successor of ExecuTime Software, LLC. Summary judgment is therefore **GRANTED** on this issue.

[9] The primary purpose of the FLSA is the protection of the nation's employees from detrimental labor conditions and to provide a minimum subsistence wage. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945), *reh'g denied* 325 U.S. 893; *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1363 (11th Cir. 1997); *see also* 29 U.S.C. §§ 202(a), 206, 207, 212.

instead gives its provisions a "fair interpretation." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (quoting Antonin Scalia & Bryan Garner, Reading Law, 363 (2012)). The employer bears the burden of proving its entitlement to an exemption. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008); *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11th Cir. 1997). For Defendant Tyler to prevail, it must prove the applicability of the exemption by "clear and affirmative evidence." *Birdwell v. City of Gadsden*, 970 F.2d 802, 805 (11th Cir. 1992).

### A. The FLSA's Administrative Exemption

The Parties vigorously dispute whether Ms. Greene was an administrative employee exempt from the FLSA based on her position as an implementation consultant, tasked with training Tyler's government customers on how to use the ExecuTime software.

In order for the FLSA's administrative exemption to apply, Tyler must prove that: (1) Ms. Greene was compensated on a salary basis at a rate of not less than $455 per week;[10] (2) Ms. Greene's primary duty consisted of the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Ms. Greene's primary duty includes the exercise of discretion and independent judgment with

---

[10] Since Ms. Greene's employment with Tyler, the DOL has increased the salary basis threshold to $684 per week (which works out to be $35,568 per year). Plaintiff does not dispute that she was paid a salary of $45,000 to $48,500 per year and therefore meets the first criteria of the administrative exemption.

respect to matters of significance. 29 C.F.R. § 541.200(a). Whether an employee falls under the administrative exemption is a highly fact-intensive inquiry that depends on the particular circumstances of each case. *See* 29 C.F.R. § 541.700 (a) (providing that the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole"); 29 C.F.R. § 541.202(b) (providing that "[t]he phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises"). As a job title is of little use for exemption purposes, courts look to the tests articulated by the Department of Labor's ("DOL") regulations under the FLSA in assessing the applicability of the FLSA's statutory exemptions. *Morgan*, 551 F.3d at 1265-66.

The regulations define the term "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Factors to consider when determining the primary duty of an employee include (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* While the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee, it is not dispositive of the primary duty issue. *See* 29 C.F.R. § 541.700(b) (noting that "employees who spend more than 50 percent of

17

their time performing exempt work will generally satisfy the primary duty requirement" and that "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion").

It is undisputed that Ms. Greene meets the salary requirement of the administrative exemption. However, the Parties dispute (1) whether Ms. Greene's primary duties involved work directly related to the management or general business operations of Tyler or its customers, and (2) whether her primary duties involved the exercise of discretion and independent judgment with respect to matters of significance. Tyler must prove both by clear and affirmative evidence for the exemption to apply. *Birdwell*, 970 F.2d at 805.

### i. Primary duty consisting of the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers

Tyler argues that, as an implementation consultant, Ms. Greene performed work directly related to both the "servicing of Tyler's business: delivering software to the public sector" and "to the servicing of the business of Tyler's clients." (Defendant's Motion for Summary Judgment ("Def. Mot."), Doc. 59 at 13.) Ms. Greene argues that she did not perform work *directly* related to the management or general business operations of Tyler or its customers, as her work with respect to Tyler was *production* work, and as her work with Tyler's government customers consisted of "presenting canned software presentations that she did not herself

18

create" and thus "[s]imply acting as a conduit for information about how ExecuTime software works does not constitute work directly related to the general business operations of Tyler's local government clients." (Resp. to Def. Mot., Doc. 69 at 11 n. 3, 15-16.)

Per DOL regulations, to meet the requirement that an employee perform work "directly related to the management or general business operations," an employee "must perform work directly related to assisting with the *running or servicing* of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a) (emphasis added). *See also, Cotten v. HFS-USA, Inc.*, 620 F.Supp.2d 1342, 1347 (M.D. Fla. 2009) ("This prong is met if the employee engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs.") (citing T*albott v. Lakeview Ctr., Inc.*, 2008 WL 4525012, at *4 (N.D. Fla. Sept. 30, 2008) (quoting *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002)) (internal citations omitted). The regulations provide examples of work that is "directly related to management or general business operations," as follows:

> (b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b). The exemption "relates to employees whose work involves servicing the business itself—employees who can be described as staff rather than line employees." U.S. DOL, Wage & Hour Div., Opinion Letter, 2010 WL 1822423, at *2 (Mar. 24, 2010) (internal citation omitted).

Courts addressing the issue of whether an employee engages in work "directly related to management or general business operations" often find the "production versus administrative" dichotomy helpful. This concept is intended to "distinguish between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself." *Id*. at *3; *Davis v. J.P. Morgan Chase & Co*., 587 F.3d 529, 535 (2d Cir. 2009) ("[W]e have drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business.") And while the administrative-production distinction may be an "imperfect analytical tool" in a service-oriented employment context, employees "can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Desmond v. PNGI Charles Town Gaming, L.L.C*., 564 F.3d 688, 694 (4th Cir. 2009) (citing *Reich v. John Alden Life Ins. Co*., 126 F.3d 1, 9 (1st Cir. 1997)).

