DocuSign Envelope ID: 8FDE539A-BBA9-4C66-BFB9-5F16E5463C53

**PLAINTIFF'S EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| TALIA N. HARRISON, <br><br> Plaintiff, <br><br> vs. <br><br> TYLER TECHNOLOGIES, INC., <br><br> Defendant. | Civil Action No. 4:21-cv-607-ALM |

### DECLARATION OF TALIA HARRISON

I, Talia N. Harrison, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. My name is Talia Harrison. I am over the age of 18, suffer from no disability or infirmity which would prevent me from testifying, and I testify to the matters herein from my own personal knowledge concerning the facts contained herein.

2. After being hired by ExecuTime in August 2013 as a Project Manager/Trainer, I was promoted in approximately 2014 to the position of Manager of Implementation Services.

3. In 2016, exhausted by the excessive demands of that position, I requested to be *demoted* into the position of Project Manager (PM), which had fewer responsibilities and less authority, and required less travel.

4. When Tyler Technologies acquired ExecuTime, they split that role into Project Manager and the new Implementation Consultant (IC) position.

5. When I was demoted, I was called a "Senior" PM, but it was never explained to me what that designation meant and what differentiated an SPM from a PM.

6. As an SPM, I did the same job duties as other PM's, however, I did typically handle far more implementations that regular PM's (and even the other SPM). This was not because

   of my SPM position, but because I had been working with ExecuTime software longer than anyone else and was far more familiar with it and with the ExecuTime implementation process.

7.  Both ExecuTime and Tyler had very high turnover of PM's (and later, IC's). People rotated in and out of these positions frequently and thus few if any ever became as familiar with the software as I was.

8.  During my time as an SPM, I reported directly to an Implementation Manager (IM). I worked in Tyler's offices, although my direct supervisor was remote. However, Other managers were in the same office, including Jamie Burns. I was in contact with my IM on a daily basis, typically several times every day, and was closely supervised by my IM at all times.

9.  As an SPM, I had a quota of billable hours I was required to meet. These hours were billed to customers who had purchased a package of hours (referred to as a "budget") along with the ExecuTime software itself.

10.  I understand that Tyler alleges that I was "in charge of preparing a high-level project plan" as an SPM. In reality, what this means is that I used a template prepared by Tyler that listed all the steps required in an implementation of ExecuTime software. I would omit certain steps in the implementation that corresponded to functionalities that had not been purchased by a given customer, and which were not required for the customer's existing payroll practices. For example, I would omit steps relating to comp. time if the customer did not issue comp. time to its employees.

11. I would also modify the project plan based on blackout dates provided by the customer (e.g., dates when the customer's IT people or HR director were on vacation and unavailable to participate in the implementation).

12. I had absolutely no discretion about what went into a project plan. I would simply input data gathered from the client on a questionnaire that the sales team had the customer fill out before I became involved, the Excel Workbook we used would then generate the plan, and I modified dates as the customer required.

13. I understand that Tyler alleges that I would "conduct[] initial post-contract meetings with the client. What would happen in these meetings is that I would reiterate how the implementation process worked so that the customer could plan accordingly (e.g., make sure that necessary employees were available for training at specific times in the implementation). My role was simply to convey information to the client in these meetings and I had no discretion how the implementation process would proceed.

14. I understand that Tyler alleges that I would "set[] up a project schedule." What this means is that I would use our Excel Workbook to automatically generate a schedule based on a "kick-off date" chosen by Tyler management in consultation with the customer. I would simply input the kick-off date into the project plan and had no discretion or made any sort of significant decision in connection with the schedule beyond making minor adjustments to dates based my pre-existing schedule and that of the IC assigned to me.

15. I understand that Tyler alleges that, after the project plan was created, "the day-to-day responsibility for the implementation shifts from the project manager to the implementation consultant." This was not always the case. I frequently performed the

   role of IC and there would be no such handoff to an IC. Off the top of my head, I can recall projects in Seattle, Oak Harbor, American Samoa, Grand Fork, Bozeman, and Baton Rouge where I worked on the implementation alone, without an IC.[1]

16.  I understand that Tyler alleges that "[m]loving a go live date typically would result in a delay of transitioning to the ExecuTime software of three to six months." This is not true. Typically, if a go-live date had to be moved, it would delay the implementation by only one or two pay periods. The exact length of time depended on the length of the client's pay period, but the delay would rarely if ever be more than one month.

17.  I understand that Tyler frequently refers to my responsibilities with respect to a project "budget." What this term means, in reality, is that I had to keep track of how many hours had been used up on a project versus how many hours the customer had purchased for the implementation. Managing the budget just meant that I had to be efficient with my billable time. If the time spent by myself or the IC assigned to me was more than anticipated by Tyler during the contract negotiation stage, I was required to inform my IM about the excessive hours.

