# EXHIBIT A

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| In 2016, exhausted by the excessive demands of that position, I requested to be *demoted* into the position of Project Manager (PM), which had fewer responsibilities and less authority, and required less travel. (Aff. ¶ 3). | Q: And ExecuTime was acquired by Tyler in June of 2016, correct?<br><br>A: That is correct.<br><br>…<br><br>Q: And after the Tyler acquisition of ExecuTime in 2016, you remained involved with ExecuTime software?<br><br>A: Yes.<br><br>Q: You continued to serve in that project manager role?<br><br>A: Yes.<br><br>Pl. Dep. 15:6-8, 16:7-12 | Irrelevant and unfair prejudice. Occurred before Tyler acquired ExecuTime in June 2016 does not relate to the duties of the PM position she held while employed by Tyler, and is well outside the statute of limitations.  Plaintiff filed her Complaint on August 3, 2021 and therefore the statute of limitations goes back to August 3, 2018 at the earliest. |
| When I was demoted, I was called a "Senior" PM, but it was never explained to me what that designation meant and what differentiated an SPM from a PM. (Aff. ¶ 5). | Q: And after the Tyler acquisition of ExecuTime in 2016, you remained involved with ExecuTime software?<br><br>A: Yes.<br><br>Q: And at some point did you become a senior project manager?<br><br>A: Yes.<br><br>Q: When did that happen? | Conflicts with deposition testimony w/o explanation.  Senior PM title did not occur with Plaintiff's alleged demotion when Plaintiff worked with ExecuTime, but was the title given to her by Tyler after the acquisition. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A: I want to say that was around – it was shortly after I started, I don't even think a year.  I want to say November of – oh, gosh.  Give me one second.  I'm sorry.  No, the senior project manager title happened after the acquisition.  That's what it was.  So it would have been June, July 2016.  That is the title Tyler gave me.  Pl. Dep. 16:13-23. | |
| As an SPM, I did the same job duties as other PM's [sic], however, I did typically handle far more implementations that [sic] regular PM's [sic] (and even the other SPM).  This was not because of my SPM position, but because I had been working with ExecuTime software longer than anyone else and was far more familiar with it and with the ExecuTime implementation process. (Aff. ¶ 6). | Q: I think earlier you stated you had, like, upwards of 20 projects at a time.  Is that right?  A: About 23, uh-huh.  Q: Twenty-three.  And was that typical for the other ExecuTime project managers?  A: No.  Q: How many did other ExecuTime project managers typically have?  A: I mean, some had as little as, you know, 12 or 13.  I think Jessie Bell would probably be right up there with myself, where she would maintain, you know anywhere from 18-19 projects at a time. | Contradicts prior deposition testimony where Plaintiff testified the other Senior Project Manager was "right up there with [Plaintiff]" in the number of implementations handled and that the Senior Project Mangers handled more implementations because of their position.  Unsupported allegation/conclusory fact.  Plaintiff does not set forth the basis for her statement that she did not handle more implementations because of her Senior Project Manager position. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q: Do you have an understanding of why you had more projects than other project managers?<br><br>A: I mean, not really, outside of just having – you know, being a senior project manager.<br><br>Q: So senior project managers handled more projects at a time?<br><br>A: Yes.<br><br>Pl. Dep. 126:4-22.<br><br>Q: Was Jessie Bell also a senior project manager?<br><br>A: She was, uh-huh.<br><br>Pl. Dep. 25:15-16. | |
| During my time as an SPM, I reported directly to an Implementation Manager (IM).  I worked in Tyler's offices, although my direct supervisor was remote. However, other managers were in the same office, including Jamie Burns.  I was in contact with my IM on a daily basis, typically several times every day, and was closely supervised by my IM at all times. (Aff. ¶ 8). | Q: So at any point that you were in the senior project manager role, did you transition from working primarily in the office to primarily working from home?<br><br>A: Yes.<br><br>Q: When did that occur? | Contradicts prior deposition testimony without explanation.  Plaintiff testified that she worked remotely for ~9 months during the time she worked as a Senior Project Manager.<br><br>Contradicts prior deposition testimony without explanation and unsupported allegations/conclusory facts.  Plaintiff testified that management would be involved for specific issues and that she |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A: That would have been – I want to say February of 2019 through the remainder of my tenure.<br><br>Q: And you were in that senior project manager role until around November of 20—<br><br>A: '19<br><br>Q: '19?<br><br>A: Yes, ma'am.<br><br>…<br><br>Q: And you said in February 2019 you began working from home primarily. What was the reason for that change?<br><br>A: I moved out of state, and so there wasn't, you know, an office.  It was more than an hour away from the office?<br><br>Q: So at that point you wouldn't come into the office regularly?  It would just be anytime you were in town, or when you could come into the office?<br><br>A: Correct, if I was in town, and only if, you know, while I was in town I wanted to work from the office.  A lot of the times | provided them with regular updates—not that she was closely supervised by her IM at all times.<br><br>Unsupported allegations/conclusory facts.  Plaintiff provides no basis for her statement that she was "closely supervised" by her manager. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | I would work from my daughter's house. but it was flexible.<br><br>Q: So you didn't have to come to the office when you were in town? It was only if you wanted to?<br><br>A: That's correct.<br><br>Q: How often would you say you went into the office during that time period?<br><br>A: Maybe two or three times.<br><br>Q: Two or three times from February 2019 until around November 2019?<br><br>A: Correct.<br><br>Pl. Dep. 17:18-18:4, 18:9-19:5.<br><br>Q: So you said management would get involved if you needed to move go-live dates or if there were client complaints about an IC, or implementation consultant, or, I guess, specific requests that you do training by the client?<br><br>A: Were there other areas where you would get management involved during the implementation? | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A: You know, pretty – anytime there was any type of escalation or a – a decision needed to be made that impacted the project, we would have to get management involved.  I'm trying to think of any other specific scenarios.  I can't think of any other specific scenarios.  But, I mean, we would meet with management regularly and give them an update on every single project and where the project stood.  And so as the PM – when I saw "we," the PM would meet with the – managers, and so – and they would meet with ICs as well.  But we would go through projects.  And so at the time, if we're – you know, something came up, we would discuss resolutions or how to approach, that type of thing.  So management was involved pretty heavily.<br><br>Q: So you said you – you involved them for go live dates, for client complaints regarding implementation consults, or client requests for you to do training.  Other than those specific examples, can you think of other times where you involved management?<br><br>A: If a contract was originally written for remote training and the client later decided they want on-site? | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q: Any other examples you can think of?<br><br>A: Not that I can think of.<br><br>Pl. Dep. 40:4-41:11. | |
| As an SPM, I had a quota of billable hours I was required to meet. (Aff. ¶ 9). | Q: Were there any sort of guidelines about how much time you were supposed to record per week?<br><br>A: Not per week, but for – yes, we had quotas that we had to meet and the – yeah, we had quotas that we had to meet.<br><br>Q: What were the quotas?<br><br>A: I'm trying to remember.  For a project manager, I don't remember exactly.  It was a certain number of days per month, but I don't remember the exact number.<br><br>Q: So it was not necessarily hours, but you had to have so many days a month of billable time recorded?<br><br>A: Yes, that's correct.<br><br>Pl. Dep. 175:8-19. | Contradicts deposition testimony without explanation.  Plaintiff previously testified that she did not have a billable hours quota, but rather that she had to have a certain number of days per month with billable time. |
| I understand that Tyler alleges I was "in charge of preparing a high-level project plan" as an SPM.  In reality, what that means is that I used a template prepared | Q: And so where – were you responsible for, I guess, managing this tab of the | Best evidence.  Exhibits 5 and 6 to Plaintiff's deposition are implementation |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| by Tyler that listed all of the steps required in an implementation of ExecuTime software.  I would omit certain steps in the implementation that corresponded to functionalities that had not been purchased by a given customer, and which were not required for the customer's existing payroll practices.  For example, I would omit steps relating to comp. time if the customer did not issue comp. time to its employees. (Aff. ¶ 10). | spreadsheet where there was a breakdown of hours? <br><br> A: Yes. <br><br> Q: And how would you do that? <br><br> A: So…Gosh, I don't even – primarily going through the JIRA tickets and just confirming.  So as you work the tasks – a task in JIRA, you would, you know, like I said, enter your time that you're billing and close that task out.  And so I would just line this up with the tasks in JIRA. <br><br> … <br><br> Q: And was the purpose of maintaining this document so you could tell how much billable time the client had left for their implementation? <br><br> A: Yes. <br><br> … <br><br> Q: Going back to Exhibit 6, Ms. Harrison, I believe the question I had asked was whether this was another example of a project – or an implementation project plan or timeline that you had created while you were a project manager. | timelines/project plans that she created/managed. <br><br> Contradicts prior deposition testimony without explanation. Plaintiff testified that as part of a project plan she: maintained project budgets to ensure client did not exhaust its allotted implementation hours; populated tasks in the project plan to ensure a client was ready to go live; would customize the allocation of resources on the project plan depending on the resources available; and would update the project plan's implementation phases depending on the client's status. As set forth in Plaintiff's deposition testimony, "preparing a project plan" was more than modifying a template, as Plaintiff now alleges. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A: Yes. This would be one that I also updated, yes.<br><br>…<br><br>Q: And it looks like this one has a "Go Live Checklist" tab.<br><br>A: Uh-huh.<br><br>Q: And we referred to this earlier.  Is that right? This is the document you referred to saying that you would have to populate this to ensure that a client was ready to go live?<br><br>A: Yes.<br><br>Q: And these are all the different tasks that they would have gone through before they could go live?<br><br>A: Correct.<br><br>….<br><br>Q: And then going over to this implementation project plant tab, this one looks a little different than the one we just looked at as Exhibit 5 in the sense that this one has more implementation team entries than Exhibit 5 did. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A: Uh-huh.<br><br>Q: Do you – do you have an understanding of why different client resources were allocated on different implementation timelines?<br><br>A: Yeah, the only thing I could – only other thing I could think of is whenever Trey's start date was, and maybe he wasn't, you know, well versed in doing some of those tasks, so I had to fill in for him, because that – that was the case. There was times where I'd travel on-site for him and – et cetera.  So that's the only scenario I can think of.  I'm not sure when he started, but that could be the case.<br><br>Q: So sometimes, depending on the resources you had available to you, you kind of had to modify this implementation timeline to reflect –<br><br>A: Yes.<br><br>Q: -- the resources available?<br><br>A: Right, correct.<br><br>…. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q: And is this an email chain between you and the client regarding updating the client's implementation timeline?<br><br>A: Yes.<br><br>Q: And it looks like – down to the bottom where you initially emailed the client, you say "Attached is an updated copy of the Implementation Timeline and below are the changes made." What changes were you making to this implementation timeline?<br><br>A: I mean, it sounds like there was some misunderstanding as to what phase of the implementation the client was on. I probably had a call with Brian, and so we were updating actual dates as to when they parallel test versus go live."<br><br>Pl. Dep. 108:7-108:17, 110:19-22, 113:14-20, 113:24-114:9, 115:11-116:8, 119:7-21, Ex. 5-7. | |
| I had absolutely no discretion about what went into the project plan. I would simply input data gathered from the client on a questionnaire that the sales team had the customer fill out before I became involved, the Excel Workbook we used would then generate the plan, and I | Q: Do you – do you have an understanding of why different client resources were allocated on different implementation timelines?<br><br>A: Yeah, the only thing I could – only other thing I could think of is whenever | Contradicts deposition testimony without explanation. Plaintiff testified she would customize the allocation of resources in a project plan based on the resources available to her—an example of the |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| modified the dates as the customer required. (Aff. ¶ 12).<br><br>I understand that Tyler alleges that I would "set[] up a project schedule." What this means is that I would use our Excel Workbook to automatically generate a schedule based on a "kick-off" date chosen by Tyler management in consultation with the customer. I would simply input the kick-off date into the project plan and had no discretion or made any sort of significant decision in connection with the schedule beyond making minor adjustments to dates based [sic] my pre-existing schedule and that of the IC assigned to me." (Aff. ¶ 14). | Trey's start date was, and maybe he wasn't, you know, well versed in doing some of those tasks, so I had to fill in for him, because that – that was the case. There was times where I'd travel on-site for him and – et cetera.  So that's the only scenario I can think of.  I'm not sure when he started, but that could be the case.<br><br>Q: So sometimes, depending on the resources you had available to you, you kind of had to modify this implementation timeline to reflect –<br><br>A: Yes.<br><br>Q: -- the resources available?<br><br>A: Right, correct.<br><br>….<br><br>Pl. Dep. 115:11-116:8, Ex. 6. | discretion of what went into the project plan.<br><br>Legal conclusion.  What constitutes discretion for the administrative exemption is a legal conclusion. |
| I understand that Tyler alleges that I would "conduct[] initial post-contract meetings with the client.  What would happen in these meetings is that I would reiterate how the implementation process | Q: And you said you had calls to go through the questionnaire?<br><br>A: We did. | Contradicts deposition testimony without explanation.  Plaintiff testified that she would ask the client specific questions to clarify her understanding of the client's questionnaire or to learn any missing |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| worked so that the customer could plan accordingly (e.g., make sure that the necessary employees were available for training at specific times in the implementation).  My role was simply to convey information to the client in these meetings and I had no discretion how the implementation process would proceed. (Aff. ¶ 13). | Q: Would these be calls between yourself and the client?<br><br>A: Yes.  We would have a call with ourself and the client to go through their questionnaire and get more in-depth answers to the questions that they answered or, you know, validate any information that we did not understand from the questionnaire that they filled out. There would be a call to go through that. There would also be a –<br><br>Q: And who would be on that call?<br><br>A: Sure.  That would be myself and the client.<br><br>Q: So in advance of that call, you would have reviewed the questionnaire to see if there was anything out there from the client that you didn't understand that you needed to discuss on the call with the client?<br><br>A: That is correct, yes.<br><br>Q: Okay. And then based on that analysis and that phone call, you'd be able to complete the solution design? | information that was needed to complete the pre-implementation documentation for the client.  Plaintiff did more than simply convey information.<br><br>Legal conclusion.  What constitutes discretion for the administrative exemption is a legal conclusion. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A: You got it.<br><br>…<br><br>Q: So how would you know what the client would need for a particular phase in order to complete the timeline?<br><br>A: It would be based on, you know, things discussed during the solution design call. Usually it's – usually in that way, because the phases were the same.  But what they need – for instance, you know, they may not use overtime or shift differential or something like that.  So when we would actually get down to the training, we would tailor that training specific to that client.  If they don't use overtime, well, we're not going to show overtime.  That type of thing.<br><br>Q: So you said based on the solution design call, you would – you would have that as an understanding of what specific needs the client would have for the different implementation phases.  Are these the solution design calls that you referenced earlier where you would go through the questionnaire?<br><br>A: Yes. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Pl. Dep. 23:10-16, 29:19-30:16, 32:8-33:3. | |
| I understand that Tyler alleges that, after the project plan was created, "the day-to-day responsibility for the implementation shifts from the project manager to the implementation consultant." This was not always the case. I frequently performed the role of IC and there would be no such handoff to an IC. Off the top of my head, I can recall projects in Seattle, Oak Harbor, American Samoa, Grand Fork, Bozeman, and Baton Rouge where I worked on an implementation alone, without an IC. (Aff. ¶ 15). | Q. So going back, Ms. Harrison, so can you kind of explain, I guess, kind of the life cycle or the phases that a senior project manager would be involved with with an implementation of ExecuTime software?<br><br>A. Sure. . . .<br><br>So once we -- we have that signed, implementation timeline, at that point we would host a kickoff call to introduce the IC to the client. So once you have all those documents and you start to -- you introduce your IC, the PM would then be responsible for just managing the project. Anything -- the budget. Anything that came up during the implementation as, like, an escalation, we would -- the project manager would be the one to communicate that with the manager of implementation to come up with an action plan for moving forward. So I guess you would call that, like, issue resolution or escalations.<br><br>Q. Now, what about after the implementation progressed? If there's a go-live period, what's the project | Unsupported allegations/conclusory facts. Plaintiff does not allege when the implementations occurred for which she allegedly did not have the support of an IC. Plaintiff alleges this occurred "frequently" but fails to allege how many total implementations she performed and how many were allegedly performed without IC support.<br><br>Contradicts deposition testimony without explanation. Plaintiff testified that an implementation would involve a transition to an IC after the timeline was created and the IC would be responsible for keeping up the implementation phases on track or involving the project manager, if needed.<br><br>Best Evidence. Exhibit 9 to Plaintiff's deposition is an email from Plaintiff to an IC recapping the tasks to be done on the Baton Rouge, Oak Harbor, and American Samoa implementations that they were working on together. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | manager's responsibility during that period?<br><br>A. Sure. So it's actually really the IC's responsibility to keep up with that go-live. For the most part, the project manager is just communicating and making sure that we stay on track for that date. You know, if the IC runs into any complications where they feel like, for whatever reason, they're not going to meet the date that we set, we would work directly with the ICs on -- on a solution to that.<br><br>Pl. Dep. 20:5-9, 22:17-19, 23:9-24:3. | |
| I understand that Tyler alleges that "[m]loving a go live date typically would result in a delay of transitioning to the ExecuTime software of three to six months." This is not true. Typically, if a go-live date had to be moved, it would delay the implementation by only one or two pay periods. The exact length depending on the length of the client's pay period, but the delay would rarely if ever be more than one month. (Aff. ¶ 16). | Q: And was – moving the go-live date, was that considered a significant change?<br><br>A: Yes.<br><br>Pl. Dep. 121:11-13. | Contradicts prior deposition testimony without explanation. Plaintiff previously described a change in the go-live date as a "significant" change.<br><br>Unsupported allegations/conclusory facts. Plaintiff claims in her declaration that "typically" a moved go live date would only delay an implementation by one or two pay periods, but she provides no specifics to support her allegation – i.e., the number of implementations where the delay was only one or two pay periods or examples of implementations where the delay was only one or two pay periods. Plaintiff does not identify any specific |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | | implementation where the delay was less than one month. |
| I understand that Tyler frequently refers to my responsibilities with respect to a project "budget."  What this term means, in reality, is that I had to keep track of how many hours had been used on a project versus how many hours the customer had purchased for the implementation.  Managing the budget just meant that I had to be efficient with my billable time.  If the time spent by myself of the IC assigned to me was more than anticipated by Tyler during the contract negotiations stage, I was required to inform my IM about the excessive hours. (Aff. ¶ 17).  As an SPM, I did not plan or control a budget. (Aff. ¶ 58). | Q: And when you said "assigning responsibilities" what does that look like? Is that you telling the implementation consultant what part of the project they're going to take on, or what exactly?  A: Yep, it would be that. . . . So, you know, again, based on the number of hours in the contract, we may have – there are some – in some cases, we would do a lot of setup for the client.  But if it were a smaller client or they purchased smaller hours, then I would work with the IC to help them understand that.  Okay, since we have a smaller budget to work with, these are the things that you'll do, and then this is what you need to try to push to the client in order to, you know, make sure we don't exceed the budget or have to go back and ask for additional time.  Pl. Dep. 69:10-70:7.  Q: And then you said "changed requirements." What were  -- what are | Conflicts prior deposition testimony without explanation.  Plaintiff testified regarding her resume, which stated she was responsible for "completion of projects on time, on budget, on specification."  Plaintiff testified that based on the client's specific project budget, she would instruct the implementation consultant as to what tasks they would complete versus the client.  Plaintiff would also escalate changes from the client that would impact their budget.  Plaintiff also testified that she would actively manage the budget and proactively bring potential budget issues to the attention of management.  Plaintiff also tracked the hours of her IC and ensured they were appropriate and escalated concerns to management.  Plaintiff also testified that she would work through ICs' concerns about budgets.  It was more than being "efficient."  Legal conclusion and unsupported allegation/conclusory fact.  Plaintiff does not provide any support for her statement |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | you referring to by "changed requirements."? <br><br> A: That would be, you know, if a client were to, you know, go from wanting – go from the web-based trainings to on-site trainings, or if they're requesting additional time for training because they want us to train their users.  So it would be changes to the solution design.  So, typically, once they signed off on the solution design, if there was anything that came up that would cause issues with the budget, then that would be something I would take back to management. <br><br> Pl. Dep. 71:16-72:3. <br><br> Q: And tall that would be triggered by, I guess, once you have updated this tab or this spreadsheet and finding out that they're out of hours? <br><br> A: Well, we – I mean, I would probably touch every project almost daily – if not daily, every other day – just because there's so many things going and so many people pulling from the budget.  So, you know, you pretty much had to stay on top of that.  So, typically, once I saw the client got down to a certain number of hours, maybe 15 or 20, I would assess and | that "[a]s an SPM, I did not plan or control a budget." |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | then start those conversations with management.<br><br>Pl. Dep. 111:15-112:2.<br><br>Q: Did you ever have a situation where you would look at a Jira ticket and see how much an implementation consultant had billed to a client and it didn't seem right to you?<br><br>A: Yes.<br><br>Q: What would happen in that situation?<br><br>A: There would be conversations with management as well as the implementation consultant.<br><br>Q: So you would escalate that to management to address?<br><br>A: Yes.<br><br>Q: And in some instances, would that time be written down or off?<br><br>A: I mean, if we found it justifiable for whatever reason, then no, it wouldn't.  We you know, we would just kind of roll with it and manage things going forward.  And then in some instances, yes, NB tasks would be created, and the IC would be | |