Keeping this framework in mind, the Court first addresses Tyler's passing argument that Ms. Greene performed work directly related to *Tyler's* business operations. (Def. Mot. at 13.) In support, Tyler argues that Ms. Greene serviced Tyler's business by "taking the software developed and licensed by other Tyler resources and deploying it for the clients assigned to her." (*Id.*)

Plaintiff first asks the Court to disregard this argument, as Defendant never "put Plaintiff on notice of the argument in discovery." (Resp. to Def. Mot. at n. 3.) During discovery, Plaintiff asked Tyler to "[i]dentify each exemption ... that you contend were applicable to Plaintiff ... [and] Describe in detail the factual basis for such contentions ..." (Interrogatory No. 1, Defendant's Answers and Objections to Plaintiff's First Continuing Interrogatories, Doc. 49-1 at 2.) In response, Tyler stated that Plaintiff was subject to the administrative exemption because "her primary duty involved the performance of office or non-manual work directly related to the general business operations of *Tyler's customers*..." (*Id.*) (emphasis added). Accordingly, Ms. Greene argues that Tyler should not now be permitted to argue that Ms. Greene's work was directly related to *Tyler's* general business operations since it did not disclose that theory previously. (Pl. Reply in Support of Mot. for Partial Summary Judgment, Doc. 70 at 5) (citing *Goodman-Gable-Gould Co. v. Tiara Condominium Ass'n, Inc.*, 595 F.3d 1203, 1210-13 (11th Cir. 2010) (holding that district court did not abuse its discretion in excluding evidence defendant sought to introduce on a misrepresentation theory that it did not mention in its answer or initial interrogatory responses)). In addition, Ms. Greene

argues that Tyler cannot show that her work was directly related to its management or general operations because, under the "administrative-production dichotomy," her work was clearly *production* work not subject to the exemption. (Pl. Motion for Partial Summary Judgment ("Pl. Mot."), Doc. 57 at 18 n. 3; Pl. Resp. to Def. Mot. at n. 3.)

Tyler does not respond to Plaintiff's argument in justification of its interrogatory response or to substantively argue that Plaintiff worked directly on Tyler's general business operations. As a result, Tyler appears to have conceded this point. *Jones v. Bank of America, N.A.*, 564 Fed.Appx. 432, 434 (11th Cir. 2014). Yet, even absent any such concession, Tyler has not carried its burden of showing by "clear and affirmative evidence" that Ms. Greene's work was directly related to Tyler's management or general business operations. *Birdwell*, 970 F.2d at 805.

Ms. Greene was undisputedly not part of Tyler's management: she had no supervisory responsibility and could not hire or fire any other employees, and she reported to a supervisor that she checked in with daily or multiple times a day. (Second Greene Decl. ¶¶ 8, 13); *See e.g. Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 694 (4th Cir. 2009) (holding that horse racing trainers did not perform work directly related to management where they had no supervisory responsibility and their positions were not part of the management). Moreover, under the production-administrative dichotomy described above, Ms. Greene's work was clearly production rather than administrative. There is no evidence in

the record that Ms. Greene's duties involved any aspect of running Tyler's business, formulating policy, negotiating contracts, or the like. *See* 29 C.F.R. § 541.201(b); *Cotten*, 620 F.Supp.2d at 1348-49 (finding that plaintiff, a field supervisor for a home finishing company, did not perform work directly related to business operations where he was not involved in formulating business policies or procedures, did not negotiate or execute contracts, create work orders, or perform duties related to defendant's financing, budgeting, accounting, auditing, research, employee benefits, taxes, insurance, advertising, or computer technology); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1231 (5th Cir. 1990) (affirming lower court's finding that television news producers did not perform tasks related to the general business operations where they were not responsible for setting business policy, planning objectives of the news department, negotiating salary or benefits, or promoting newscasts). The service Ms. Greene provided to Tyler's government customers — implementation and training on ExecuTime software — was, according to Tyler's corporate representative, *always* provided to customers purchasing the ExecuTime software. (Pasch Dep. p. 56:4-18) (explaining that she was not aware of any customers who purchased ExecuTime software without the installation, implementation (which includes the training), and support). It is therefore clear that the ExecuTime training was an "output of the business." *Davis*, 587 F.3d at 535; *Desmond*, 564 F.3d at 694.

Tyler's contention that Ms. Greene's work was "critical" to its own business operations because her failure to perform would "leave Tyler vulnerable" and at

reputational risk is an argument that could be applied to nearly any employee in any workplace and is legally without merit. Whether or not an employee is indispensable is insufficient to prove that her primary duties are administrative. *See Desmond*, 564 F.3d at 692 (citing *Clark v. J.M. Benson Co.*, 789 F.2d 282, 287 (4th Cir. 1986) ("The regulations emphasize the *nature* of the work, not its ultimate consequences. Thus, [the plaintiff's] apparent indispensability does not obviate the need to prove independently that her primary duty is 'directly related to management policies or general business operations.'"). In sum, Tyler does not seriously appear to rely on this argument, for good reason. The uncontroverted evidence shows that Ms. Greene did not perform work directly related to Tyler's general business operations.

Tyler next and principally argues that Ms. Greene's work was directly related to servicing the general business operations *of Tyler's clients*. (Def. Mot. at 13.) According to Tyler, because Ms. Greene "led the deployment of ExecuTime software based on the client's policies and procedures, trained clients on the software, and helped troubleshoot issues," she was an "adviser or consultant on the ExecuTime software for Tyler's clients." (*Id.* at 14.) Plaintiff responds that:

> Plaintiff Greene did not consult municipal governments about how to compensate their employees or how to track their time. Rather, she assisted them in teaching them how to [use] their new time and pay software and how to configure its functionalities—a fancy way of saying "changing the settings." How the customers used the software was based on their own needs, which were determined long before Plaintiff ever became involved. Simply acting as a conduit for information about how ExecuTime software works does not even

24

arguably constitute the "general business operations" of Tyler's local government clients.