18.  I understand that Tyler frequently refers to my responsibilities with respect to "scheduling resources" and "setting deadlines." "Resources" refers to the IC assigned to me, as well as the tech and development teams. If a customer needed assistance from the IC or those other teams, I would schedule that assistance in Outlook based on the published availability of the IC or other team members. Then, if the client or other teams

---

[1] On the Baton Rouge implementation, an IC and a customer support rep. did accompany me to an in-person customer training session because of the large number of employees that needed to be trained. There was simply too many for me to train on my own. I did not supervise them, however. Rather, they would simply run parts of the trainings instead of me because it would have been too much work for one person to speak non-stop all day long.

had a problem with the scheduling, they would tell me and I would move the date as needed. If there was a conflict, I would send it to my IM for resolution. I did not resolve such conflicts myself. Deadlines (a/k/a "milestones") were set out in the initial project plan, and I could not independently change them. And in some cases, rather than scheduling in Outlook, I would enter a JIRA ticket that was placed in a queue for the members of the tech/development teams to pull from and work on according to their own criteria.

19. I understand that Tyler refers to my responsibilities with respect to "assigning responsibilities." This is specific to tasks that were handled by other teams. For example, if a customer needed help with overtime not being calculated correctly, then that had to be addressed by the technical team. I had no discretion about who to assign responsibilities to, and it was always obvious who the appropriate person or team was to handle it.

20. I understand that Tyler alleges that I would "adjust the timeline to reflect the implementation resources available to [me]—e.g., if [I] assessed an implementation consultant would not be capable of completing certain tasks, [that I] would assign [my]self those tasks." That is incorrect. My IM would make that decision. I did give feedback to my IM if she asked me about an IC's capabilities. I can recall one instance in which that happened: at the beginning of on IC's employment before he had learned all functionalities of the software. It was by no means a regular occurrence.

21. I understand that Tyler alleges that I "might adjust the timeline to include 'buffer room' for additional training if [I] believed the implementation was particularly complex." This is false. If a customer had an unusually large number of employees to be trained—more

than typical and more than Tyler's generic timeline anticipated—then I would tell my IM and my IM would make a decision about how to handle it, possibly deciding to add such "buffer room."

22. I understand that Tyler alleges that I could adjust the go-live date in an implementation timeline after advising [my] supervisor that the date . . . needed to be changed." This is false. The customer decided if the go-live date needed to be changed, not me. If the customer wanted to move the date, I would inform my IM of the request.

23. I understand that Tyler alleges that I "worked with other implementation consultants in addition to [my] assigned implementation consultant." This allegation is highly misleading. I was assigned a single implementation consultant at a time. However, given that I had far more experience and competence with ExecuTime software than other IC's and PM's, other PM's and IC's frequently came to me for help with how the software worked. However, I did not work on their projects with them or assign them work. I would often spend half my day assisting other ExecuTime team members with various questions, unable to even bill my time spent because I was not assigned to their projects.

24. This enormous drain on my time—explaining things and fixing problems for other ExecuTime team members—was a major reason why I ultimately requested to move into the Implementation Analyst position, where I would no longer be responsible for entire implementations and would instead spend all my time assisting others with the software.

25. I understand that Tyler alleges that "[w]hither an item would be billable or not would be determined on a case-by-case basis based on discussions between Plaintiff and her supervisor." This statement is misleading. The IM would approach me about any billed items that were questionable, I would provide requested information to my IM, and the

IM would determine whether the time was billable or not, perhaps based on discussion with me, perhaps not.

26. Like all other employees who track billable time, I of course had to make initial determinations whether to enter my time or not for a certain task, but the vast majority of the time it was entirely clear based on long-established practices. My billed hours were always reviewed at a higher level and I had no say in the determination whether recorded time would be written off or not.

27. I understand that Tyler alleges that prior to customer training sessions, "[I] prepared a custom document for the client that reflected the client's custom configuration that the client could reference after go-live." In reality, this entailed merely arranging the relevant parts of a pre-existing template provided by Tyler. The relevance of specific parts of the template was determined solely by what software functionalities the customer had purchased. I had no discretion in deciding what to include and what to omit.

28. I understand that Tyler alleges that I would have calls client calls to discuss[] client concerns and made recommendations to the client about how they should configure ExecuTime." In reality, what I did was explain how the functionalities present in ExecuTime could be used to reflect the customer's existing payroll practices. If a customer had no need for a functionality (e.g., comp. time), then I would show them *how* they could eliminate that functionality from the menu display. I did not advise the client *whether* they should do that or not.