| Affidavit | Deposition Testimony | Objection |
|-----------|---------------------|-----------|
| | told to report the next hour to whatever – to that NB task to kind of balance things out.<br><br>Q: And when you were looking at the tickets and would see one where maybe the hours didn't seem right, is that just based on kind of your experience with these implementations, knowing how long it takes to do certain tasks?<br><br>A: Yes.<br><br>Pl. Dep. 124:16-125:16.<br><br>Q: Did you – did they ever come to you with any, like, concerns about the budgeted hours for implementation?<br><br>A: Yes, if they felt they were –<br><br>Q: What would that –<br><br>A: -- getting close to the budget.  Again, just emails or verbal conversations so that I have what I need to understand, you know, why are we running into this – you know, how did we get to the point we were reaching the budget, so that I could have those conversations with management. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Pl. Dep. 138:13-23. | |
| I understand that Tyler frequently refers to my responsibilities with respect to "scheduling resources" and "setting deadlines." "Resources" refers to the IC assigned to me, as well as the tech and development teams. If a customer needed assistance from the IC or those other teams, I would schedule that assistance in Outlook based on the published availability of the IC or other team members. Then, if the client or other team members had a problem with the scheduling, they would tell me and I would move the date as needed. If there was a conflict, I would send it to my IM for resolution. I did not resolve such conflicts myself. Deadlines (a/k/a "milestones") were set out in the initial project plan, and I could not independently change them. And in some cases, rather than scheduling in Outlook, I would enter a JIRA ticket that was placed in queue for the members of the tech/development teams to pull from and work on according to their own criteria. (Aff. ¶ 18).<br><br>As an SPM, I did not plan the work, determine the techniques to be used, or apportion the work among employees | Q: And is this an email chain between you and the client regarding updating the client's implementation timeline?<br><br>A: Yes.<br><br>Q: And it looks like – down to the bottom where you initially emailed the client, you say, "Attached is an updated copy of the Implementation Timeline and below are the changes made." What changes were you making to this implementation timeline?<br><br>A: I mean, it sounds like there was some misunderstanding as to what phase of the implementation the client was on. I probably had a call with Brian [IC], and so we were updating actual dates as to when they parallel test versus go live.<br><br>Pl. Dep. 119:7-21<br><br>….<br><br>Q: So on this next bullet point, it continues on to the second page. It says, "Responsible for completion of projects on time, on budget, on specification. Performs a variety of tasks, including but | Unsupported allegations/conclusory facts. Plaintiff fails to provide any specific dates or examples of instances where she escalated a conflict to her IM or entered a JIRA ticket for team members to work on according to their own criteria. Plaintiff does not support her statement that she "did not plan the work, determine the techniques to be used, or apportion the work among employees."<br><br>Contradicts deposition testimony without explanation. Plaintiff testified during her deposition that she changed milestones/deadlines in the project plan, see Pl. Dep. Ex. 7. Plaintiff also testified exhaustively as to all of the areas where she would escalate an issue to her IM. None of the examples she provided in her deposition included escalating scheduling issues with the tech and development team. Further, when discussing scheduling resources in her deposition, Plaintiff described her duties as far greater than simply checking people's schedules for availability.<br><br>Best evidence. Plaintiff's resume, Ex. 2 to her deposition, states that she "manages, monitor, and motivates the |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| beyond delegating implementations to my assigned IC as described above. (Aff. ¶ 54). | not limited to, scheduling all resources; setting deadlines; assigning responsibilities; and monitoring, summarizing, and communicating the progress of the project." What – what – I guess, what would you be referring to when you said scheduling resources?<br><br>A: So the implementation team. So, you know – or – and even deployment. So once we have the timeline built, you know, and we've got an idea of – you know, a lot of our clients came in ready to run with implementation. It was, like, they had a timeline as to when this needed to be done. They were going to be losing access to their existing payroll system within a certain time frame. And so that would just be assigning resources, make sure the deployment's done by this date, you know, make sure the technical team has access to the serve there on prem, and I need them to go in there and do any configuration before my IC can go in and set the database up and prepare for training things of that nature.<br><br>Q: And how would that be accomplished? Would you just be sending emails to the different members of the implementation team and just telling them, like, Hey I | cross functional team assigned to each project" while working as a Senior Project Manager. In Ex. 7 of her deposition, Plaintiff independently changed the implementation timeline for a client. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | need you to do "X" so we can get "Y" rolling? Is that right, or – <br><br> A: Uh-huh.  Some – some – some was via email.  And then, like, for deployment, we actually had Jira.  We would use Jira. And, again, it was a ticketing system. And so we would put a ticket in, and we would put specifics in that ticket as to when we would need that task completed by.  And then usually they would communicate back if they weren't going to, you know, be able to make that date, or if they could pull it forward.  You know, they wanted to verify that was okay.  But, yeah, it would be primarily emails, or we would use the Jira ticketing system. <br><br> Pl. Dep. 67:17-69:9. <br><br> Q.   What about "monitor and motivates"? How would you do that? <br><br> A.   So there were some times where we would have to put tickets in to have things done.  And so I would monitor the ticketing system to make sure that -- because when you initially enter a ticket, it's in just -- in a pool with other tickets that have to be assigned or pulled from that queue.  Excuse me. And so I would just monitor to make sure that that's | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | happening in a timely manner and it's been assigned to a representative, so that once it's assigned to a representative, I know who I can go in and touch base with as to when it will be completed.<br><br>Q.   And then what about the "motivates"?<br><br>A.   That would just come from, Hey, team, you know, can -- it would be great if you can kind of get this done by this date; the client has expectations of such-and-such from sales.  You know, just trying to, you know, just promote a healthy working team morale.<br><br>Q.   And you were often, I guess, out of that team, the one that had the direct client contact, so you were aware of what the client's expectations were as far as progressing and the schedule?<br><br>A.   Exactly.<br><br>Pl. Dep. 56:24-59:9<br><br>Q: And when you say that you ensured resources are sufficient, what are you referring to by that?<br><br>A: Pretty much just making sure that – you know, whatever the timeline we were | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | producing, that we had the appropriate resources available for the dates that are outlined in the timeline.