(Resp. to Def. Mot. at 19.) On the issue of whether an employee is subject to the administrative exemption based on work related to their employer's *customers*, the DOL regulations provide:

> (c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consults, for example) may be exempt.

29 C.F.R. § 541.201(c). Courts interpreting this subsection have explained that "while the regulations provide that 'servicing' a business may be administrative, § 541.205(b), 'advising the management' as used in [subsection (c)] is directed at advice on matters that involve policy determinations, *i.e.*, how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation." *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990) (emphasis added) (finding that probation officers were nonexempt because the services they provided to courts were not related to court policy or overall operational management, contrasting with financial advisers who advise customers on how to increase financial productivity or reduce risk); *see also Boyd v. Bank of America Corp.*, 109 F.Supp.3d 1273, 1288 (C.D. Cal. 2015) (holding that real estate appraisers were nonexempt as a matter of law and did not "advise" or consult" with defendant's customers, mortgage lenders, within the meaning of 29 C.F.R. § 541.201(c) ,where they did not offer a service meant to guide

the internal policies of the customer, contrasting with tax or financial consultants); *Watts v. Silverton Mortgage Specialists, Inc.*, 378 F.Supp.3d 1164, 1174 (N.D. Ga. 2019) (Jones, J.) (finding that plaintiff, a mortgage underwriter, did not function as advisor or servicer to bank's customers where plaintiff "analyzed loan applications utilizing *pre-determined* guidelines for risk provided to her by her employer" and did not market defendant's loans); *Gallegos v. Equity Title Co. of America, Inc.*, 484 F.Supp.2d 589, 595-596 (W.D. Tex. 2007) (determining that duties of escrow officer, who performed closing services for defendant's customers, did not relate to the management or business operations of defendant or its customers, as it was production work that merely applied existing policies and procedures on a case-by-case (customer-by-customer) basis).

Here, Tyler's customers are not other businesses with private financial incentives but local and state governments. The Wage & Hour Division of the DOL recently explained that there is "scarce authority … regarding what constitutes the general business operations of a [government]." U.S. DOL, Wage & Hour Div., Opinion Letter, FLSA 2020-9 at 3-4 (June 25, 2020)[11] (citing *O'Neill v. City of Palo Alto*, 2007 WL 9733770, at *5 (N.D. Cal. May 4, 2007)). However, it is often more useful to ask whether the job duties involve, "on the one hand, the day-to-day carrying out of the government's functions or, on the other, *running* the government (or a component of the government) itself or determining its overall

---

[11] *See*, https://www.dol.gov/sites/dolgov/files/WHD/opinion-letters/FLSA/2020_06_25_09_FLSA.pdf (last accessed Mar. 11, 2021).

course and policies." *Id.* at 4. (emphasis added) (citing *Dalheim*, 918 F.2d at 1230-31) (explaining that plaintiffs who did not set business policy or plan the long- or short-term objectives of the company were nonexempt).

Accordingly, regardless of the details of the general business operations of Tyler's particular government customers, a reasonable jury could not find that Ms. Greene primary duties involved *advising* those government customers on matters involving running a component of the government or determining the overall course and policies of the government. *Id.*; *Bratt*, 912 F.2d at 1070 (explaining that subsection (c) is directed at "advice on matters that involve policy determinations, *i.e.*, how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation"). Indeed, there is no record evidence that Ms. Greene *advised* any government customer, for example, how to run their personnel department, what benefits to offer (comp time, overtime, vacation time), or even what software to use to administer their time and attendance policies. (Second Greene Decl. ¶ 6.) As characterized by Tyler, Ms. Greene's role was entirely distinct from that of a tax adviser or financial consultant who may direct a customer on matters of policy determination about how to better or more efficiently run their business operation or how to comply with particular regulations (an example Defendant cites in its reply at 7).

The DOL regulations identify the following areas as connected to general business operations of a business: tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing;

27

research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. 29 C.F.R. § 541.201(b). Of these categories, the only ones Tyler even suggests are implicated here are "quality control" and "database administration." (Resp. to Pl. Mot. at 9.) But Defendant does not provide any explanation or theory, let alone record evidence, to show how or when Plaintiff *advised* any government customer in either capacity. In contrast, Plaintiff argues (Pl. Reply at 3), and the uncontroverted record supports, that Ms. Greene did not advise government customers how to set up, modify, test or secure their government databases; how to program, design, or modify software; what software or functionalities to buy; or how to update or reconfigure the software to function more efficiently. The decision of what software to buy was made in collaboration with a Tyler sales representative and a product owner. (Pasch Dep. p. 34:13-18.) After a customer had decided to purchase ExecuTime software, Ms. Greene did not advise it on what ExecuTime features or functionalities to purchase – such as whether to have advanced scheduling or a milestone contract, or how many timeclocks to have – as those decisions too were made prior to her involvement and in conjunction with a Tyler sales representative. (Second Greene Decl. ¶¶ 8, 9, 16, 23; Pasch Dep. p. 39:3-8; 44:12-14; 58:1-5; 60:11-13.)

The Parties agree that the majority of Plaintiff's work time was spent conducting trainings and preparing to conduct trainings. (Pl. SOMF ¶ 38; Def.