29. In my résumé, I used a great deal of language that was inapplicable to the positions of SPM and Implementation Analyst (IA). I do not believe that it is really accurate to state that I "managed, monitored, and motivated a 'cross-functional team' in the positions I

held while employed by Tyler. I *did* do that in my *former* position as Manager of Implementation Services prior to Tyler's acquisition of ExecuTime. My résumé conflates many different positions I held at both ExecuTime and Tyler over more than 8 years. I listed only the job title "Senior Project Manager"—not even my final position—in my résumé because it sounded most impressive. Unlike for most employees, I had more responsibilities and authority early in my employment than later due to my above-mentioned self-demotion.

30. As SPM, I did certainly interact with the same "cross-functional team," including the implementation consultant, software deployment team, and technical configuration team, but it is not accurate to state that I "managed" them in my position as SPM. I had no authority over members of other teams whatsoever. My authority with respect to my assigned IC was limited to simply assigning implementations given his or her existing workload. And of course even that could be and was reviewed by my IM.

31. I understand that Tyler alleges that I "made recommendations regarding security profiles for users or building different configurations for groups of employees based on their practices." What this means is that I explained to the client that it would be more efficient and user-friendly to set up ExecuTime's security functions by groups of employees rather than having each employee have their own customized security profile. So, typically, the customer would create lists of different employee groups based on the functionalities they wanted those groups of employees to have access to. I did not advise the customers on how they should organize those groups. I simply explained to the customers how they could create security profiles in the ExecuTime software matching the levels of access they wanted to assign each group.

32. I understand that Tyler alleges that I was responsible for "ensuring the team was in sync; ensuring support tickets were resolved in a timely manner; and promoting a healthy team morale. This is true. It is also equally true for every other ExecuTime team member.

33. Both in my position of SPM and IA, I was responsible for training customers, other PM's, and IC's. This training could be both formal or informal. As described above, much of my day was spent on non-billable work "training" other ExecuTime employees on how to use the software. This was a constant need because of the high turnover rate at ExecuTime and because, as the team member with the longest ExecuTime experience, I had a more accurate and deeper understanding of how the software worked.

34. Training—whether for a Tyler employee or for a customer—always entailed conveying factual information about how the ExecuTime software operated. In other words, I taught them how to use it.

35. I understand that Tyler alleges that I "created knowledge transfer materials" including knowledge-based standard (KBS) articles for other implementation consultants or project managers to consult when they encountered an issue with an implementation. This is true. It is also true of approximately 30 other Tyler employees, including IC's and customer support personnel. These KBS articles simply described in detail how to correctly fix known problems.

36. I did not make recommendations about how customers should organize their own payroll structure. I taught them how the settings in ExecuTime could be used to match their needs, whether it was turning on or off the comp. time function, setting pay periods to weekly, bi-weekly, or semi-monthly, or any other ExecuTime function that was available and applicable to their payroll structure.

37. Tyler points to an email exchange I had with Jamie Burns regarding a talk I had with an IC who was assigned to me regarding negative client feedback he had received. The subject matter and content of this discussion was based on previous conversations I had with my own superiors and their recommendations for what to say to him. Obviously, the exact words and style I used for this sensitive conversation were up to me, but the substance was determined by my supervisors. I did not typically provide my IC with my own evaluation of their performance; rather, I conveyed information and made recommendations, the substance of which had already been provided or approved by my supervisors.

38. I did occasionally participate in interviewing potential new hires. These interviews were invariably group interviews and Tyler would solicit impressions from all team members who were present for the interviews. I did not lead the interviews and my participation in the interviews and feedback provided was no greater than that of any other team members below the level of IM.

39. Over the years, I put several interested friends and acquaintances in contact with management when IC positions became available. This was not a part of my job duties at Tyler.

40. In October 2019 I requested to be put into the newly-created position of Implementation Analyst and started in that role the following month. That position consisted of training both customers and Tyler employees in how to use the ExecuTime software, both formally and informally. This is the exact same work that I had been spending half my days on already, without being able to bill for it.

41. As an IA, I was no longer responsible for my own implementations or for working with an assigned IC.

42. I requested the change in position because of the unbearably long hours I had been working as SPM, to have less travel, and to move to a different manager.

43. I understand that Tyler claims that I conducted training at "a three-day project management summit in Texas." This statement is misleading. I did not do three days of presentations. I did four identical 30-minute presentations explaining what the new role of Implementation Analyst was and how they could come to me for help. I did not even draft the text of the presentation. It was provided to me by Tyler.

44. I understand that Tyler also claims that I "conducted trainings in Maine on ExecuTime for newly hired project managers and implementation consultants." I did such training on two occasions, once in Maine and once over the phone. The training was basically a souped-up version of the basic functionality training that I or an IC would do with clients in a normal training session. In other words, I just showed them how the ExecuTime software worked. And the script for the training session was provided to me by Tyler. I did not write it myself.