Q: And so that would be, you know, staffing appropriately as well?

A: Yes.

Pl. Dep. 75:9-18.

Q: So sometimes, depending on the resources that you had available to you, you kind of had to modify this implementation timeline to reflect –

A: Yes.

Q: The resources available?

A: Right, correct.

**Pl. Dep. 116:3-8.** | |
| I understand that Tyler refers to my responsibilities with respect to "assigning responsibilities." This is specific to tasks that were handled by other teams. For example, if a customer needed help with overtime not being calculated correctly, then that had to be handled by the technical team. I had no discretion about who to assign responsibilities to, and it | Q: Who would – who would be the cross-functional team that you're referencing there?

A: Sure. So that would be the implementation consultant that I'm working with; it would be the team responsible for deploying the software to the servers; it would be any technical | Unsupported allegations/conclusory facts. Plaintiff does not specify what she means by "overtime not being calculated correctly." As Plaintiff testified in her deposition, there were certain issues she could handle based on her expertise whereas other issues that involved coding or technical aspects would have to be assigned by her to the technical team for |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| was always obvious who the appropriate person or team was to handle it. (Aff. ¶ 19). | contacts that are – that are helping with establishing the email configuration within ExecuTime so that email server talks to ExecuTime, sends notifications. The technical team would also assist with time clock setup that needed to be done on a server so that my IC could actually train on the time clock.  The technical team would also assist with any type of technical calls that we had to discuss server specifications required for the installation of ExecuTime, those type of things.  So it's typically Tyler, Tyler teams.<br><br>Q:   Okay.  And that would consist of the implementation consultant, the deployment team, and the technical contacts?<br><br>A.   Correct.  And I would include management in that as well because, you know, sometimes we would have to get them involved if, you know, an installation couldn't happen sooner, you know, as soon as we needed. We would have to go to management for management to go to the manager of, you know, those teams to kind of get things pushed through. | resolution.  Plaintiff also omits that it was her responsibility to ensure the technical team resolved the issue and that Plaintiff would communicate the resolution directly to the client.<br><br>Contradicts prior deposition testimony without explanation.  Plaintiff testified she would set expectations for the teams and would escalate to management if the teams were not completing tasks.  Plaintiff also testified that she, not the tech team, fixed a customer's overtime not calculating correctly.<br><br>Best evidence.  Plaintiff's resume states she "manages, monitor, and motivates the cross functional team assigned to each project."  Pl. Dep. Ex. 2.<br><br>Legal conclusion.  What constitutes discretion for the administrative exemption is a legal conclusion. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
|  | Q.  And so when you said you managed the cross-functional team, how would you be managing those different groups?<br><br>A.  We're still managing the communication between all groups so that we're all on one accord and can set, you know, appropriate expectations.<br><br>Q.  And that would be all, I guess, with the purpose of getting this implementation done, you know, on schedule, within scope?<br><br>A.  That is correct.<br><br>Q.  What about "monitor and motivates"? How would you do that?<br><br>A.  So there were some times where we would have to put tickets in to have things done.  And so I would monitor the ticketing system to make sure that -- because when you initially enter a ticket, it's in just -- in a pool with other tickets that have to be assigned or pulled from that queue.  Excuse me. And so I would just monitor to make sure that that's happening in a timely manner and it's been assigned to a representative, so that once it's assigned to a representative, I |  |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | know who I can go in and touch base with as to when it will be completed.<br><br>Q.  And then what about the "motivates"?<br><br>A.  That would just come from, Hey, team, you know, can -- it would be great if you can kind of get this done by this date; the client has expectations of such-and-such from sales.  You know, just trying to, you know, just promote a healthy working team morale.<br><br>Q.  And you were often, I guess, out of that team, the one that had the direct client contact, so you were aware of what the client's expectations were as far as progressing and the schedule?<br><br>A.  Exactly.<br><br>Pl. Dep. 56:24-59:9<br><br>Q. So what did you do to reconfigure ExecuTime?<br><br>A. So I, you know, trained -- you know, worked with the team there at Lawson and trained them on their options on handling different things. They had a lot of overtime rules that were misfiring and not calculating overtime correctly, putting the | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | overtime on the wrong week. So we corrected -- you know, manually corrected the overtime configurations.<br><br>Pl. Dep. 189:24-190:6 | |
| I understand that Tyler alleges that I would "adjust the timeline to reflect the implementation resources available to [me]—e.g., if [I] assessed an implementation consultant would not be capable of completing certain tasks, [that I] would assign [my]self those tasks." That is incorrect.  My IM would make that decision.  I did give feedback to my IM if she asked me about an IC's capabilities.  I can recall one instance in which that happened: at the beginning of on [sic] IC's employment before he had learned all functionalities of the software. It was by no means a regular occurrence. (Aff. ¶ 20). | Q. Do you -- do you have an understanding of why different client resources were allocated on different implementation timelines?<br><br>A. Yeah, the only thing I could -- only other thing I could think of is whenever Trey's start date was, and maybe he wasn't, you know, well versed in doing some of those tasks, so I had to fill in for him, because that -- that was the case. There was times where I'd travel on-site for him and -- et cetera. So that's the only scenario I can think of. I'm not sure when he started, but that could be the case.<br><br>Q. So sometimes, depending on the resources that you had available to you, you kind of had to modify this implementation timeline to reflect --<br><br>A. Yes.<br><br>Q. -- the resources available? | Contradicts deposition testimony without explanation.  Plaintiff testified that she reassigned implementation tasks based on her IC's experience. Plaintiff did not testify that management was involved in that decision.<br><br>Best evidence.  Exhibits 5 and 6 to Plaintiff's deposition are implementation timelines where Plaintiff modified the tasks assigned to a PM versus an IC. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A. Right, correct.<br><br>Pl. Depo 115:17-116:8 | |
| I understand Tyler alleges that I "might adjust the timeline to include 'buffer room' for additional training if [I] believed an implementation was particularly complex."  This is false.  If a customer had an unusually large number of employees to be trained—more than typical and more than Tyler's generic timeline anticipated—then I would tell my IM and my IM would make a decision about how to handle it, possibly deciding to add such "buffer room."  (Aff. ¶ 21). | Q. Were there ever instances where you look at a client and you would just -- you would know based on, I guess, either the size of the client or the project, that that client was going to need more time than what the standard was in an implementation timeline and you would adjust it accordingly?<br><br>A. Would you mind reasking that question?<br><br>Q. Sure. It was kind of clunky. So I'm -- I'm assuming that all clients -- not all clients were the same size or same complexity when it came to implementation. So sometimes when you were dealing with a larger client or a more complex implementation, would you go ahead and adjust that implementation to kind of give yourself additional buffer room?<br><br>A. Yes.<br><br><br>Pl. Dep. 43:4-44:21 | Contradicts deposition testimony without explanation.  Plaintiff testified that she, not her IM, would build in buffer room around training sessions for clients based on her judgment depending on the size or complexity of the particular implementation. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| I understand that Tyler alleges that I could adjust the go-live date in an implementation timeline after advising [my] supervisor that the date . . . needed to be changed." That is false.  The customer decided if the go-live needed to be changed, not me.  If the customer wanted to move the date, I would inform my IM of the request. (Aff. ¶ 22). | Q: And is this an email chain between you and the client regarding updating the client's implementation timeline?<br><br>A: Yes.<br><br>Q: And it looks like – down to the bottom where you initially emailed the client, you say, "Attached is an updated copy of the Implementation Timeline and below are the changes made." What changes were you making to this implementation timeline?<br><br>A: I mean, it sounds like there was some misunderstanding as to what phase of the implementation the client was on.  I probably had a call with Brian [IC], and so we were updating actual dates as to when they parallel test versus go live.<br><br>Pl. Dep. 119:7-21<br><br>….<br><br>Q: And when you updated this timeline to, I guess, clarify the phases as to when they test and go live, is that something that you had to provide to management before you did? | Contradicts prior deposition testimony without explanation.  Plaintiff testified about her changing a client's go live date in the implementation timeline based on confusion regarding phases.  Plaintiff testified it was the project manager's responsibility to make sure they stayed on track for go live.<br><br>Best evidence.  Exhibit 7 to Plaintiff's deposition reflects Plaintiff changing a client's go live date in their implementation timeline. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A: Yes.<br><br>Q: And what did that look like? Did you just shoot an email to Hillary or Jamie and say, you know, I'm updating to clarify the confusion on the implementation phases?<br><br>A: Yes, that appears to be how I addressed it.<br><br>Pl. Dep. 120:6-10<br><br>Q. Now, what about after the implementation progressed? If there's a go-live period, what's the project manager's responsibility during that period?<br><br>A. Sure. So it's actually really the IC's responsibility to keep up with that go-live. For the most part, the project manager is just communicating and making sure that we stay on track for that date. You know, if the IC runs into any complications where they feel like, for whatever reason, they're not going to meet the date that we set, we would work directly with the ICs on -- on a solution to that.<br><br>Pl. Dep. 23:18-24:3 | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| I understand that Tyler alleges that I "worked with other implementation consultants in addition to my assigned implementation consultant." This allegation is highly misleading. I was assigned a single implementation consultant at a time.  However, given that I had far more experience and competence with ExecuTime software than other IC's [sic] and PM's [sic], other PM's [sic] and IC's [sic] frequently came to me for help with how the software worked.  However, I did not work on their projects with them or assign them work.  I would often spend half my day assisting other ExecuTime team members with various questions, unable to bill my time spent because I was not assigned to their projects. (Aff. ¶ 23).