Resp. to SOMF ¶ 38.) With respect to her time actually conducting the trainings with power users, super users, and end users, the Wage & Hour Division has instructed that providing routine education by way of "delivering educational lectures, materials, and presentations would be day-to-day work and would be nonexempt." *See, supra*, U.S. DOL, Wage & Hour Div., Opinion Letter, FLSA 2020-9 at 4 (June 25, 2020)) (also noting that furnishing presentations or "acting as a courier or messenger" of information is likely exempt). *See also, Kohl v. Woodlands Fire Dep't*, 440 F. Supp. 2d 626, 640 (S.D. Tex. 2006) ("To the extent that [plaintiff] taught prepackaged classes, delivered preset lectures, or presented preestablished programs, she was not engaged in administrative work."); *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 686, 690 (6th Cir. 2001) (affirming decision that training officer, who taught employees based on inherited lesson plans that he adjusted to incorporate new administrative orders issued by the Nuclear Regulatory Commission was nonexempt). And while Tyler makes much of Plaintiff's time spent reviewing client information, such as the questionnaire, and familiarizing herself with their policies, such review time certainly doesn't meet the standard of *advising* a government customer on its general business operations as contemplated by 29 C.F.R. § 541.201(c).

Tyler's attempt to dress up Ms. Greene's duties is no substitute for evidence of the actual duties she performed. In this vein, Tyler's reliance on Ms. Greene's title of "implementation *consultant*" is misplaced. "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of

any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2. *See also*, *Trammell v. Amdocs, Inc.,* No. 2:15-CV-01473-RDP, 2016 WL 3618367, at *4 (N.D. Ala. July 6, 2016) ("[R]egardless of job title, a plaintiff must have *actually* performed one of the exempt executive, administrative, or professional duties *customarily and regularly*.") (emphasis added) (citing 29 C.F.R. § 541.201(a)); *Chin Hui Hood v. JeJe Enterprises, Inc*., 207 F.Supp.3d 1363, 1371 (N.D. Ga. 2016); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 674 (11th Cir. 2009) (explaining that courts should look beyond an employee's title to the specific duties performed). Of course, were job titles sufficient to prove an exemption, employers would be able to escape liability simply by casting an employee's job title in a manner befitting a particular exemption.

Similarly, Tyler's heavy-handed reliance on Ms. Greene's post-employment resume, which is framed at a high level of generality, first is not evidence of the actual duties she performed as an implementation consultant, as numerous courts have explained. *Ale*, 269 F.3d 680 at 689–90 (6th Cir. 2001) ("When titles and vague job descriptions are not born out by more specific evidence they are not entitled to any special weight, in fact, this type of evidence has been rejected."); *Schaefer v. Indiana Michigan Power Co*., 358 F.3d 394, 400–01 (6th Cir. 2004) ("[W]e have recognized that resumes may not provide the most accurate picture of an employee's job because resumes are typically designed to enhance the

30

employee's duties and responsibilities in order to obtain a job. ") (internal citations omitted); *Morrison v. Cty. of Fairfax, VA*, 826 F.3d 758, 764 (4th Cir. 2016) (explaining that generalized job descriptions or employee resumes "do not add appreciably to or call into question the more specific evidentiary submissions of the parties"). Second, the duties as described in Ms. Greene's resume do not indicate that her work was in any way directly related to the general business operations of Tyler's customers. "Directing project teams to meet project objectives," (which were in fact undisputedly pre-determined, *see* Greene Dep. p. 102:10-17), "setting clear expectations for project teams," or "holding regular meetings with clients to ensure that milestones are met" in no way establishes that Ms. Greene guided local policy or procedure, or ran/ serviced the government customer's operations, or advised in any capacity listed in 29 C.F.R.§ 541.201(b).

Defendant's argument that Ms. Greene's work of "troubleshooting" for the government customers renders her exempt is not supported by the DOL regulations, the legal authority, or the facts. The Wage & Hour Division has explained that IT support work, such as work involving "installing, configuring, testing, and troubleshooting computer applications, networks and hardware" does not qualify for the administrative exemption under Section 13(a)(1) of the FLSA. *See*, U.S. DOL, Wage & Hour Div., Opinion Letter, FLSA 2006-42 (Oct. 26, 2006) at 5 (citing *Martin v. Ind. Mich. Power Co*., 381 F.3d 574, 581-84 (6th Cir. 2004) (finding that IT support specialist responsible for installing and upgrading hardware and software, and testing and troubleshooting equipment was not

exempt because work was not directly related to management policies or general business operations)). *See also, Lee v. MegaMart, Inc.*, 223 F. Supp.3d 1292, 1300 (N.D. Ga. 2016) (May, J.) (explaining that IT workers "who primarily troubleshoot and repair computer systems are not exempt while those who have a more in-depth role in creating and managing computer systems are exempt"). Here, not only did Plaintiff spend a minimal amount of time "troubleshooting" but she undisputedly did not have a role creating or managing computer systems, did not repair computer systems, and did not do work involving any programming expertise. In fact, she explicitly stated that she was not able to do such technical work:

> Q: But in terms of what your responsibility was to, quote, unquote, build the schedule, are you actually programming the software or what is it that you're doing?
>
> A: No, I'm not very technical, so when it comes to, like, programming and things in depth on the technical side, I did not handle any of that.

(Greene Dep. p. 26:11-18.) Instead, Ms. Greene was able to fix straightforward problems related to the software's functionality, like overtime not populating, by something as "simple" as fixing the preferences on the back end. (Greene Dep. p. 135:11-17.) If a problem was at all technical, a ticket would be sent to the support team to handle it. (Second Greene Decl. ¶ 4.)

Also misplaced is Defendant's reliance on Plaintiff's alleged indispensable role in allowing local government customers to schedule and pay their employees. (Def. Mot. at 13-14.) *See Desmond*, 564 F.3d at 692, *supra* (explaining that it is the *nature* of the work, not the ultimate consequences that should be evaluated, and

noting that secretaries, for example, can be essential but are typically nonexempt employees). By Defendant's logic, nearly any employee would be rendered exempt as indispensable in some manner or other, for example, a store clerk indispensable because a customer could not make a purchase without their involvement.