45. As an SPM, I did not "manage" any Tyler employees as I understand that word to be generally used. The only minor supervision I did of the IC's assigned to me was to delegate implementations to them based on their existing workload. I only ever did this with a single IC at a time. I was never assigned to work with more than one IC at a time.

46. As an SPM, I did not have management or supervisor duties relating to any customarily recognized department or subdivision of Tyler Technologies. I worked *with* other team

members of the ExecuTime Division, but had no supervisory duties except the limited duties described above with respect to a single IC at a time.

47. As an SPM, I did not have the authority to hire or fire other employees. I gave feedback following group interviews on occasion, but my participation in those group interviews was no different than any of the other Tyler employees below the level of IM who participated. I was never informed that my feedback was given special weight and have no reason to believe that was the case. Those group interviews and feedback were occasional and cannot be fairly described as my primary duty.

48. As an SPM, I did not have the authority to set or adjust other employees' rates of pay or hours of work.

49. As an SPM, I did not direct the work of other employees beyond delegating implementations to my assigned IC as described above.

50. As an SPM, I did not maintain production or sales records for use in supervision or control.

51. As an SPM, I did not appraise employees' productivity and efficiency for the purpose of recommending promotions or other changes in status.

52. As an SPM, I did not handle employee complaints and grievances.

53. As an SPM, I did not discipline employees.

54. As an SPM, I did not plan the work, determine the techniques to be used, or apportion the work among employees beyond delegating implementations to my assigned IC as described above.

55. As an SPM, I did not determine the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold.

56. As an SPM, I did not control the flow and distribution of materials or merchandise and supplies.

57. As an SPM, I did not provide for the safety and security of employees or property.

58. As an SPM, I did not plan or control a budget.

59. As an SPM, I did not monitor or implement legal compliance measures.

60. Both as an SPM and as an IA, I did not have authority to formulate, affect, interpret, or implement management policies or operating practices.

61. Both as an SPM and as an IA, I did not carry out major assignments in conducting the operations of Tyler's business.

62. Both as an SPM and as an IA, I did not perform work that affected Tyler's business operations to a substantial degree more than any employee whose work must be performed correctly and on time. I had absolutely no role or input into the structure of Tyler's business or of its customers' operations.

63. Both as an SPM and as an IA, I did not have authority to commit Tyler in matters that have significant financial impact.

64. Both as an SPM and as an IA, I did not have authority to waive or deviate from established policies and procedures without prior approval.

65. Both as an SPM and as an IA, I did not have authority to negotiate or bind Tyler on significant matters.

66. Both as an SPM and as an IA, I did not provide consultation or expert advice to management.

67. Both as an SPM and as an IA, I was not involved in planning Tyler's long- or short-term business objectives.

68. Both as an SPM and as an IA, I did not investigate or resolves matters of significance on behalf of management.

69. Both as an SPM and as an IA, I did not represent Tyler in handling complaints, arbitrating disputes or resolving grievances.

70. In both my SPM and IA positions, my primary duty was the same: to show people (both customers and other Tyler employees) how to correctly operate the ExecuTime software.

71. My work as an IA was almost entirely work that I had already been performing as a SPM, simply with fewer responsibilities.

72. There were virtually no differences between the actual job duties of an Implementation Consultant like Suzi Greene and those of a Senior Project Manager like me except for: (1) I delegated work to my IC's based on their workload, and (2) I conveyed messages to my IC's from management. Beyond that, our jobs were identical: we taught people how to use ExecuTime software. I was very good at my job and lots of people in the company asked me for help when they ran into problems.

73. As an IA, there was even less difference between me and an IC than when I was a SPM. I did exactly what an IC did except that I wasn't assigned to specific implementations. I was a resource for everyone in the ExecuTime division to rely on because I understood how the software worked better than almost anyone else outside upper management. I taught them how to use it correctly. And I also continued to do customer training as needed. Tyler had massive turnover and few people could stand working for Tyler for very long, so there were always people who needed my assistance.

74. I am currently employed as a Project Manager and classified as FLSA overtime exempt.[2] In this position I have many duties that I did not have as a SPM for Tyler, including approving and rejecting employee timesheets, reviewing and editing invoices before they are sent out to clients, writing change orders and estimating additional time needed to complete implementations, and hand-picking my preferred resources to work with on each implementation, among other more administratively significant duties.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/7/2022

*DocuSigned by:*
*Talia Harrison*
Talia Harrison

---

[2] At the time of my deposition, I was an Associate Project Manager, but the responsibilities have not changed since I became a Project Manager.