As an SPM, I did not "manage" any Tyler employees as I understand that word to be generally used. The only minor supervision I did of the IC's assigned to me was to delegate implementations to them based on their existing workload. I only ever did this with a single IC at a time. I was never assigned to work with more than one IC at a time. (Aff. ¶ 45).

As an SPM, I did not have management or supervisor duties relating to any customarily recognized department or | Q. So what would happen if the implementation consultant that you typically worked with was not available to take on a new project or maybe didn't have the experience to handle the implementation?

A. In most cases, I would fill in. If I wasn't able to fill in for whatever reason, then at that point we would go to management, and management would talk to other project managers to see if their ICs had any flexibility.  And a lot -- in a lot of cases, especially during that specific -- you know, the specific time frame that we're talking about, they -- we had a lot of new people. So it was kind of easy to pull in someone else because it was an opportunity for them to test what they'd been learning and then also kind of get their feet wet.  So depending on the type of training, as long as it wasn't, like, configuration or admin, if it was just, like, a basic user training or supervisor training, usually they could step in. If it was something more like an admin training or a payroll export training, then I would -- I would step in just for the -- you know, just to ensure that we kept the ball rolling. | Contradicts prior deposition testimony without explanation.  Plaintiff testified she would work with other ICs on implementation trainings if her IC was not available or did not have the necessary experience.  She also testified she assigned another IC work in addition to her assigned IC.  Plaintiff also testified that she spent 50% of her time training ICs.