Tyler's cited cases in support all involve employees directly engaged in advising the policies and operations of their employer or its relevant customers and are therefore inapplicable to the facts of this case. In *Verkuilen v. MediaBank, LLC*, 646 F.3d 979 (7th Cir. 2011), the plaintiff was an account manager for a media company who worked with clients (companies) to determine their specific advertising needs and customize the advertising products accordingly, as follows:

> Identifying customers' needs, translating them into specifications to be implemented by the developers, assisting the customers in implementing the solutions—in the words of [the employer's] chief operating officer, account managers are expected to 'go out, understand [the customers' requirements], **build specifications**, understand the competency level of our customers. Then they will **build functional and technical specifications and turn it over to ... developers who will then build the software**, ... checking in with the account manager, making sure what they are building is ultimately what the customer wanted.

*Id.* at 982. (emphasis added) (also explaining the account manager helped the software engineers determine how to adapt its software and dealt with the complexity and variance as to each client). Here, there is no evidence that Ms. Greene built any specifications or customizations or advised in any capacity related to the development of new software. She did not interact with anyone who engineered software. All of the decisions about what functionalities a local

government preferred were made prior to Ms. Greene's involvement and she was not in a powerful intermediary role, as described in *Verkuilen*.

In *Brooks v. Healthcare-Iq, Inc.,* 2019 WL 497693 (M.D. Fla. Feb. 8, 2019), the plaintiff, who was primarily a training and development manager, performed a "complete redesign" of the complex medical software training curriculum and also "managed the curriculum design." He testified that he "completely redesigned the approach that was taken in the curriculum," and either designed teaching modules himself or gave instructions to his colleague/ assistant to do so, without any approval from higher-ups. *Id.* at 2. (also noting that the plaintiff designed graphs and illustrations or would go to the marketing department and give them ideas about what he wanted certain marketing materials to look like). Here, Ms. Greene's duties did not involve the design or redesign of any software, she certainly did not have anyone at a lower level or in another department design modules or training materials at her request, and she did not approve any other employee's expense reports, as in *Brooks*.[12]

For the reasons above, Tyler has not met its burden of demonstrating that Ms. Greene's primary duties were directly related to the management or general business operations of Tyler or of its local government customers under the

---

[12] *Carbaugh v. Unisoft Intern., Inc.*, 2011 WL 5553724 (S.D. Tex. Nov. 15, 2011) is also highly distinguishable. In that case, the plaintiff was responsible for installing, adapting, and tailoring software to suit clients' needs, working with programmers and coders to supply them with information to produce software suited to the clients' needs, and himself developed and tailored training modules. *Id.* at *22. Ms. Greene did not install or adapt any ExecuTime software and she had no engagement with programmers or coders to produce new software capabilities.

applicable legal standard and as contemplated by 29 C.F.R. § 541.200. A reasonable jury could not find otherwise. In contrast, Plaintiff has met her burden in establishing that the exemption is not applicable under the present facts as construed in the light most favorable to Tyler. Therefore, the Court finds that Ms. Greene did not fall within the administrative exemption and summary judgment in favor of Plaintiff is appropriate. For good measure, however, the Court addresses the third prong of the administrative exemption test below.

### ii. Primary duties consisting of the exercise of discretion and independent judgment with respect to matters of significance

Tyler argues that Ms. Greene exercised discretion and independent judgment because she made recommendations to and worked directly with the government customer with little supervision. (Def. Mot. at 18.) Further, when troubleshooting, she had to "evaluate issues presented, escalate issues as appropriate and ensure they were resolved to the client's satisfaction." (*Id.*) On the flipside, Ms. Greene argues that her duties of ExecuTime instruction and troubleshooting existed within "constrained and pre-established parameters that did not permit any real discretion with respect to matters of significance, much less as a *primary duty*," and that no factfinder could conclude otherwise based on the applicable regulations and law. (Pl. Mot. at 25.)

In order to qualify as an exempt administrative employee, the DOL's regulations provide:

> [i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluations of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

29 C.F.R. § 541.202(a). Factors to consider in determining whether the "discretion and independent judgment" criteria is satisfied include, but are not limited to: (1) whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; (2) whether the employee carries out major assignments in conducting the operations of the business; (3) whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; (4) whether the employee has authority to commit the employer in matters that have significant financial impact; (5) whether the employee has authority to waive or deviate from established policies and procedures without prior approval; (6) whether the employee has authority to negotiate and bind the company on significant matters; (7) whether the employee provides consultation or expert advice to management; (8) whether the employee is involved in planning long- or short-term business objectives; (9) whether the employee investigates and resolves matters of significance on behalf of management; and (10) whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. *Id.* at § 541.202(b).

Although the "exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate

direction or supervision . . . employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review . . . The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c). The regulations further provide that the "exercise of discretion and independent judgment *must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources.*" *Id.* at § 541.202(e) (emphasis added). It "does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." *Id.* Finally, "[a]n employee does not exercise discretion and judgment in matters of significance merely because the employer will experience financial losses if the employee fails to properly perform his or her job." 29 C.F.R. § 541.202(f).