Legal conclusion and Unsupported allegations/conclusory facts.  What constitutes a "customarily recognized department or subdivision of Tyler Technologies" is a legal conclusion and is outside the scope of Plaintiff's personal knowledge.  Plaintiff provides no support in Paragraph 46 for her statement that did not have management or supervisor duties related to a "customarily recognized department or subdivision of Tyler Technologies." |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| subdivision of Tyler Technologies. I worked with other team members of the ExecuTime Division, but had no supervisory duties except the limited duties described above with respect to a single IC at a time. (Aff. ¶ 46). | Pl. Dep. 73:11-74:9<br><br>Q. Brian Ledbetter, I believe. So were you having Brian work on some of the items that Suzi was having trouble completing?<br><br>A. Yes, during this time period. This was when Brian was stepping in to assist Suzi. I believe Suzi was out on leave.<br><br>Q. And then it looks like in this -- we'll scroll down -- Dearborn, Michigan -- or, sorry, Missouri, there is a second bullet. It says, "This clients weekly call wasn't on my schedule for yesterday 03/06 so I missed sitting in for this call even though it was in Hillary's recap to me about filling in for Suzi. I was wrapped up with working with Brian and it completely slipped my mind."<br><br>A. Uh-huh.<br><br>Q. Is this what you're saying where Suzi was out on leave, so you had taken over, I guess, her duties and were working with Brian on, I guess, kind of filling in for Suzi?<br><br>A. Yes. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Pl. Dep. 153:6-25<br><br>Q. What would you estimate to be the job duties that took the majority of your time as a senior project manager?<br><br>A. Vamping up new hires, getting them prepared to be able to conduct trainings on their own, and helping them through understanding tasks and the timeliness of that.<br><br>Q. And how much of a percentage of your time would you estimate that that took up?<br><br>A. More than 50 percent of my day, on most days.<br><br>Q. Okay. And you said ramping up new hires. When you're referring to "new hires," is that implementation consultants and project managers?<br><br>A. More so, implementation consultants.<br><br>Pl. Dep. 179:6-19 | |
| I understand Tyler alleges that "w[h]ither [sic] an item would be billable or not would be determined on a case by case basis based on discussions between Plaintiff and her supervisor." This | Q: Did you ever have a situation where you would look at a Jira ticket and see how much an implementation consultant had billed to a client and it didn't seem right to you? | Contradicts deposition testimony without explanation. Plaintiff testified she would escalate certain billable hour entries to her IM that she believed were suspicious. Plaintiff also testified that she would work |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| statement is misleading.  The IM would approach me about any billed items that were questionable, I would provide requested information to my IM, and the IM would determine whether the time was billable or not, perhaps based on a discussion with me, perhaps not. (Aff. ¶ 25).<br><br>Like all other employees who track billable time, I of course had to make initial determinations whether to enter my time or not for a certain task, but the vast majority of the time it was entirely clear based on long-established practices.  My billed hours were always reviewed at a higher level and I had no say in the determination whether recorded time would be written off or not. (Aff. 26). | A: Yes.<br><br>Q: What would happen in that situation?<br><br>A: There would be conversations with management as well as the implementation consultant.<br><br>Q: So you would escalate that to management to address?<br><br>A: Yes.<br><br>Q: And in some instances, would that time be written down or off?<br><br>A: I mean, if we found it justifiable for whatever reason, then no, it wouldn't.  We you know, we would just kind of roll with it and manage things going forward.  And then in some instances, yes, NB tasks would be created, and the IC would be told to report the next hour to whatever – to that NB task to kind of balance things out.<br><br>Q: And when you were looking at the tickets and would see one where maybe the hours didn't seem right, is that just based on kind of your experience with | with her IM to determine whether a task should be billable or not. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | these implementations, knowing how long it takes to do certain tasks?<br><br>A: Yes.<br><br>Pl. Dep. 124:16-125:16.<br><br>Q. And it says -- in this column over here labeled "Billed Out," there's "yes" entered for it looks like all the -- almost all the tasks. There's one down here in row 97 that says "no charge."<br><br>A. Uh-huh.<br><br>Q. What -- what, I guess, tasks were billable, and which tasks were not billable?<br><br>A. So, I mean, that was on a case-by-case basis. And for the most part, it would be, you know, whatever -- you know, some things, we would have to go to management. But, you know, I think I mentioned before that we would have to update the tasks with the client's name. That wasn't something that would be billable. Spending time to copy our email strand into the task, that wouldn't be considered billable. If I was working | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | with Trey on, you know, understanding something so that he could train or meet with the client, that wouldn't be considered billable. The checklist I put together to assist him on knowing what to do and when, that wasn't billable.<br><br>Q. And so was it something you just kind of used your judgment on as to whether to bill it or not?<br><br>A. Between myself and -- and Jamie, we -- we would have conversations about, you know -- yeah, like, you know, what are some of the issues that we're seeing and, you know, go back and forth about, you know, what we can do to help.<br><br>Q. So the entry in here that wasn't billable --<br>A. Uh-huh.<br><br>Q. -- it looks like "internal discussion regarding export change needed" --<br><br>A. Uh-huh.<br><br>Q. -- would that have been recorded in here as well, and then you, after discussing it with Jamie, would come back and mark it as nonbillable? | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A. Yes.<br><br>Pl. Dep. 109:12-110:18 | |
| I understand that Tyler alleges that prior to customer training sessions, "[I] prepared a custom document for the client that reflected the client's custom configuration that the client could reference after go-live." In reality, this entailed merely arranging the relevant parts of a pre-existing template provided by Tyler. The relevance of specific parts of the template was determined solely by what functionalities the customer had purchased. I had no discretion in deciding what to include and what to omit. (Aff. ¶ 27). | Q. And did you ever -- for any clients, did you ever update those manuals to be custom to their specific implementation setup?<br><br>A. No. No, I wouldn't -- I wouldn't make adjustments to the manual, but I did used to keep just, like, a generic Word document, you know, letting them know that, you know, you guys don't use this, you don't use that, so that when they are going to maintain the system after go-live, they would -- they would know that that's not a setting they have to do when they bring a new hire into the -- into the application.<br><br>Q. Okay. So you kept, like, a -- your own Word document that you would give to the clients that would let them know what wouldn't apply or what would apply?<br><br>A. That is correct. | Contradicts deposition testimony without explanation. Plaintiff testified she would prepare a reference document for the client to use after go live that was specifically tailored to the settings the client had implemented. Plaintiff did not testify that the reference document was a pre-existing template or that she had no discretion in drafting the Word doc, but agreed that it was her "own" Word doc. |
| I understand that Tyler alleges that I would have calls [sic] client calls to discuss[] client concerns and made recommendations to the client about how | Q: And in the next bullet point down, you said, "Continuously consults with Stakeholders regarding their specific company operations in order to | Contradicts prior deposition testimony without explanation. Plaintiff testified that she would talk to the client about their business operations and, based on the |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| the functionalities present in ExecuTime could be used to reflect the customer's existing payroll practices.  If a customer had no need for a functionality (e.g., comp time), then I would show them they could eliminate that functionality from the menu display.  I did not advise the client *whether* they should do it or not. (Aff. ¶ 28).<br><br><br>I understand Tyler alleges that "I made recommendations regarding security profiles for users or building different configurations for different groups of employees based on their practices."  What this means is that I explained to the client that it would be more efficient and user-friendly to set up ExecuTime's security functions by groups of employees rather than having each employee have their own customized security profile.  So, typically, the customer would create lists of different employees to have access to.  I did not advise the customers on how they should organize those groups.  I simply explained to the customers how they could create security profiles in ExecuTime software matching the levels | recommend best utilization and customization of ExecuTime configuration." What recommendations would you be making regarding utilization and customization of ExecuTime?<br><br>A. Sure. So as we're configuring security roles, so when you build a -- or security permission role in ExecuTime, you typically want to, you know, try as best you can to encompass security setup based on a group of individuals, so that if you have 200 employees, you don't want to have to create 200 security roles to accommodate how they're going to use ExecuTime. You would -- the preference would be to create a security role, and that one security role would be applicable to multiple users, so that once you create that role, you can go into the user profile, assign that security role, and, you know, that knocks out, you know -- I don't know -- 30 of your users. And then you may have to create another security profile that matches how the next 30 or 25 users are going to use ExecuTime. So it's basically making recommendations on what ExecuTime could do for them so that they're setting it up in a way that it won't become a maintenance nightmare, so to speak. | client's specific operations, she would make recommendations to the client as to how to configure ExecuTime based on the client's specific operations. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| of access they wanted to assign each group. (Aff. ¶ 31). | Q. Gotcha. Other than the security setup, are there other examples of recommendations with respect to utilization or customization of ExecuTime configuration that you would make?<br><br>A. Uh-huh. There were other areas of the application that held the same type of -- based on how you set the system up in reference to the available functionality is going to determine what it's going to take to maintain the system going forward, as you have, you know, people terminate or new hires come in or rehires or whatever the case may be. So a lot of the recommendations would be, Okay, based on what I'm hearing, this group of employees handles things this way, whereas this group of employees handles other scenarios a different way. So let's, you know, build a configuration within ExecuTime, you know, using our options available like this so that going forward, as you're maintaining the new hires and what -- and so forth, you can, you know, easily group employees together or classify employees. That was pretty much -- that's it.<br><br>Q. So you would be able to kind of come up with these recommendations for how they build out or configure ExecuTime | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | based on, I guess, client calls and just your communications with the client, understanding their specific setup?<br><br>A. Correct. And -- right, and comparing that what -- to what ExecuTime offers, what ExecuTime – you know, what ExecuTime can do.<br><br>Pl. 65:11-67:16 | |
| In my resume, I used a great deal of language that was inapplicable to the positions of SPM and Implementation Analyst (IA).  I do not believe that it is really accurate to state that I "managed, monitored, and motivated a 'cross-functional team' in the positions I held while employed by Tyler.  I *did* do that in my *former* position as Manager of Implementation Services prior to Tyler's acquisition of ExecuTime.  My resume conflates many different positions I held at both ExecuTime and Tyler over more than 8 years.  I listed only the job title "Senior Project Manager"—not even my final position—in my resume because it sounded the most impressive.  Unlike for most employees, I had more responsibilities and authority early in my | Q: And do you recognize Exhibit 2?<br><br>A. I do.<br><br>Q. And is this a résumé that you had prepared?<br><br>A. Yes.<br><br>Q. And it looks like you prepared this while you were still working at Tyler in the senior project manager role. Is that right?<br><br>A. Yes.<br><br>Q. I wanted to ask you about some of the bullet points that you had included in this résumé. Do you see about halfway down, on the first set of bullet points under senior project manager, there's one that | Best Evidence.  Exhibit 2 to Plaintiff's deposition is Plaintiff's resume.<br><br>Contradicts deposition testimony without explanation.  Plaintiff testified during deposition as to the descriptions in her resume, including that it referenced Tyler, not ExecuTime, teams.  She did not deny the accuracy of the descriptions.  She also testified that she submitted the resume as part of her application for the Implementation Analyst role (and the resume lists her employment as a senior project manager as "present").<br><br>Relevance.  Plaintiff's duties with ExecuTime, including her alleged demotion, are far outside the statute of limitations and are not relevant to whether |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| employment than later due to my above-mentioned self-demotion. (Aff. ¶ 29).<br><br>As SPM, I did certainly interact with the same "cross-functional team," including the implementation consultant, software deployment team, and technical configuration team, but it is not accurate to say that I "managed" them in my position as SPM.  I had no authority over members of other teams whatsoever. (Aff. ¶ 30). | starts with "Manages, monitor, and motivates"?<br><br>A. Yes. Yes, I do.<br><br>Q. Okay. And it says, "Manages, monitor and motivates the cross functional team assigned to each project." Who would -- who would be the cross-functional team that you're referencing there?<br><br>A. Sure. So it would be the implementation consultant that I'm working with; it would be the team responsible for deploying the software to the servers; it would be any technical contacts that are -- that are helping with establishing the email configuration within ExecuTime so that the email server talks to ExecuTime, sends notifications. The technical team would also assist with time clock setup that needed to be done on a server so that my IC could actually train on the time clock. The technical team would also assist with any type of technical calls that we had to discuss server specifications required for the installation of ExecuTime, those type of things. So it's typically Tyler, Tyler teams.<br><br>Q. Okay. And that would consist of the implementation consultant, the | the duties she performed while employed by Tyler are exempt. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | deployment team, and the technical contacts?<br><br>A. Correct. And I would include management in that as well because, you know, sometimes we would have to get them involved if, you know, an installation couldn't happen sooner, you know, as soon as we needed. We would have to go to management for management to go to the manager of, you know, those teams to kind of get things pushed through.<br><br>Q. And so when you said you managed the cross-functional team, how would you be managing those different groups?<br><br>A. We're still managing the communication between all groups so that we're all on one accord and can set, you know, appropriate expectations.<br><br>Q. And that would be all, I guess, with the purpose of getting this implementation done, you know, on schedule, within scope?<br><br>A. That is correct. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q. What about "monitor and motivates"? How would you do that?<br><br>A. So there were some times where we would have to put tickets in to have things done. And so I would monitor the ticketing system to make sure that -- because when you initially enter a ticket, it's in just -- in a pool with other tickets that have to be assigned or pulled from that queue. Excuse me. And so I would just monitor to make sure that that's happening in a timely manner and it's been assigned to a representative, so that once it's assigned to a representative, I know who I can go in and touch base with as to when it will be completed.<br><br>Q. And then what about the "motivates"?<br><br>A. That would just come from, Hey, team, you know, can -- it would be great if you can kind of get this done by this date; the client has expectations of such-and-such from sales. You know, just trying to, you know, just promote a healthy working team morale.<br><br>Q. And you were often, I guess, out of that team, the one that had the direct client contact, so you were aware of what the client's expectations were as far as | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | progressing and the schedule?<br><br>A. Exactly.<br><br>Pl. Dep. 56:6-59:9 | |