The Court turns first to Plaintiff's "troubleshooting" work as the law is abundantly clear on this front. The Wage & Hour Division has clearly articulated that IT support work, including troubleshooting computer applications, networks, and hardware and ensuring that computer equipment or a computer application is "working properly according to the specifications designed by others" are examples of work that "lacks the requisite exercise of discretion and independent judgment

within the meaning of the administrative exemption." *See supra*, U.S. DOL, Wage & Hour Div., Opinion Letter, 2006-42 (Oct. 26, 2006) (further explaining that such work "does not involve formulating management policies or operating practices, committing the employer in matters that have significant financial impact, negotiating and binding the company of significant matters, planning business objectives, or other indicators of exercising discretion and independent judgment with respect to matters of significance discussed in 29 C.F.R. § 541.202(b)); *Turner v. Human Genome Scis., Inc.*, 292 F.Supp. 2d 738, 745, 747 (D. Md. 2003) (finding that although employees responsible for troubleshooting and correcting software problems and network connectivity issues used knowledge and skill to solve computer problems, their primary duties did not involve discretion or independent judgment); *Burke v. County of Monroe*, 225 F. Supp. 2d 306, 320 (W.D.N.Y. 2002) (noting that operating computer networks involved "routine duties without the requirement of discretion"). Moreover, the facts here show that Ms. Greene only spent a "small percentage" of time "troubleshooting." (Greene Dep. p. 93:5-13.)

Likewise unavailing is Tyler's contention that Ms. Greene exercised discretion in determining whether to escalate a troubleshooting question to the support team. (Def. Mot. at 18). Not only does the record indicate that Ms. Greene had to go through her supervisor before a ticket could be sent to the support team (Greene Dep. p. 136:3-11; Second Greene Decl. ¶¶ 4-5) but moreover, an employee does not exercise discretion by following prescribed procedures. *Gallegos*, 484 F.Supp.2d at 597 (holding that escrow officer did not exercise independent

38

judgment where his "decisions," such as whether to proceed with a closing if only one party appeared, were simply a matter of following the prescribed procedures and where he had to contact a borrower or broker if there was a problem with the lien).

Next, Tyler's argument that Plaintiff exercised discretion because she coordinated and prioritized her own schedule also does not meet the requirements of 29 C.F.R. § 541.202(a). It is insufficient to show discretion on matters of significance only through evidence that an employee makes decisions regarding "when and where to do different tasks, as well as the manner in which to perform them." *Clark v. J.M. Benson, Co*., 789 F.2d 282, 287-88 (4th Cir. 1986) (explaining that the district court erred in finding that bookkeeper exercised discretion in deciding when and where to do different tasks and the order and manner in which to perform them); *see also,* U.S. DOL, Wage & Hour Div., Opinion Letter, 2005 WL 3308592 (Aug. 19, 2005) ("[P]lanning one's own workload, such as prioritizing the pursuit of particular leads ... determining which potential witnesses to see and which documents to review, and making similar decisions that promote effective and efficient use of that individual's own work time ... do <u>not</u> constitute exercising discretion and independent judgment with respect to matters of significance."). Such decisions assuredly do not meet the standard for "matters of significance" which generally includes "responsibilities dealing with matters of broad scope and significant detail that have a profound effect on the employer's business," such as: "matters that have significant financial impact, negotiating and binding the

39

company on significant matters; and planning long- or short-term business objectives." *Allemani v. Pratt (Corrugated Logistics) LLC*, No. 1:12-cv-100-RWS, 2014 U.S. Dist. LEXIS 77715, at *30 (N.D. Ga. June 6, 2014) (citing *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp.2d 1308, 1313-14 (S.D. Fla. 2008)).

Tyler next argues that Ms. Greene exercised discretion and independent judgment because, for each project she worked on, she "assessed client protocols and procedures, managed competing client deadlines and priorities, [and] created custom training agendas based on client feedback." (Def. Resp. to Pl. Mot. at 14.) Not only is this characterization devoid of any specifics and unsupported by record evidence[13], but it is not indicative of any duties emblematic of discretion and independent judgment in matters of significance: that is, actions that "involve[] the comparison and the *evaluations of possible courses of conduct*, and *acting or making a decision* after the various possibilities have been considered." 29 C.F.R. § 541.202(a) (emphasis added).

Tyler admits that Ms. Greene herself had no involvement in making decisions to set deadlines for the projects she was involved in. (Def. Resp. to Pl. SOMF ¶ 24.) As noted *supra* at n. 5, Tyler's suggestion that Ms. Greene herself made decisions to delay "go live" dates finds no support in the record and nevertheless is not a matter of significance. (Second Greene Decl. ¶¶ 13, 15);

---

[13] Defendant does not cite to the record in support. However, Ms. Greene testified in connection with a particular client that she "did not create the actual agenda," that it was a template set up by her supervisor (Greene Dep. p. 139:15-20), and that project managers "built a template within the project plan" (*id.* p. 111:17-19).

(Greene Dep. p. 181:24-25; 182:1-3) (explaining that the project manager "handled the Go-Live date. I would just tell them the – you know, essentially the client is requesting to put on hold, and they would take it from there.")

As a result, the evidence before the Court indicates that any decision-making capacity Ms. Greene held was a matter of following prescribed procedures, and that it was her supervisor who had to make any substantive change to a customer's project plan or timeline.[14] Under the applicable legal authority, this does not constitute the exercise of discretion, let alone in matters of significance. *See, Ale*, 269 F.3d at 686, 690 (6th Cir. 2001) (affirming decision that training officer, who taught employees based on inherited lesson plans that he adjusted to incorporate new administrative orders and also tested those employees, did not exercise discretion or independent judgment because job only involved following prescribed procedures and did not involve comparison of possible courses of conduct); *Gallegos*, 484 F.Supp.2d at 597 (holding that escrow officer did not exercise independent judgment where his "decisions" were simply a matter of following the prescribed procedures and where he had to contact a borrower or broker if there was a problem); *Beauford v. ActionLink, LLC*, 781 F.3d 396, 405 (8th Cir. 2015) (holding that brand advocates who followed set scripts and well-established techniques, procedures, and standards set forth in manuals were not

---

[14] Indeed, whether the supervisor's decision to alter the deadlines of a given implementation project is a "matter of significance" is by no means apparent.

covered by the administrative exemption, noting that they had to seek approval before deviating from procedure).