| My authority with respect to my assigned IC was limited to simply assigning implementations given his or her existing workload.  And of course even that could be and was reviewed by my IM (Aff. ¶ 30). | Q. What would you estimate to be the job duties that took the majority of your time as a senior project manager?<br><br>A. Vamping up new hires, getting them prepared to be able to conduct trainings on their own, and helping them through understanding tasks and the timeliness of that.<br><br>Q. And how much of a percentage of your time would you estimate that that took up?<br><br>A. More than 50 percent of my day, on most days.<br><br>Q. Okay. And you said ramping up new hires. When you're referring to "new hires," is that implementation consultants and project managers?<br><br>A. More so, implementation consultants.<br><br>Pl. Dep. 179:6-19 | Contradicts prior testimony without explanation.  Plaintiff testified extensively regarding her management of her IC, including that she spent the majority of her time training ICs and PMs. Plaintiff also testified that she provided training, feedback/coaching, and directed ICs' work.<br><br>Best evidence.  Exhibits 9-16 to Plaintiff's deposition show her providing coaching to her ICs and doing more than simply assigning implementations to an IC based on the IC's workload. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q. When you said ramping up new hires and conduct training on their own took about 50 percent of your time, what all went into ramping up new hires? I know we've talked about the feedback that you would provide, listening to calls that they would conduct. What else would go into that?<br><br>A. Spending one-on-one time with them; you know, training them on the application to increase their knowledge; you know, assisting them with troubleshooting issues with support that they'd run into that I'm not able to, you know, address right off the bat; creating cheat sheets, just Word document cheat sheets to help them, you know, stay organized and keep up with action items that came up to ensure they follow up.<br><br>Q. So would that be similar to kind of the summary and checklists that you had -- that we saw earlier where you'd list out each project and kind of where it was and what you expected from the IC with respect to that project and -- something like that?<br><br>A. Yes, ma'am. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Pl. Dep. 181:22:182:16 | |
| I understand that Tyler alleges that I was responsible for "ensuring the team was in sync; ensuring support tickets were resolved in a timely manner; and promoting a healthy team morale.  This is true.  It is also equally true for every other ExecuTime team member. (Aff. ¶ 32). | | Unsupported allegations/conclusory facts.  Plaintiff puts forth no basis for her knowledge of the duties of every other ExecuTime team member.  It is also irrelevant as to the duties of other ExecuTime team members. |
| Training—whether for a Tyler employee or for a customer—always entailed conveying factual information about how the ExecuTime software operated.  In other words, I taught them how to use it. (Aff. ¶ 34). | A. Also, as a project manager, you know, we were responsible for, you know, allowing new hires to shadow us to get experience and help with projects that we're currently working on. We were training new hires.<br><br>Q. And this would be new-hired PMs?<br><br>A. Or ICs.<br><br>Pl. Dep. 24:5-10<br><br>Q. You said you would configure the training before you went to the client's site; is that right?<br><br>A. Yes, that is correct.<br><br>Q. Explain to me what configuring it would entail. | Contradicts prior deposition testimony without explanation.  Plaintiff's description of her training duties during her deposition indicates that those duties were more than merely conveying factual information, but that she mentored new employees.  Plaintiff also testified that, during initial training, she would set up multiple configurations to demonstrate to clients so clients could elect their preferred configuration. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
|  | A. Sure. So there's -- in ExecuTime there were a few imports that would take place. So we would import employee demographics, phone numbers, addresses, you know, employee status, that type of thing. But then if they were using -- if they were using, let's say, overtime or shift differential, we would actually have to go in and configure that. If they weren't going to have users clocking in and out, we would have to go build security walls to say, you know, okay, this particular employee's going to clock in and out versus these employees are going to do manual time sheet entry. And usually you would -- you would configure both types of scenarios, so that if it's one of the initial trainings, where a client doesn't know exactly which option they're going to choose, you can show both, you know, to give the client a better idea of what their options are. And then, you know, they can make a decision from there. So we would have to build, you know, security permissions. We would have to go in and build overtime rules and shift differential rules. We would go in and prepopulate time cards so that when we're going through the training, we're not actually clocking in and out or doing time entry. We're basic- -- we'll show how that |  |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | functionality works, but then we can go and show them how the time card would look based on the time entry type that's -- that's chosen.<br><br>Q. So it sounds like some of the configuration that you needed to do you might learn during an initial training with the client, but would other, I guess, instances of configuration that needed to occur, would -- how else would you figure that out if it wasn't through an initial training?<br><br>A. Yeah, so during training, usually the client can identify, Oh, well, we forgot about this.  It's almost impossible to capture everything in the solution design. And then also once they have a better understanding of how ExecuTime can be configured, and they realize that not every department has to do things the same way, a lot of times we would leave those trainings and have to go back and make adjustments based on the client's new understanding of what their options are.<br><br>Q. So some of it would come through the solution design; some of it would come through training as it evolved? | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A. Yes.<br><br>Pl. Dep. 47:14-49:15<br><br>Q., you did the client training, but it sounds like you also trained Tyler employees. Tell me a little bit about the internal training you did. What would that have covered?<br><br>A. Sure. So usually it would be a specific function. It wouldn't be, like, an entire basic user training or supervisor training. If I was training a new project manager, I'm kind of -- I'm training her on -- you know, or training them on just processes here and there. What management would do would – is whenever we had a new project manager or IC, they would schedule time for that new hire with each person on the team, you know, just to kind of get acclimated with them and see how they do things, because pretty much every project manager did -- you know, kind of did their own thing.  I mean, we all had templates and processes and things like that, and, you know, we had a guide that we had to follow, but there were some things that -- that we did differently, I guess you could say. And so it would have other PMs or ICs that are new hires shadowing myself. And then management | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | would also take the new hires through a series of training, and they would take -- you know, have them learn a small piece of ExecuTime, and then the new hire would train management on that. And management would ask us to sit in and critique the new hire, pretend that we were a client, so as the new hire was going through training, we might interrupt them and ask them a question or ask them to clarify something just to kind of see how they would handle that based on how we knew our clients respond to us.<br><br>Pl. Dep. 61:4-62:12<br><br>Q. When you said ramping up new hires and conduct training on their own took about 50 percent of your time, what all went into ramping up new hires?  I know we've talked about the feedback that you would provide, listening to calls that they would conduct. What else would go into that?<br><br>A. Spending one-on-one time with them; you know, training them on the application to increase their knowledge; you know, assisting them with troubleshooting issues with support that they'd run into that I'm not able to, you know, address right off the bat; creating | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | cheat sheets, just Word document cheat sheets to help them, you know, stay organized and keep up with action items that came up to ensure they follow up.<br><br>Pl. Dep. 181:22-182:10<br><br>Q. Tell me about the training that you provided in Maine.<br><br>A. It was classroom style. I would have my laptop hooked up to a projector, and I was -- well, I'm sorry. The first training that I attended, I literally flew out there my first day in that role, and I observed Kayla conducting the ExecuTime training. And then the next time they flew me out there, I conducted the training. It was classroom style, just going through the ExecuTime application, set up basic users, you know, how supervisors use the system, that type of thing.<br><br>Q. So were you teaching, I guess, implementation consultants and project managers how they would configure ExecuTime?<br><br>A. Not really. More so just showing them what's available. The majority of those users that attended that, they've already seen and trained on ExecuTime in some | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | capacity. And so it was more just a way -- an opportunity for them to address questions, us to discuss issues that they are running into, that type of thing.<br><br>Q. And you were able to, I guess, have these kind of trainings and answer these questions based on your experience with ExecuTime?<br><br>A. Yes.<br><br>Pl. Dep. 193:7-194:6 | |
| I understand that Tyler alleges that I "created knowledge transfer materials" including knowledge-based standard (KBS) articles for other implementation consultants or project managers to consult when they encountered an issue with an implementation. This is true. It is also true of approximately 30 other Tyler employees, including IC's and customer support personnel. These KBS articles simply described in detail how to correctly fix known problems. (Aff. ¶ 35). | Q. What knowledge transfer materials did you create?<br><br>A. So out on SharePoint, it was just quick how-tos as far as configuration, how to set up a specific type of pay code, accrual code combination. I documented the Jira tickets that I worked to ensure, you know, whatever steps were taken to resolve the issue were noted. And then I created knowledge base standard -- "KBS articles" is what we referred to them as.<br><br>Q. KBFRs?<br><br>A. Articles. | Contradicts deposition testimony without explanation.  Plaintiff testified that she was the only Implementation Analyst for the ExecuTime product.  Plaintiff testified the KBS articles Plaintiff created were client-facing materials used by ICs or PM to resolve issues they encountered with ExecuTime.  Plaintiff also testified she created the KBS articles using her experience/knowledge of ExecuTime and her successful resolution of an implementation issue.<br><br>Unsupported allegations/conclusory facts. Plaintiff does not establish that basis for her knowledge of other Tyler employee's job duties or who those employees are. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q. Oh, KB --<br><br>A. KBS.<br><br>Q. -- articles?<br><br>A. Yes, ma'am.<br><br>Q. What were those?<br><br>A. They were just quick knowledge base standard forms, that we -- you know, we take the information from the ticket we were working and basically just transfer what the question was and what we did to resolve that issue. Then that was made accessible to internal teams as well as clients so that they can, you know, check that database before they report an issue to see if there's already a resolution out there.<br><br>Q. Okay. So you would be putting together stuff kind of based on your experience or the issues you were seeing, and then --<br><br>A. In support.<br><br>Q. -- the ICs or PMs could use that to resolve issues that they were encountering with an ExecuTime implementation? | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
|  | A. Yes.<br><br>Pl. Dep. 197:10-198:17<br><br>Q. I know we talked about those Confluence page creation/updates. And I think you mentioned the KCS articles, but I wasn't quite sure what those are. Can you tell me a little bit more about what those are?<br><br>A. Sure. I think I was referring to them as "KBS" articles. That's my apologies for that. But those are the just -- quick articles that we would create for the ICs, project managers, as well as our clients. We would make them client facing for them to quickly troubleshoot issues. So they could search an error message on our KCR -- KCS articles, and if it's something that was reported and an article was created, it would come up and usually produce steps to resolve that issue or give them knowledge of the fact that it's a known issue and when it's expected to be corrected.<br><br>Pl. Dep. 220:14-221:4<br><br>Q. Were there any other implementation analysts for the ExecuTime product? |  |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A. No, not at the time that I was there, no.<br><br>Q. And the implementation analyst position, was that a new role at Tyler when you applied for it?<br><br>A. Yes.<br><br>Pl. Dep. 194:7-12 | |
| I did not make recommendations about how customers should organize their own payroll structure. I taught them how the settings in ExecuTime could be used to match their needs, whether it was turning on or off the comp. time function, setting pay periods to weekly, bi-weekly, or semi-monthly, or any other ExecuTime function that was available and applicable to their payroll structure. (Aff. ¶ 36).<br><br>Both as an SPM and as an IA, I did not perform work that affected Tyler's business operations to a substantial degree more than any employee whose work must be performed correctly and on time. I had absolutely no role or input into the structure of Tyler's business or of its customers' operations. (Aff. ¶ 62). | Q: And in the next bullet point down, you said, "Continuously consults with Stakeholders regarding their specific company operations in order to recommend best utilization and customization of ExecuTime configuration." What recommendations would you be making regarding utilization and customization of ExecuTime?<br><br>A. Sure. So as we're configuring security roles, so when you build a -- or security permission role in ExecuTime, you typically want to, you know, try as best you can to encompass security setup based on a group of individuals, so that if you have 200 employees, you don't want to have to create 200 security roles to accommodate how they're going to use ExecuTime. You would -- the preference would be to create a security role, and that one security role would be applicable to | Contradicts prior deposition testimony without explanation.  Plaintiff testified that she would make recommendations to clients based on the capabilities of ExecuTime and the clients' practices and those recommendations would impact the clients' practices with respect to payroll.<br><br>Unsupported allegation/conclusory fact.  Legal conclusion.  Plaintiff provides no support for her statements in Paragraph 62 of her affidavit. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | multiple users, so that once you create that role, you can go into the user profile, assign that security role, and, you know, that knocks out, you know -- I don't know -- 30 of your users. And then you may have to create another security profile that matches how the next 30 or 25 users are going to use ExecuTime. So it's basically making *recommendations* on what ExecuTime could do for them so that they're setting it up in a way that it won't become a maintenance nightmare, so to speak.<br><br>Q. Gotcha. Other than the security setup, are there other examples of recommendations with respect to utilization or customization of ExecuTime configuration that you would make?<br><br>A. Uh-huh. There were other areas of the application that held the same type of -- based on how you set the system up in reference to the available functionality is going to determine what it's going to take to maintain the system going forward, as you have, you know, people terminate or new hires come in or rehires or whatever the case may be. So a lot of the *recommendations* would be, Okay, based on what I'm hearing, this group of employees handles things this way, | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | whereas this group of employees handles other scenarios a different way. So let's, you know, build a configuration within ExecuTime, you know, using our options available like this so that going forward, as you're maintaining the new hires and what -- and so forth, you can, you know, easily group employees together or classify employees. That was pretty much -- that's it.<br><br>Q. So you would be able to kind of come up with these recommendations for how they build out or configure ExecuTime based on, I guess, client calls and just your communications with the client, understanding their specific setup?