Likewise, Tyler's position that Ms. Greene had the "discretion to make recommendations" to its government customers that "shaped the course and trajectory of any given implementation" is inconsistent with the record evidence. Ms. Greene declared that she "never made any recommendations to Tyler customers about the possibility of purchasing additional hours" (Second Greene Decl. ¶ 16); "the decision whether a customer would have in-person trainings or remote trainings was made before I was brought in on a project" (*id.* ¶ 9); "at no point in my employment did I ever recommend that a customer have me come back on-site for additional training" (*id.* ¶ 21); she "never made any recommendations to customers about making any changes to their payroll practices" (*id.* ¶ 24); she "cannot recall a single instance of ever making a recommendation to a customer about purchasing timeclocks … that would be the job of Tyler salespeople," (*id.* ¶ 23); and she "never made any recommendations to customers on how to manage their information databases" (*id.* ¶ 25). Ms. Greene's deposition also indicates that she never recommended to a client that they needed more training hours, and instead, if the client was getting low on their pre-allotted hours, she would merely indicate that to the project manager. (Greene Dep. p. 110:1-14.) Tyler has identified no instances where Ms. Greene made any recommendations to a government customer in contravention of her sworn testimony, let alone shown that making such recommendations on *matters of significance* was a *primary duty* of her job.

*See, Beauford*, 781 F.3d at 405 (noting that "almost all possess some discretion in their daily work, but employees qualify for the administrative exemption only when that discretion "is real and substantial, that is, they must be exercised with respect to matters of consequence.") (internal citation omitted).

Tyler's cited legal authority, previously discussed, does not persuade otherwise, as the facts in those cases are inapposite. The plaintiff in *Brooks* testified that he had discretion to develop training materials and pedagogic examples without the approval or supervision of anyone at headquarters and had the authority to supervise another employee who assisted him in these tasks. 2019 WL 497693 at *3. The court in *Carbaugh*, 2011 WL 5553724, at *22-23 found that the plaintiff exercised discretion in consulting with client businesses on new product ideas and enhancements, approving new product versions and fixes, and developing cost savings to increase profit revenue for customers.   In *Cruz v. Lawson Software, Inc.*, 764 F.Supp.2d 1050 (D. Minn. 2011), the plaintiffs testified to almost "nonexistent supervision," as they did not communicate on a regular basis with supervisors, and also made decisions in connection with configuring software for specific clients, upgrading software, adding new features, developing the interface, converting data, and more. *Id.* at 1058-59, 1068.

Finally, Tyler stresses that Plaintiff's work was done at home or the customer's site as confirmation of her independent judgment and discretion. (*See* Def. Mot. at 16) (citing *Brooks*, 2019 WL 497693 at *3) (noting that on multiple occasions, plaintiff took sick or personal time at his leisure, entertained clients in

43

the evening and took hour-long lunches which at times included alcohol in support of finding of exercise discretion); (citing *Verkuilen*, 646 F.3d at 981) (noting that an employee working off-site might be tempted to inflate his hours). Tyler has pointed to no regulation or guidance making this distinction as indicative of independent decision-making on matters of significance on its own, without other persuasive indicators of such discretion. In the increasingly technological (and currently, pandemic-ridden) waters in which we swim, working remotely and separate from other employees and supervisors is not unusual, and companies have developed ways to track employee time while not physically on the premises, as Tyler well knows. The location of Ms. Greene's work alone is insufficient to show that she exercised independent judgment on matters of significance. *See e.g.* *Beauford*, 781 F.3d at 399-400 (finding that "brand ambassadors" whose work primarily involved visiting stores and teaching store employees about employer-backed products, maintaining displays, and speaking with customers who had questions about the product did not exercise discretion in matters of significance).

As detailed thoroughly herein, Tyler has not supplied the Court with any concrete evidence to create a genuine fact issue on whether Ms. Greene exercised discretion and independent judgment in matters of significance as a primary function of her job as implementation consultant. Plaintiff Greene, however, has shown, based on the facts construed in Tyler's favor, that she did not hold primary duties that included the exercise of independent judgment. For this separate

reason, the Court concludes that Ms. Greene is not subject to the administrative exemption and summary judgment for Plaintiff on this issue is warranted.

### B. Willfulness

The Court now turns to the issue of willfulness. The statute of limitations for a claim seeking unpaid overtime wages under the FLSA is generally two years. 29 U.S.C. § 255(a). But if the claim is one "arising out of a willful violation," the statute of limitations is extended to three years. *Id.* "To establish that the violation of the [FLSA] was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). Federal regulations define "reckless disregard as the 'failure to make adequate inquiry into whether conduct is in compliance with the [FLSA].'" *Id.* (quoting 5 C.F.R. § 551.104). To succeed on a motion for summary judgment on this issue, Tyler "must show that no reasonable trier of fact could find that [it] acted without good faith." *Smith v. Ideal Towing, LLC*, No. 1:16-CV-1359-TWT, 2017 WL 5467154, at *8 (N.D. Ga. Nov. 13, 2017).