<br><br>A. Correct. And -- right, and comparing that what -- to what ExecuTime offers, what ExecuTime – you know, what ExecuTime can do.<br><br>Pl. Dep. 65:11-67:16 (emphasis added).<br><br>Q. So "analyzing user requirements" would refer to, I guess, kind of learning about the client's business and processes, and it's applying your knowledge of ExecuTime to under- -- to explain to them | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | how it would work with their specific protocols and policies?<br><br>A. Correct.<br><br>Q. And then sometimes that would result in the client needing to change certain, I guess, procedures they had?<br><br>A. Yes, that is correct.<br><br>Q. Can you think of a specific instance where a client had to go back and change a policy or procedure based on your discussions with them?<br><br>A. I mean, I can't think of a specific time, no, but, I mean, it would -- it would happen all the time just because, again, you know, what their expectations of the software are doing versus what ExecuTime could actually do. That was a continuous, repetitive conversation that we would have with clients, and they would have to make adjustments accordingly.<br><br>Q. But you can't recall any specific adjustments that clients had to make?<br><br>A. Well, I mean, the specific adjustments would have to be the classification of the | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | security roles and things that we spoke about earlier.<br><br>Q. But that's stuff you're doing on Tyler's side. Is there anything that you're aware of that clients had to go do on their side after you had those conversations with them?<br><br>A. Oh, I see what you're saying. I'm sorry. I see what you're saying. Okay. Let me think about this for a second. I mean, the only thing I could really think of is, like, if the client was expecting to be able to require a certain group of employees to do manual entry or clock in and out and then later realize that -- because they actually have to have access to a computer or a time clock. And these users work in the field. They don't report to an actual location. They would have to go back and say, Okay, never mind. You guys are not going to clock in and out with a manual entry. We're going to prepopulate a time card for you. And then at some point, you know, within the two-week or the one-month pay period, whatever the case may be, the user would have to make sure that they access the application at least one time and approve the time card. So I guess to summarize, you know, making changes | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | based on how they're expecting to do time entry for certain groups.<br><br>Q. Any other changes you can think of that clients have to make?<br><br>A. Well, they -- yeah, they would make changes to when they run payroll, because, again, you know, they were used to having paper time cards, and they had a timekeeper or someone that manually went in there and keyed everyone's time, verified it, to now having an automated process. So instead of having to do the payroll processing, you know, by Monday at 12 a.m., they were able to extend that a little bit more because everything 1 was electronic. But that would be it.<br><br>Pl. Dep. 86:14-89:1 | |
| Tyler points to an email exchange I had with Jamie Burns regarding a talk I had with an IC who was assigned to me regarding negative client feedback he had received. The subject matter and content of this discussion was based on previous conversations I had with my own superiors and their recommendations for what to say to him. Obviously, the exact words and style I used for this sensitive conversation were up to me, but the | Q. All right. And Exhibit 11, do you recognize this as an email that you sent to Jamie Burns?<br><br>A. Yes.<br><br>Q. And this was sent to her on October 8th, 2019. And it looks like you are discussing Brian, one of the | Best evidence.  Exhibit 11 to Plaintiff's deposition is the referenced email.  In the email, Burns asks Plaintiff for a meeting to discuss Plaintiff's team.  Plaintiff tells Burns she has already met with the IC and had a "heart to heart" so Burns and Plaintiff do not have to meet.  Plaintiff relays to Burns the feedback she gave to the IC. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| substance was determined by my supervisors. I did not typically provide my IC with my own evaluation of their performance; rather, I conveyed information and made recommendations, the substance of which had already been provided or approved by my supervisors. (Aff. ¶ 37). | implementation consultants you worked with?<br><br>A. Yes.<br><br>Q. So it looks like you were planning to schedule a meeting with Jamie to talk about Brian. And you said, kind of, We can still meet if you want, but it looks like you already went ahead and talked to him about feedback you had been getting? Is that right?<br><br>A. Yes.<br><br>Q. So what feedback did you provide to Brian?<br><br>A. At that time, you know, there were just complaints where the client felt like they knew more of the software than Brian. Some of the same issues that we were seeing with Trey, where things weren't being completed or followed through with.<br><br>Q. It looks like you told -- down in the third paragraph, you say, "I told him if there is anything I can do better to help him to let me know, even if that means scheduling more time with him." So it looked like you were making yourself | Contradicts deposition testimony without explanation.  Plaintiff testified that, while she had discussed the IC's performance with her managers, they simply made "suggestions" and it was up to Plaintiff to make sure the IC understood the expectations and consulted with Plaintiff so Plaintiff and the IC could work through issues. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | available to -- to Brian as a resource so he could try and improve his performance?<br><br>A. Correct.<br><br>Q. Did his performance improve?<br><br>A. Not while he was under -- under myself as far as being his project manager.<br><br>Q. Why were you sending Jamie this email about the feedback that you had given to Brian?<br><br>A. Jamie and I, as well as Hillary, had already had conversation. They had gotten feedback as well.<br><br>Q. And what were the conversations you had had with Hillary and Jamie about Brian?<br><br>A. Just discussions on, you know, some of the things that clients were reporting back.<br><br>Q. Did you guys discuss what action should be taken?<br><br>A. I believe Hillary and Jamie did make – make suggestions, but more so, just, you know, me making sure that -- or making sure that he understands he needs to, you | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | know, communicate things, you know, with me as they come up so that we can address them together.<br><br>Pl. Dep. 145:18-147:12 | |
| I did occasionally participate in interviewing potential new hires. These interviews were invariably group interviews and Tyler would solicit impressions from all team members who were present for the interviews. I did not lead the interviews and my participation in the interviews and feedback provided was no greater than that of any other team members below the level of IM. (Aff. ¶ 38).<br><br>As an SPM, I did not have the authority to hire or fire other employees. I gave feedback following group interviews on occasion, but my participation in those group interviews was no different than any of the other Tyler employees below the level of IM who participated. I was never informed that my feedback was given special weight and have no reason to believe that was the case. Those group interviews and feedback were occasional and cannot be fairly described as my primary duty. (Aff. ¶ 47). | | Unsupported allegation/conclusory fact. Plaintiff provides no basis for her statement that her feedback was no greater than that of any other team member below the level of IM.  Plaintiff has no personal knowledge of the level of importance placed on her feedback by management.<br><br>Legal conclusion.  What constitutes Plaintiff's primary duty is a legal conclusion. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | | |
| Over the years, I put several interested friends and acquaintances in contact with management when IC positions became available. This was not a part of my job duties at Tyler. (Aff. ¶ 39). | Q. This next bullet point, you say, "Assists with onboarding process for new hires through recruiting, interviewing and hiring." Explain to me a little bit, I guess, about your role in the recruiting process.<br><br>A. Sure. So in the recruiting process, I -- during my time at Tyler, I referred, and they hired, gosh, probably seven -- seven to nine employees. So recruiting would be actually just more so, you know, people that I worked with in the past that were looking for different -- new opportunities. You know, I sent their résumé on to management for consideration.<br><br>Pl. Dep. 75:19-76:5 | Best evidence.  Plaintiff listed "Assists with onboarding process for new hires through recruiting, interviewing and hiring" in her resume (Pl. Dep., Ex. 2).<br><br>Contradicts prior deposition testimony without explanation.  Plaintiff in her deposition described recruiting, i.e., referring people to Tyler, as part of her job duties. |
| In October 2019 I requested to be put into the newly-created position of Implementation Analyst and started in that role the following month. That position consisted of training both customers and Tyler employees in how to use the ExecuTime software, both formally and informally. This is the exact same work that I had been spending half my days on already, without being able to bill for it. (Aff. ¶ 40). | Q. All right. Ms. Harrison, I've shared with you what will be Exhibit 20. Do you see the document in front of you?<br><br>A. I do.<br><br>Q. And let me know after you've had a chance to review it or if you need to scroll down. | Best evidence.  Plaintiff testified that Exhibit 20, the Implementation Analyst job description is an accurate description of her job duties as an Implementation Analyst.<br><br>Contradicts prior deposition testimony without explanation.  Plaintiff testified that as an Implementation Analyst she spent the majority of her time on CRM tickets she received and requests for assistance from Project Managers and ICs, |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
|  | A. Okay. (Reviewing document.) Okay. (Reviewing document.) Okay. (Reviewing document.) Okay.<br><br>Q. Is Exhibit 20 an accurate description of the implementation analyst job duties?<br><br>A. Yes.<br><br>Pl. 196:6-16<br><br>Q. What would you say took up the majority of your time as an implementation analyst?<br><br>A. Caseload. The number of cases that were coming in from the project managers and IC, as well as the number of cases that were existing at the time I joined the team.<br><br>Q. And that would be in the form of either the CRM tickets or I- -- ICs and PMs reaching out to do team meetings? That is kind of what you mean by "caseload"?<br><br>A. Yes, ma'am.<br><br>Q. And how much of your time would you say that took up?<br><br>A. More than a hundred percent. | job duties she did not have as a Senior Project Manager. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
|  | Pl. Dep. 215:3-15 |  |
| I understand that Tyler claims that I conducted training at "a three-day project management summit in Texas." This statement is misleading. I did not do three days of presentations. I did four identical 30-minute presentations explaining what the new role of Implementation Analyst was and how they could come to me for help. I did not even draft the text of the presentation. It was provided to me by Tyler. (Aff. ¶ 43). | Q. And you said you traveled to project management summits in Austin. Were these just kind of like conferences for different employees?<br><br>A. Yes, they were. We had stations set up and -- you know, based on the type of employee, yes.<br><br>Q. And how long did those conferences last?<br><br>A. Three days.<br><br>Q. Did other implementation analysts attend those conferences?<br><br>A. Not that I'm aware of. None from my team. I don't know of any other team.<br><br>Q. Were these conferences that you were invited to or conferences that you asked to go to?<br><br>A. Conference that I was invited to, and I was -- I was asked to do --<br><br>Q. Who invited you?<br><br>A. -- a presentation. | Contradicts prior deposition testimony without explanation.  Plaintiff testified her presentation was educational as to the new ExecuTime features, not that the presentation consisted of explaining the Implementation Analyst role and how the attendees could come to her for help.<br><br>Unsupported allegation/conclusory fact. There is nothing misleading regarding Tyler's claim. It tracks Plaintiff's testimony that she conducted training at a three day project management summit in Texas. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q. You said you presented at those conferences?<br><br>A. Yes. I had a small segment where I did a quick, 30-minute, you know, "Here's what's new with ExecuTime" type presentation.<br><br>Q. And who would you be presenting to? Who was the audience for that?<br><br>A. Other Tyler project managers.<br><br>Q. You'd be educating project managers on new features with ExecuTime?<br><br>A. That's correct.<br><br>Pl. 191:12-192:20. | |
| I understand that Tyler also claims that I "conducted trainings in Maine on ExecuTime for newly hired project managers and implementation consultants." I did such training on two occasions, once in Maine and once over the phone. The training was basically a souped-up version of the basic functionality training that I or an IC would do with clients in a normal training session. In other words, I just showed them how the ExecuTime software | Q. Tell me about the training that you provided in Maine.<br><br>A. It was classroom style. I would have my laptop hooked up to a projector, and I was -- well, I'm sorry. The first training that I attended, I literally flew out there my first day in that role, and I observed Kayla conducting the ExecuTime training. And then the next time they flew me out there, I conducted the training. It was classroom style, just going through the | Contradicts prior testimony without explanation.  Plaintiff testified she observed one training and then conducted another training—both in person. Plaintiff also testified that the training session was an opportunity for her to address questions and issues that attendees (who were experienced on ExecuTime) were running into based on her experience with ExecuTime, not that it was a basic functionality training. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| worked. And the script for the training session was provided to me by Tyler. I did not write it myself. (Aff. ¶ 44). | ExecuTime application, set up basic users, you know, how supervisors use the system, that type of thing.<br><br>Q. So were you teaching, I guess, implementation consultants and project managers how they would configure ExecuTime?<br><br>A. Not really. More so just showing them what's available. The majority of those users that attended that, they've already seen and trained on ExecuTime in some capacity. And so it was more just a way -- an opportunity for them to address questions, us to discuss issues that they are running into, that type of thing.<br><br>Q. And you were able to, I guess, have these kind of trainings and answer these questions based on your experience with ExecuTime?<br><br>A. Yes.<br><br>Pl. Dep. 193:7-194:6 | |
| As an SPM, I did not appraise employees' productivity and efficiency for the purpose of recommending promotions or other changes in status. (Aff. ¶ 51). | Q. Okay. I've shared with you what will be Exhibit 14. Let me know if you have that in front of you, and I can scroll | Best evidence.  Exhibits 14-15 of Plaintiff's deposition include an IC's performance evaluation that Plaintiff completed. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | through it so you can see the entire document.<br><br>A. I see it. I can see it. Oh, I'm sorry. You can scroll down. (Reviewing document.) Okay.<br><br>Q. So do you recognize Exhibit 14 as an email exchange between you and Jamie Burns about Brian Ledbetter's performance evaluation?<br><br>A. Yes.<br><br>Q. And Jamie was asking for you to give her your feedback on Brian that she could include in his performance evaluation?<br><br>A. Yes.<br><br>Q. I'm going to share with you the attachment to Exhibit 14, which is the Brian Ledbetter performance eval document.<br><br>(Exhibit 15 marked.)<br><br>Q. All right. Do you see that in front of you? We'll make that Exhibit 15.<br><br>A. Yes. | Contradicts prior testimony without explanation.  Plaintiff testified she completed an IC's performance evaluation at the request of her manager.  Plaintiff also testified about performance improvement feedback she provided to ICs.<br><br>Legal conclusion and unsupported allegation/conclusory fact.  Plaintiff simply recites the C.F.R. without providing any factual support. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | … <br><br> Q. So Exhibit 15 was the feedback that you provided to Jamie for Brian Ledbetter to include in his performance evaluation? <br><br> A. Yes. <br><br> Pl. Dep. 155:5-18 <br><br> Q. All right. And Exhibit 11, do you recognize this as an email that you sent to Jamie Burns? <br><br> A. Yes. <br><br> Q. And this was sent to her on October 8th, 2019. And it looks like you are discussing Brian, one of the implementation consultants you worked with? <br><br> A. Yes. <br><br> Q. So it looks like you were planning to schedule a meeting with Jamie to talk about Brian. And you said, kind of, We can still meet if you want, but it looks like you already went ahead and talked to him about feedback you had been getting? Is that right? | |