Tyler argues that Ms. Greene "cannot meet the high standard to establish that Tyler acted willfully by classifying Plaintiff as exempt," in large part because Tyler's general counsel testified that the classification of implementation consultants was "in part based on the advice of outside legal counsel," Mr. Paolo

McKeeby, who is also counsel for Tyler in this case. (Def. Mot. at 20-21) (citing *Bailey v. Innovative Contracting Sols., Inc.*, No. 1:13-cv-4114-LMM, 2014 WL 6816830, at *6 (N.D. Ga. Dec. 4, 2014) (finding no willfulness by employer *in part* because employer relied on advice of counsel regarding classification)). In response, Plaintiff points to evidence that Tyler "was sued for the exact same violation in 2008" and that "the existence of that case is strong evidence that Defendant was put on notice that its classification of [implementation consultants] was legally suspect." (Resp. to Def. Mot. at 22-23.) Further, according to Plaintiff, Tyler's "advice from outside counsel" rationale is insufficient because Tyler has no records regarding this advice, can provide no details regarding outside counsel's (Mr. McKeeby's) investigation in support of the advice, and Mr. McKeeby's refusal to testify on this subject creates a presumption that his testimony would be unfavorable. (*Id.* at 23) (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 658-59 (11th Cir. 1988) ("[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.") (citing *Graves v. United States*, 150 U.S.118, 121 (1983)).

"Although consultation with an attorney may help prove that an employer lacked willfulness, such a consultation is, by itself, insufficient to require a finding in favor of the employer." *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011). Further, "[t]he court's operative inquiry focuses on the employer's diligence in the face of a statutory obligation, not on the employer's

mere knowledge of relevant law." *Id.* (citing *McLaughlin,* 486 U.S. at 134–35); *see also, Fuentes v. CAI Int'l, Inc.,* 728 F. Supp. 2d 1347, 1358-59 (S.D. Fla. 2010) ("mere reliance on the advice of counsel is insufficient to satisfy the defendants' burden in proving their good faith in failing to pay overtime") (citing *Townley v. Floyd & Beasley Transfer Co.,* 1989 WL 205342, at *4 (N.D. Ala. 1989)).

Here, Tyler has presented no evidence of what information was supplied to outside counsel in support of his exemption determination, no evidence of his investigation, and no records in connection with his review or determination. *Carr v. AutoZoner, LLC*, No. 5:15-CV-00356-AKK, 2020 WL 6827897, at *5 (N.D. Ala. Nov. 20, 2020) (finding that jury question existed on question of willfulness where defendant "has not cited any evidence regarding what information it supplied its attorneys or what its attorneys considered when advising [defendant] about the proper classification of its store managers ... Thus, the evidence currently before the court relating to [defendant's] reliance on the advice of counsel does not establish that the plaintiffs cannot prove a willful violation of the FLSA as a matter of law."); *see also*, *Ideal Towing,* 2017 WL 5467154, at *8 (finding that a single assertion that defendant consulted with counsel "is not proof of good faith. The Defendants do not provide any other information about the content or nature of this consultation, which would be important in determining whether reliance on this advice was both honest and reasonable").

In addition, Ms. Greene has supplied evidence that Tyler was previously sued regarding the same issue of whether it improperly classified implementation

consultants as administratively exempt under the FLSA. *See Patty Beall et al. v. Tyler Technologies, Inc., and EDP Enterprises, Inc*., No. 2:08-cv-422 TJW (E.D. Tex. 2008). Plaintiff also emphasizes that Tyler settled this case after full summary judgment briefing but before the court ruled. (Resp. to Def. Mot. at 22-23.) Tyler paints this past lawsuit as entirely irrelevant, citing *Sullivan v. PJ United, Inc.,* 362 F. Supp. 3d 1139, 1175 (N.D. Ala. 2018), *opinion vacated in part on reconsideration* (Aug. 7, 2018) (explaining that defendant's settlement, in a different judicial district did not have any bearing on whether defendants willfully violated the FLSA through their vehicle reimbursement methodology). But other courts have determined that prior settlements are relevant to the willfulness determination. *See e.g., Seward v. Midwest Commc'n Servs., Inc.,* No. 020CV00093 JRTKMM, 2020 WL 8256362, at *1 (D. Minn. Dec. 15, 2020) ("Prior lawsuits, proceedings, and other such events in which [defendant] was previously involved, if any, would not be made less relevant to the issues of willfulness or good faith by the fact that they occurred in other jurisdictions, as the FLSA is a statute of nationwide application."); *Sims v. Event Operations Grp., Inc.,* No. 2:17-CV-01489-JHE, 2019 WL 1301959, at *5 (N.D. Ala. Mar. 21, 2019) (finding that defendants' objective reasonableness in relying on their policies is undermined by a motion for approval of a settlement agreement in a prior FLSA lawsuit and finding that defendants had not shown good faith).

Taking all of the relevant facts into consideration, the Court concludes that there is a material question of fact as to whether Tyler knew that its conduct was

prohibited by the FLSA or showed reckless disregard about whether it was. Defendant's request for summary judgment as to willfulness is **DENIED**.

## IV. Conclusion

In sum, Defendant has not shown that Ms. Greene was an exempt employee under the administrative exemption and fact questions preclude summary judgment on the issue of willfulness. Thus, Tyler's Motion for Summary Judgment [Doc. 56] is **DENIED**. Plaintiff has established that, under the facts of this case, construed in the light most favorable to Tyler, Ms. Greene was nonexempt under the applicable legal authority. Plaintiff has also established that Tyler was a successor in interest of ExecuTime. Therefore, her Partial Motion for Summary Judgment [Doc. 57] is **GRANTED. The Court ORDERS AND REFERS this case to mediation with the next available magistrate judge on the rotation wheel.** Mediation shall be completed by **April 30, 2021**. The Parties shall notify the Court of the status of the case within 5 days of the conclusion of mediation. If a settlement agreement is not reached, the Parties' proposed Consolidated Pretrial Order shall be due 30 days after the mediation.

**IT IS SO ORDERED** this 16th day of March 2021.

**Honorable Amy Totenberg**
**United States District Judge**

49