| Affidavit | Deposition Testimony | Objection |
|-----------|---------------------|-----------|
|  | A. Yes.<br><br>Q. So what feedback did you provide to Brian?<br><br>A. At that time, you know, there were just complaints where the client felt like they knew more of the software than Brian. Some of the same issues that we were seeing with Trey, where things weren't being completed or followed through with.<br><br>Q. It looks like you told -- down in the third paragraph, you say, "I told him if there is anything I can do better to help him to let me know, even if that means scheduling more time with him." So it looked like you were making yourself available to -- to Brian as a resource so he could try and improve his performance?<br><br>A. Correct.<br><br>Q. Did his performance improve?<br><br>A. Not while he was under -- under myself as far as being his project manager.<br><br>Pl. Dep. 145:18-147:12 |  |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| In both my SPM and IA positions, my primary duty was the same: to show people (both customers and other Tyler employees) how to correctly operate the ExecuTime software. (Aff. ¶ 70).<br><br>My work as an IA was almost entirely work that I had already been performing as a SPM, simply with fewer responsibilities. (Aff. ¶ 71).<br><br>As an IA, there was even less difference between me and an IC than when I was a SPM. I did exactly what an IC did except that I wasn't assigned to specific implementations. I was a resource for everyone in the ExecuTime division to rely on because I understood how the software worked better than almost anyone else outside upper management. I taught them how to use it correctly. And I also continued to do customer training as needed. Tyler had massive turnover and few people could stand working for Tyler for very long, so there were always people who needed my assistance. (Aff. ¶ 73). | Q. What would you say took up the majority of your time as an implementation analyst?<br><br>A. Caseload. The number of cases that were coming in from the project managers and IC, as well as the number of cases that were existing at the time I joined the team.<br><br>Q. And that would be in the form of either the CRM tickets or I- -- ICs and PMs reaching out to do team meetings? That is kind of what you mean by "caseload"?<br><br>A. Yes, ma'am.<br><br>Q. And how much of your time would you say that took up?<br><br>A. More than a hundred percent.<br><br>Pl. Dep. 215:3-15<br><br>Q. What would you estimate to be the job duties that took the majority of your time as a senior project manager?<br><br>A. Vamping up new hires, getting them prepared to be able to conduct trainings on their own, and helping them through understanding tasks and the timeliness of that. | Legal conclusion as to what is a primary duty.<br><br>Contradicts prior testimony without explanation.  Plaintiff testified in her deposition as to what duties took up the majority of her time as a Project Manager and as an Implementation Analyst, which were different duties. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q. And how much of a percentage of your time would you estimate that that took up?<br><br>A. More than 50 percent of my day, on most days.<br><br>Q. Okay. And you said ramping up new hires. When you're referring to "new hires," is that implementation consultants and project managers?<br><br>A. More so, implementation consultants.<br><br>Q. But also some new PMs?<br><br>A. That is correct.<br><br>Q. And then second to the time you spent ramping up new hires to conduct trainings on their own, what would be the next responsibility you had that took up the most -- majority of your time or the most amount of your time?<br><br>A. Sure. Creating implementation timelines and, you know, mapping out resources to complete the different -- the various tasks.<br><br>Q. When you say "mapping out resources," what do you mean by that? | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | A. Just, you know, reviewing their calendars and checking their availability to complete trainings and things.<br><br>Q. So this would be for the implementation consultants?<br><br>A. Yes, ma'am.<br><br>Q. And would this also include people from the development team or tech support as well?<br><br>A. Yes.<br><br>Q. And how much of your time would you estimate that you spent on that responsibility? A. I'd say maybe 30 percent of my time.<br><br>Q. And then what would you say took up the remaining balance of your time, the 20 percent that's left?<br><br>A. You know, following up on support issues, issue resolution, transition to support calls, updating and managing, you know, Jira tickets, and doing the large amount of copy/pasting emails from -- you know, copy/pasting emails and making sure that stuff's in Jira, and just kind of keeping up with those tasks in Jira | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
|  | to ensure that they're closed out and being handled in a timely manner.<br><br>Q. What about the time that you spent conducting training? Where would that fall?<br><br>A. Good question. I would say issue -- you know, along with the issue resolution and stuff, because typically the only time I was pulled in to conduct training is when there was an issue with the original trainer.<br><br>Q. So that would fall into the 20 percent category?<br><br>A. Yeah, give or take, uh-huh.<br><br>Q. Then what about conducting calls with clients?<br><br>A. I guess that would fall in with the whole, you know, managing of the project. The budget, timelines, you know, communication with management as to where projects stand.<br><br>Q. That would be that second category, 30 percent?<br><br>A. Correct. |  |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Q. When you said ramping up new hires and conduct training on their own took about 50 percent of your time, what all went into ramping up new hires?  I know we've talked about the feedback that you would provide, listening to calls that they would conduct. What else would go into that?<br><br>A. Spending one-on-one time with them; you know, training them on the application to increase their knowledge; you know, assisting them with troubleshooting issues with support that they'd run into that I'm not able to, you know, address right off the bat; creating cheat sheets, just Word document cheat sheets to help them, you know, stay organized and keep up with action items that came up to ensure they follow up.<br><br>Q. So would that be similar to kind of the summary and checklists that you had -- that we saw earlier where you'd list out each project and kind of where it was and what you expected from the IC with respect to that project and -- something like that?<br><br>A. Yes, ma'am. | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | Pl. 179:6-182:16 | |
| There were virtually no differences between the actual job duties of an Implementation Consultant like Suzi Greene and those of a Senior Project Manager like me except for: (1) I delegated work to my IC's based on their workload, and (2) I conveyed messages to my IC's from management. Beyond that, our jobs were identical: we taught people how to use ExecuTime software. I was very good at my job and lots of people in the company asked me for help when they ran into problems. (Aff. ¶ 72).<br><br>As an IA, there was even less difference between me and an IC than when I was a SPM. I did exactly what an IC did except that I wasn't assigned to specific implementations. I was a resource for everyone in the ExecuTime division to rely on because I understood how the software worked better than almost anyone else outside upper management. I taught them how to use it correctly. And I also continued to do customer training as needed. Tyler had massive turnover and few people could stand working for Tyler for very long, so there were always people who needed my assistance. (Aff. ¶ 73). | Q. So going back, Ms. Harrison, so can you kind of explain, I guess, kind of the life cycle or the phases that a senior project manager would be involved with with an implementation of ExecuTime software?<br><br>A. Sure. So, you know, once the -- the project is assigned to the project manager implementation consultant team, the PM -- is it okay to refer to project manager as "PM"?<br><br>Q. Sure.<br><br>A. Okay. So the PM would be responsible for hosting a stakeholder's kickoff call with the client. Prior to that call, the project manager will have reviewed a questionnaire that typically is provided by sales initially. And during the transition over to the project manager, it's completed. So we would review the questionnaire. We would, you know, read the contract, understand the number of powers or the type of contract it was. We would map out an implementation timeline for the IC that we're assigning that project to, you know, based on | Best evidence.  Exhibit 10 to Plaintiff's deposition is a task list that Plaintiff created for her ICs that shows the division of tasks for an implementation between the Project Manager and the Implementation Consultant.  Exhibits 5 and 6 are implementation timelines or project plans that show the different tasks completed by the Project Manager or the Implementation Consultant.<br><br>Contradicts prior testimony without explanation.  Plaintiff testified as to the different portions that would be handled by an IC versus a PM.  Plaintiff also testified regarding the duties that took up the majority of her time as an Implementation Analyst and those are duties that and Implementation Consultant did not have.<br><br>Unsupported allegation/conclusory fact.  Plaintiff does not describe the job duties of Ms. Greene. |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
|  | their current availability. And so we're basically prepping for the stakeholder call so that we could review all of this documentation on that call. Once we have the stakeholder presentation, it would be up to the project manager to stay in communication with the client, to give them an opportunity to review the timeline, you know, make sure that that lines up with their current schedules and priorities. And then ultimately we're requesting sign-off on that timeline before we start to engage the implementation consultant. . . . So once we -- we have that signed, implementation timeline, at that point we would host a kickoff call to introduce the IC to the client.  And, I'm sorry, I need to back up just a second. So from the questionnaire, the project manager was also responsible for taking that questionnaire and producing what we called a scope of work or a -- yeah, pretty much a scope of work. And it basically -- or solution design is another term for it. But we basically would outline based on what they answered in that questionnaire what we would be implementing, you know, what our pilot users would be, how things would be phased out. You're pretty much putting together a synopsis of what you're going to deliver to the client. And |  |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | that's also something that would have to be signed off on with the timeline. So once you have all those documents and you start to -- you introduce your IC, the PM would then be responsible for just managing the project.  Anything -- the budget. Anything that came up during the implementation as, like, an escalation, we would -- the project manager would be the one to communicate that with the manager of implementation to come up with an action plan for moving forward. So I guess you would call that, like, issue resolution or escalations.<br><br>Q. Now, what about after the implementation progressed? If there's a go-live period, what's the project manager's responsibility during that period?<br><br>A. Sure. So it's actually really the IC's responsibility to keep up with that go-live. For the most part, the project manager is just communicating and making sure that we stay on track for that date. You know, if the IC runs into any complications where they feel like, for whatever reason, they're not going to meet the date that we set, we would work directly with the ICs on -- on a solution to that. A lot of times management would be involved in that as | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| | well.  Also, as a project manager, you know, we were responsible for, you know, allowing new hires to shadow us to get experience and help with projects that we're currently working on. We were training new hires.<br><br>Q. And this would be new-hired PMs?<br><br>A. Or ICs. During that -- my tenure, during that time, it was just myself and one other lady that had the most seniority. And so during that time period, we had five or six new implementation consultants. So we all kind of had to, you know, pitch in and assist with getting them up to speed so that we could come off the road, because we were also -- myself and Jessie Bell, another project manager there, we were doing a lot of  the IC work as well just because there was so much turnover.  And we constantly, you know, had so many new people at one time, we were having to travel and do on-site trainings and, you know, remote trainings and things like that that the ICs typically would do under the Tyler umbrella.<br><br>Pl. Dep. 20:5-24:24 | |

| Affidavit | Deposition Testimony | Objection |
|---|---|---|
| I am currently employed as a Project Manager and classified as FLSA overtime exempt.  In this position I have many duties that I did not have as a SPM for Tyler, including approving and rejecting employee timesheets, reviewing and editing invoices before they are sent out to clients, writing change orders and estimating additional time needed to complete implementations, and hand-picking my preferred resources to work with on each implementation, among other more administratively significant duties. (Aff. ¶ 74). | | Legal conclusion that her job duties are "more administratively significant." |