# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| TALIA N. HARRISON, | § § § | |
| *Plaintiff,* | § § | Civil Action No.  4:21-CV-607 |
| v. | § § | Judge Mazzant |
| TYLER TECHNOLOGIES, INC., | § § § | |
| *Defendant.* | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Tyler Technologies, Inc.'s Motion for Summary Judgment (Dkt. #14).  Having considered the motion and the relevant pleadings, the Court finds that the motion is **GRANTED in part** and **DENIED in part.**

## BACKGROUND

This case arises out of an employer-employee relationship whereby Plaintiff Talia N. Harrison ("Harrison") alleges that her former employer, Defendant Tyler Technologies, Inc. ("Tyler"), did not compensate her with overtime pay, which is legally required under the Fair Labor Standards Act ("FLSA") when she worked more than forty (40) hours a week.  29 U.S.C. § 207(a).  Tyler alleges that both of Harrison's positions while working at Tyler, Senior Project Manager and Implementation Analyst, were exempt from receiving overtime pay.  29 U.S.C. § 213.

Tyler is a technology service provider that works exclusively with the public sector.  One of the services that Tyler currently provides is the implementation of the software ExecuTime.  ExecuTime is a time-keeping software that tracks employees' attendance and hours worked, then exports that information to payroll vendors to ensure each employee is properly compensated for

his or her time.  In June 2016, Tyler bought out the company ExecuTime and acquired all its employees, including Harrison (Dkt. #14, Exhibit 1 at p. 4).  Before the buy-out, Harrison worked as a Project Manager/Trainer and Implementation Manager for ExecuTime (Dkt. #14, Exhibit 1 at p. 4; Dkt. #14, Exhibit 2 ¶ 3).  When Harrison was offered the Project Manager/Trainer position by ExecuTime in 2013, she was given a letter that informed her that her position was exempt from receiving overtime pay under the FLSA (Dkt. #14, Exhibit 1 at p. 4).  After the buy-out, Tyler broke the Project Manager/Trainer role into two different positions: Project Manager and Implementation Consultant (Dkt. #14, Exhibit 1 at p. 71).

When a client wishes to acquire the ExecuTime software from Tyler, the purchase includes installation, implementation, and post-implementation support (Dkt. #29, Exhibit 4 at p. 4).  These services require that each client be assigned a team, which usually includes both a Project Manager and an Implementation Consultant (Dkt. #14, Exhibit 2 ¶ 4).  The implementation process begins with a kickoff call where the client and the implementation team communicate regarding the client's preferences and existing time-keeping system (Dkt. #14, Exhibit 1 at p. 10).  After the kickoff call, an implementation timeline is created along with a solution design that is curated for the client (Dkt. #14, Exhibit 1 at p. 8).  These timelines can last several months, ultimately resulting in a "go live" date where the client officially transitions to using the ExecuTime software full-time (Dkt. #14, Exhibit 2 ¶ 8).

## I.    Senior Project Manager

Generally, Project Managers are responsible for ensuring that the implementation process stays on schedule (Dkt. #14, Exhibit 2 ¶ 9).  This means that Project Managers must be in direct communication with the client, keep track of the number of hours worked, and respond to any "road blocks" that may arise during the implementation process (Dkt. #14, Exhibit 2 ¶ 12).  The

Project Manager is the one who reads over the initial contract to understand the nature of the client's purchase and then inputs data to create the project plan and implementation schedule based on the client's needs.  These documents are created based on templates created by Tyler that can change depending on which services the client purchased (Dkt. #14, Exhibit 1 at p. 9).  After the initial documents have been created, the day-to-day operations are supposed to be handed off to the Implementation Consultant, however, the Project Manager would still communicate with the client throughout the process.  In terms of hierarchy, the Project Manager would oversee an Implementation Consultant but would report to an Implementation Manager (Dkt. #14, Exhibit 1 at pp. 13–14).

Harrison did not conduct the work of a normal Project Manager.  Because she had more experience with the ExecuTime software than many Tyler employees, she was considered a subject-matter expert on the software and given the title of Senior Project Manager by Tyler (Dkt. #14, Exhibit 2 ¶ 21).  Although this title did not come with any additional job instructions, Harrison describes the position as the same as a Project Manager, only that Senior Project Managers "handled more projects at a time" (Dkt. #14, Exhibit 1 at p. 87).  Harrison was assigned to work on nineteen (19) to twenty-three (23) clients at a time, the most of any Project Manager at the company (Dkt. #14, Exhibit 1 at p. 42; Dkt. #14, Exhibit 2 ¶ 21).  Additionally, because of the high turnover rates at Tyler, Harrison would also have to conduct the work of an Implementation Consultant from time to time, even though she never held that title (Dkt. #14, Exhibit 1 at p. 24).

Outside of the implementation process, Harrison conducted training sessions for clients as well as new Tyler employees on how to use the ExecuTime software (Dkt. #14, Exhibit 1 at pp. 21, 38).  Harrison also participated in interviewing new hires at Tyler, which included being present at the interview, ranking the interviewees, and providing feedback to a supervisor

3

(Dkt. #14, Exhibit 1 at p. 49–51).  Other employees, both Project Managers and Implementation Consultants, also frequently came to Harrison for help on their projects, which could take up a significant portion of her day (Dkt. #14, Exhibit 1 at p. 107).  Although she performed all this additional work, Harrison still reported directly to an Implementation Manager and worked under a "management" team (Dkt. #14, Exhibit 1 at p. 86).  Harrison continued as Senior Project Manager until 2019, when she then transitioned to the Implementation Analyst position (Dkt. #14, Exhibit 1 at pp. 111–12).  The Implementation Analyst position was a newly created position for the ExecuTime product that focused more time on assisting others with the ExecuTime software. Since Harrison stated that was essentially most of the work she performed as Senior Project Manager, she applied and was ultimately given the position (Dkt. #14, Exhibit 1 at p. 113).

## II.  Implementation Analyst

On November 18, 2019, Harrison became the only Implementation Analyst for the ExecuTime product (Dkt. #14, Exhibit 1 at p. 121).  Her main responsibilities included training employees on the software and being available for any questions or issues that arose.  Harrison supported the entire ExecuTime implementation team and was available to the Project Managers and Implementation Consultants, assisting them with issues that required a higher degree of knowledge or experience with the product (Dkt. #14, Exhibit 3 at ¶ 4).  Employees were required to fill out tickets when they needed assistance, and Harrison would address these problems one-by-one based on priority level (Dkt. #14, Exhibit 1 at p. 122).  Harrison also conducted larger-scale trainings that sometimes required her to travel (Dkt. #14, Exhibit 3 at ¶ 9).  This included a management summit that took place in Austin, Texas and a new-hire training that took place in Maine.  In these trainings, Harrison would go over PowerPoints that were provided to her by Tyler (Dkt. #14, Exhibit 1 at pp. 119–20).  Harrison was also tasked with creating "how to" guides for

ExecuTime systems as well as other documents that Tyler employees could refer to during the implementation process (Dkt. #14, Exhibit 1 at pp. 123–24).

While being available to other employees as necessary, the Implementation Analyst position lacked the team aspect and project work that the Senior Project Manager had.  Harrison would sometimes work with clients when asked by management, but there was never any team or client that she was assigned to full-time (Dkt. #14, Exhibit 3 ¶ 6).  Although Harrison would work fewer hours as an Implementation Analyst than as a Senior Project Manager, Harrison still worked during the weekends in this position (Dkt. #14, Exhibit 1 at p. 148).

While in this role, Harrison did not have the authority to manage other employees, could not hire or fire anyone, and could not set or adjust an employee's hours.  Harrison reported to Kayla Wagner, who worked as a manager throughout Harrison's time as an Implementation Analyst (Dkt. #14, Exhibit 3 ¶ 2).  While the position allowed her to delegate some implementations based on the existing workload of the Implementation Consultants, she was never anyone's official supervisor.  Harrison continued to work in this position until she found a job elsewhere.  On June 17, 2021, Harrison resigned from Tyler (Dkt. #14, Exhibit 1 at p. 145).

### III.  Tyler's Previous FLSA Litigation

Tyler has dealt with FLSA overtime pay cases in the past.  *See Beall v. Tyler Techs.*, No. 2:08-CV-422, 2009 WL 1766141 (E.D. Tex. June 23, 2009); *Greene v. Tyler Techs.*, 526 F. Supp. 3d 1325 (N.D. Ga. 2021); *Wright v. Tyler Techs.*, No. 4:20-CV-454, 2021 WL 4255287 (E.D. Ark. Sept. 17, 2021); *Kudatsky v. Tyler Techs.*, No. 3:19-CV-7647, 2021 WL 5356724 (N.D. Cal. Nov. 17, 2021).  In these lawsuits, Tyler was sued by former employees that made the same claim as Harrison—failure to receive overtime pay.  Tyler alleged the same defense as it alleges here, that each of those employees was exempt from receiving overtime pay under the FLSA.  The difference

in this case is that none of the above-mentioned lawsuits dealt with either the Senior Project Manager or the Implementation Analyst position.  Rather, the lawsuits dealt with Implementation Consultants and related positions.  *See Beall v. Tyler Techs.*, No. 2:08-CV-422, 2009 WL 1766141 (E.D. Tex. June 23, 2009) (plaintiffs comprised of: customer/systems support, trainers, client liaisons, implementation specialists, implementation consultants, technical sales product specialists, and quality assurance analysts).  In *Greene*, the parties settled after Tyler's motion for summary judgment was denied and the court found that the administrative exemption did not apply to the Implementation Consultant position (Dkt. #29 at p. 2).  No court has had to decide whether Tyler's Senior Project Manager or an ExecuTime Implementation Analyst position qualify under the FLSA exemptions, which makes sense given the informal nature of the "Senior" Project Manager title and the recently created Implementation Analyst position for the ExecuTime product.

## IV.   Procedural History

On August 3, 2021, Harrison sued Tyler for Failure to Pay Overtime under the FLSA and alleges that it did so willfully (Dkt. #1).  On August 27, 2021, Tyler filed its answer, claiming that Harrison's positions were properly classified as exempt from the FLSA and denies any willful conduct (Dkt. #6).

On February 10, 2022, Tyler filed this present motion for summary judgment (Dkt. #14). On September 7, 2022, Harrison filed a response (Dkt. #29).  On September 21, 2022, Tyler filed a reply in support of its motion for summary judgment (Dkt. #31).[1]  For the reasons discussed below, the Court will grant in part and deny in part Defendant's summary judgment motion.

---

[1] In conjunction with filing its reply, Tyler raised several objections to the Declaration of Talia Harrison (Dkt. #29, Exhibit 3), which was attached as part of Harrison's summary judgment evidence, and asked the Court to strike the declaration (Dkt. #33).  On October 6, 2022, Harrison filed a response to the Motion to Strike, to which Tyler filed a reply on October 12, 2022 (Dkt. #34; Dkt. #35).  After reviewing the objections and the disputed evidence, the Court

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).  Once the movant has carried its burden, the

---

need not reach these objections in order to make its determination.  The Court relies solely on Tyler's summary judgment evidence—including the Deposition of Talia Harrison (Dkt. #14, Exhibit 1)—and the undisputed evidence that Harrison provided.  The Court need not refer to the Declaration of Talia Harrison in this Order, as it will not change the analysis.

nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Tyler raises three reasons as to why it is entitled to summary judgment on Harrison's claims. First, Tyler alleges that Harrison's role as Senior Project Manager qualifies under the FLSA's administrative and executive exemption and was not required to receive overtime pay. Second, Tyler alleges that Harrison's role as an Implementation Analyst qualifies under the FLSA's administrative exemption and was not required to receive overtime pay. For these reasons, Tyler alleges that Harrison's initial claims have no merit. Finally, in the alternative, Tyler alleges that Harrison has not provided any evidence that Tyler engaged in "willful" behavior, reducing the statute of limitations on Harrison's claims from three years to two years.

Harrison responds with the position that Senior Project Manager does not qualify under the executive employee exemption according to the four factors that must be met for the exception. Harrison contends that while some of her duties debatably included management work, they were

in no way enough to constitute her primary duty in that position.  Harrison also responds that she was not an exempt administrative employee for Tyler.  Specifically, Harrison contends that her primary duty in both positions: (1) was production work and not administrative in nature; (2) was not related to management or business operations; and (3) never had any discretion with respect to significant matters.  Finally, Harrison responds to the third argument that, because of Tyler's previous lawsuits of this nature, there is at least a genuine issue of material fact as it relates to willfulness.  The Court will address each of Tyler's three arguments in turn.

## I.   **Senior Project Manager**

The primary purpose of the FLSA is to protect this nation's working population from detrimental labor conditions.  *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706–07 (1945).  In staying with this purpose, the FLSA requires employers to pay covered employees at time and a half when they work over forty (40) hours a week.  29 U.S.C. § 207(a)(1).  Section 213 lists an exemption to this requirement for employees working "in a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1).  Congress did not define what constitutes working in a bona fide executive or administrative capacity, but the Department of Labor has issued regulations to help interpret these exemptions.  *Alawar v. Trican Well Serv., L.P.*, 397 F. Supp. 3d 873, 887 (W.D. Tex. 2019).  When determining if an FLSA exemption applies, courts will not narrowly apply these exemptions and instead give the exemptions a "fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).  However, it is the employer that bears the burden of proving its entitlement to an exemption.  *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002).

Pursuant to the Department of Labor's regulations, the Court must make three findings for Harrison's positions to be covered by the administrative exemption: (1) Harrison must be

compensated on a salary or fee basis at a rate not less than $684 per week;[2] (2) Harrison has, as a primary duty, the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Harrison has, as a primary duty, the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200(a).

The Department of Labor has defined a bona fide executive employee as one who is: (1) compensated on a salary basis at a rate of not less than $684 per week, exclusive of board, lodging, or other facilities; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a).  Whether an employee in their position qualified under the administrative or executive exemption is a highly-fact intensive inquiry that will vary case-by-case.  *See* 29 C.F.R. § 541.700(a) (explaining that a finding of an employee's "primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole").

### A.  Primary Duty—FLSA's Administrative Exemption

Starting with administrative exemption, neither party disputes the first finding regarding Harrison's salary, so the Court will focus instead on the "primary duty factors."  An employee's

---

[2] The Court notes that the Department of Labor has increased this salary test from the $455 amount that parties referred to in their briefing to $684 per week, effective January 1, 2020.  29 C.F.R. § 541.200(a)(1).  This increase in the salary threshold is not a problem for this case, as Harrison received $64,400 a year working as a Senior Project Manager and $72,500 a year working as an Implementation Analyst.  (Dkt. #14, Exhibit 1 at pp. 7, 114).  Additionally, the parties do not dispute that this test is satisfied.

primary duty has been defined as the principal, main, major, or most important duty that the employee performs.  29 C.F.R. § 541.700(a).  The Department of Labor provided a non-exhaustive list of factors that can aid a court in making its determination.  *Id.* The factors include:

> [T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*  In evaluating the amount of time an employee spends doing exempt work, a helpful guide is to look at whether the employee spends "more than 50 percent of their time performing exempt work," as that is a strong indicator that the primary duty portion is satisfied.  29 C.F.R. § 541.700(b).  However, time is only one factor that should be considered, as employees that do not spend more than half their time doing exempt work may still satisfy the primary duty requirement if the other factors support that finding.  *Id.*

The parties disagree as to what exactly Harrison's primary duties consisted of while working as Senior Project Manager.  Tyler alleges that Harrison's most important duties were managing ExecuTime implementations (Dkt. #14, Exhibit 2 at ¶ 12).  However, Harrison states that most of the work she conducted was training and overseeing Implementation Consultants. (Dkt. #14, Exhibit 1 at p. 107) (Harrison stated that she worked with Implementation Consultants "to be able to conduct trainings on their own, and helping them through understanding tasks and the timeliness of that," and that took up "more than 50 percent of my day, most days").  Tyler argues that whichever duty the Court views as Harrison's primary duty, the answer will not change for the purposes of the administrative exemption.  (Dkt. #14 at p. 16).  The Court disagrees with Tyler's assertion, as the classification of Harrison's primary duty is crucial for this analysis.

As a preliminary matter for determining Harrison's primary duty during her time as Senior Project Manager, Harrison's job title and resume do not hold much weight.  *See Vela v. City of Houston*, 276 F.3d 659, 677 (5th Cir. 2001) (explaining that a title provides no guidance on whether the administrative exemption applies); *Morrison v. Cnty. of Fairfax, VA*, 826 F.3d 758, 764 (4th Cir. 2016) (explaining that employee resumes "do not add appreciably to or call into question the more specific evidentiary submissions of the parties").  Instead, the Court must focus on what exactly Harrison's role was at Tyler to properly classify her primary duty.  *Vela*, 176 F.3d at 677.  Harrison seemed to have several responsibilities at Tyler during her time as Senior Project Manager that related to her subject-matter expertise with the ExecuTime product.  Harrison had responsibilities that were directly related to the implementation process, as well as behind-the-scenes responsibilities to ensure that Tyler's employees and clients were adequately prepared to use the ExecuTime product.  The Court views both sides of Harrison's role equally as necessary for the implementation process to run smoothly.  Harrison would, at times, conduct the role of a typical project manager, as Harrison oversaw the scheduling of the implementation process with certain clients.  Another responsibility Harrison was given during her time as Senior Project Manager was to assist other Tyler employees on an as-needed basis.  Finally, when new Implementation Consultants and Project Managers were hired, Harrison would train these new employees.  A fact issue exists as to whether Harrison's primary duty constituted that of a regular project manager, a consultant for Tyler's implementation team to receive assistance, or a team trainer for the ExecuTime product.  Each primary duty comes with additional responsibilities and expectations.  Moreover, additional facts are needed to decide which one was Harrison's primary duty and whether that primary duty falls under one of the FLSA exemptions.

Although Tyler provided some evidence that Harrison's "main job duties" were to ensure the success of an implementation from start to finish, the evidence does not support finding that to be her primary duty as a matter of law. *See Burns v. Blackhawk Mgt. Corp.*, 494 F. Supp. 2d 427, 431–32 (S.D. Miss. 2007) (stating that the court could not conclude as a matter of law that the exemption was satisfied when parties disagreed about the plaintiff's duties and identified relevant facts for why this position was exempt and non-exempt). Even if the Court decided that Harrison's main job duties were related to implementations, her work on implementations was not something that she did alone. Harrison would conduct some of the preliminary work for a client, but certain decisions that Harrison made needed to be approved by management. Eventually, Harrison would handoff the process to the Implementation Consultant but would be available for troubleshooting, a process that also required consulting with management. There remains a question of how much management was involved in the implementations and how free from supervision Harrison was while working with clients. Additionally, although the work of a traditional project manager was important for Tyler's services and necessary to complete a transaction, it was not the majority of the work Harrison performed. Harrison assisted other Tyler employees when they were first hired and when problems arose after being hired. Harrison stated in her deposition that Tyler's implementation team was "short-staffed," as there were three project managers and five implementation consultants on Tyler's team while she worked there (Dkt. #14, Exhibit 1 at pp. 13–14). Harrison had the most seniority out of all the employees on the team, and as a result, Harrison worked with these other employees, and it took up "over 50% of her time, most days" (Dkt. #14, Exhibit 1 at p. 107). Harrison was utilized for her expertise with the ExecuTime software, yet the evidence is unclear whether Tyler compensated her for this additional work.[3]

---

[3] The deposition of Harrison states that her compensation did not change with the new title of Senior Project Manager, rather she received an annual salary increase that varied year by year (Dkt. #14, Exhibit 1 at pp. 5–6). However, the

While Harrison had some role in working with Tyler employees, Harrison still recognizes that a big aspect of her job included oversight of the implementation process.  One of the reasons that Harrison states she applied for another position after Senior Project Manager was because she was having to spend hours "managing the number of projects that [she] had" (Dkt. #14, Exhibit 1 at p. 18).

Tyler's ExecuTime implementation team was under-staffed and Tyler utilized Harrison for her experience because of it.  Similar to *Marzuq v. Cadete Enterprises, Inc.*, although Harrison's job title included "manager," the circumstances show that the company needed more than what was expected of the manager role.  807 F.3d 431, 434 (1st Cir. 2015) (explained that store-manager had more duties than just running the store because the store was "short on staff").  The First Circuit concluded that the plaintiff "effectively was doing two jobs, for one salary" and that a fact issue existed for that reason.  *Id.* at 445.

Here, the discrepancies as to what Harrison's primary duty was as Senior Project Manager is important for the administrative exemption because the classification is necessary before the Court can proceed.  For example, if Harrison's primary duty was related to the implementation process, then the follow-up question is whether that constitutes production work, as found in *Greene* to be the case with an Implementation Consultant, or work ancillary to the general business operations.  *See Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990) (explaining that the regulations draw a distinction between employees "administering the business affairs of the enterprise" and employees "producing the commodity or commodities, whether goods or services, that the enterprise exists to product and market").  Additionally, the question of whether Harrison's primary duty required "discretion and independent judgment" or if Harrison simply acted as a

---

Declaration of Jamie Burns states that the "Senior Project Manager role both provides for additional compensation and involves additional responsibilities" (Dkt. #14, Exhibit 2 at ¶ 21).

"data input clerk" because of the use of templates in this case will have to be answered.  *See Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585–86 (5th Cir. 2006) (determining the fact that employees were asked to exercise discretion in apportioning liability and percentage of fault based on their expertise outweighed the evidence of having to consult certain manuals or guidelines for the "discretion and independent judgment" requirement); *Self v. Meritage Homes Corp.*, No. G-11-0070, 2014 WL 2171468, at *6–7 (S.D. Tex. May 23, 2014) (finding that argument stating plaintiffs are "nothing more than data input clerks" was not supported by the record simply because they used computer programs for setting certain deadlines for the purposes of showing "discretion and independent judgment").  If Harrison's primary duty is more of a consultant or team trainer, then this analysis will look vastly different.

## B.  Primary Duty—FLSA's Executive Exemption

The fact issue to the Senior Project Manager position also impacts the executive exemption. The primary duty determination is necessary because Tyler must prove that Harrison's primary duty is in management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof.  Until such a determination has been made, the Court may not proceed.

Another fact issue exists as to whether the two-member implementation teams that were assigned to each client satisfy the "customarily recognized department or subdivision" requirement.  This is because, based on the evidence provided, the Court cannot make a proper determination as to how to identify a proper "unit" within the ExecuTime implementation department.  *See* 29 C.F.R. § 541.103.  Based on the evidence provided, Harrison worked as part of a subgroup that was assigned to work on implementations of the ExecuTime product.  From there, employees were broken up into smaller teams assigned to each client.  Additionally, a fact

issue exists as to whether Harrison's recommendations were given "particular weight."  29 C.F.R.
§ 541.105.  An employee of Tyler stated that Harrison sat in on interviews of potential new-hires,
and she would give feedback to upper management for them to make decisions (Dkt. #14, Exhibit
2 ¶ 20).  Harrison's deposition stated that she did not give recommendations, as the process merely
consisted of her and other members of the implementation team sitting in with the candidate and
all employees were asked to rank the potential new-hires (Dkt. #14, Exhibit 1 at pp. 49–51).  A
question exists as to whether this is actually consistent with decisions that are given "particular
weight."

In sum, at this point in the proceedings, Tyler's evidence depicts Harrison's role as Senior
Project Manager in one light, but Harrison's deposition paints a different picture.  *See Snively v.
Peak Pressure Control, LLC,* 317 F. Supp. 3d 911, 916 (W.D. Tex. 2018) (finding that a fact
question at summary judgment stage existed when the depiction of a position was different from
both sides and the Court could not weigh the evidence).  Although the ultimate determination of
whether these positions are exempt will be one for the Court, that determination will rely "on many
factual determinations" that can be resolved by a factfinder.  *See Dewan v. M-I, LLC.*, 858 F.3d
331, 334 (5th Cir. 2017) (citing *Singer v. City of Waco*, 324 F.3d 813, 818 (5th Cir. 2003)).  The
question of which duty is a "primary duty" is a question of fact, and therefore, because Tyler has
not proven that no genuine issue of material fact exists as to Harrison's primary duty, Tyler's
motion as it relates to the Senior Project Manager will be denied.  *Miller v. Travis Cnty, Texas*,
No. 1:16-CV-1196, 2018 WL 1004860, at *10 (W.D. Tex. Feb. 21, 2018) (citing *Maestas v. Day
& Zimmerman, LLC*, 664 F.3d 822, 828–29 (10th Cir. 2012)).

II.   **Implementation Analyst**

In Harrison's response to Tyler's Motion for Summary Judgment, Harrison attempts to group her Senior Project Manager position with her Implementation Analyst position, using the same arguments for both (Dkt. #29 at pp. 15–25).  However, the Court finds that the problems that were present with the Senior Project Manager position are not at play with the Implementation Analyst position.  During Harrison's time as an Implementation Analyst, her primary duty was much clearer—offering her expertise with the ExecuTime product by resolving problems that arise with employees and the implementation process.  According to Harrison, she moved to this position because it "allows [her] to help other [Project Managers] and potentially [Implementation Consultants] with less experience" (Dkt. #14, Exhibit 1 at pp. 112–13).  When asked how much of her time resolving these problems would take up, Harrison responded by saying "more than a hundred percent" (Dkt. #14, Exhibit 1 at p. 140).

Again, the parties do not dispute that the salary basis is satisfied for this position, so the Court will analyze whether the second and third findings are satisfied.  *See* 29 C.F.R. § 541.200(a).  The findings that the Court must make to satisfy the exemption are that: (1) Harrison's primary duty of resolving problems that arise with the implementation process is office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (2) that Harrison's primary duty must have allowed for the exercise of discretion and independent judgment with respect to matters of significance.  *Id.*

Starting with the employer's customers, a reasonable jury could not find that Harrison's primary duty directly relates to the management or general business operations of Tyler's government customers.   An example of when this exemption is utilized is when tax experts or financial consultants offer their expertise as a service, which will in turn, have an impact on general

business operations.  29 C.F.R. § 541.201(c).  ExecuTime is a timekeeping software product, and while this software was created to make the clients' lives easier, Harrison did not have a say on any employee's salary, required hours, or any insight on government related functions.  In *Greene*, the court discussed this point in detail and found that the implementation of the ExecuTime software to Tyler's government customers did not amount to advisement or any matters involving running a component of the government, and the Court agrees with that conclusion.  *Greene*, 526 F. Supp. 3d at 1342.

As to the employer itself, the production work versus administrative work distinction is significant.  The regulations draw a distinction between employees "administering the business affairs of the enterprise" and employees "producing the commodity or commodities, whether goods or services, that the enterprise exists to product and market." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990).  Employers that are in the business of offering services, like Tyler, can find that their employees are classified as production based when "their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Desmond v. PNGI Charles Town Gaming, LLC*, 564 F.3d 688, 694 (4th Cir. 2009).  Using this definition, the court in *Greene* court found that ExecuTime training was an output of the business because the purchase of the ExecuTime product includes installation, implementation, training, and support. *Greene*, 526 F. Supp. 3d at 1340.  Since Greene's job was in that arena alone, she was not in a general business operations position.  *Id.*  However, the Court finds the production and administrative distinction does not apply to Harrison's Implementation Analyst position.  In *Greene*, the court was dealing with the Implementation Consultant position, a member of the implementation team that worked in-person with clients regarding the implementation itself, client trainings, and client support.  *Id.*  The difference between an Implementation Consultant and

Harrison's Implementation Analyst position is that Harrison did not normally deal directly with the clients in her new position.  The production aspect of Tyler is related to the services that are offered to its clients, and the Court denies extending the finding in *Greene* to apply to Harrison's role that mainly focused on working with Tyler employees.

The fact that an employee's primary duty is not production related does not automatically mean that it is related to management or general business operations.  *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 582 (6th Cir. 2004).  There must be an additional finding that the work is related to administrative operations.  *See id.*  Here, the Court finds that Harrison's primary duty does relate to Tyler's general business operations.

Tyler is in the business of selling products and services like the ExecuTime software.  This includes the implementation of the product that the client purchases from Tyler.  Harrison's job as an Implementation Analyst was to "assist all of the Tyler [Project Managers] and [Implementation Consultants] with implementations that they were taking on for ExecuTime" (Dkt. #14, Exhibit 1 at pp. 121–22).  The Implementation Analyst position required expertise in the ExecuTime product, which explains why this position was given to Harrison.  Harrison was the most experienced member at the time the Implementation Analyst position was first announced.  This level of expertise was required because the position was a resource for implementation teams, meaning assistance was provided when complex issues arose.  However, this expertise was not just utilized for the implementation team.  Harrison would work with other teams—like technical services or development—as issues occurred (Dkt. #14, Exhibit 1 at p. 127).  Harrison served as an asset for Tyler because of her ExecuTime knowledge and experience, and her salary reflected this utilization.  Harrison received a raise immediately upon taking this new Implementation Analyst role (Dkt. #14, Exhibit 1 at p. 114) (stating that her salary as an Implementation Analyst

19

was an increase compared to what she made as a Senior Project Manager).  Harrison's position is similar to the plaintiff's position in the *Verkuilen v. MediaBank, LLC* case.  646 F.3d 979 (7th Cir. 2011).  In *Verkuilen*, the plaintiff served as an account manager for the defendant corporation, and part of his job was to work with software engineers and software developers on different issues that arose with complex software used for media advertising.  The account manager in that case dealt with software integration, and it was the "complexity and variance" of the software where the account manager came in because it was important to know all the ins and outs to understand how the software could be adapted to the customer's needs.  *Id.* at 982.  Although the ExecuTime software is not as complex as in the *Verkuilen* case, Harrison's knowledge of all the ins and outs of the ExecuTime software was necessary for her position because she was brought in for complex issues.  For example, part of the implementation process for ExecuTime requires a Rules Engine Configuration policy that Harrison would assist employees with if they had any problems (Dkt. #14, Exhibit 3 ¶ 8).  Just as in *Verkuilen*, the Court finds that there is no genuine issue of material fact as to Harrison's primary duty directly relating to the general business operation of her employer.

The final requirement is that Harrison had, as a primary duty, exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200(a).  In defining "discretion and independent judgment," the Department of Labor lists ten factors that should aid the Court in making its determination.  29 C.F.R. § 541.202(b).  The regulations state the following:

> Factors to consider include, but are not limited to: (1) whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; (2) whether the employee carries out major assignments in conducting the operations of the business; (3) whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; (4)

whether the employee has authority to commit the employer in matters that have significant financial impact; (5) whether the employee has authority to waive or deviate from established policies and procedures without prior approval; (6) whether the employee has authority to negotiate and bind the company on significant matters; (7) whether the employee provides consultation or expert advice to management; (8) whether the employee is involved in planning long- or short-term business objectives; (9) whether the employee investigates and resolves matters of significance on behalf of management; and (10) whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).  Although this list is non-exhaustive, several factors are satisfied here. First, Harrison had the authority to formulate operating practices.  As part of her job, Harrison created how-to articles that she would share with Tyler employees and clients to ensure that the same question would not have to be answered twice (Dkt. #14, Exhibit 1 at pp. 123–24). Additionally, Harrison had an analyst page where she could document things going on with the implementation teams and even updated a document that was dispersed to the entirety of the team with new issues that arose (Dkt #14, Exhibit 1 at pp. 138–39).  Harrison also performed major assignments in conducting the operations of the business.  Harrison stated in her deposition that she would resolve tickets that were submitted by employees to keep the implementation on schedule (Dkt. #14, Exhibit 1 at p. 128).  Harrison also had the ability to waive established policies and procedures.  Harrison testified that, although it was required for employees to fill out tickets for Harrison, she would assist employees who did not go through the proper channels (Dkt. #14, Exhibit 1 at pp. 129–30).  Additionally, the problem-solving nature of the job required Harrison to act and use independent judgment based on her expertise to allow for smooth implementations.  A Tyler employee stated that Harrison had the authority to create tickets for other departments and create a database backup, which was not allowed for lower-level employees (Dkt. #14, Exhibit 3 ¶ 7).

21

In determining whether Harrison's role as an Implementation Analyst qualifies under the discretion and independent judgment category, the Court finds that is exactly why Tyler created the position in the first place, to utilize expertise on the product to assist the entire implementation process, a matter of significance for Tyler (Dkt. #14, Exhibit 3 ¶¶ 3–4) ("Implementation Analysts are subject matter experts" and "have more technical knowledge of the products they work on than implementation consultants and project managers").  This stated reason for creating the position and the subsequent role that Harrison took over is different than that of an IT Support Specialist position.  The Department of Labor has stated an IT Support Specialist does not qualify under the administrative exemption because the employee does not exercise direction and independent judgment.  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2006–42 (Oct. 26, 2006).  The focus of the analysis requires a look into the nature of the individual's particular work. While a general IT Support Specialist is needed for almost any job, an Implementation Analyst or an account manager, like in *Verkuilen,* requires specialized knowledge of the specific software that is the product of the company.  An IT Support Specialist is a generalized position, like an HR director, that can be found in almost all offices, regardless of the type of company.  Harrison's role as an Implementation Analyst does not fit the same mold.

Harrison's role as Implementation Analyst qualifies under the administrative exemption of the FLSA, and therefore, Tyler's summary judgment motion will be granted, as to the Implementation Analyst position.

## III.    Willfulness

The relevant sections of the FLSA impose a two-year statute of limitations for violations of the FLSA.  29 U.S.C. § 255(a).  The statute of limitations is extended to three years for willful violations of the FLSA.  *See id.*  The Fifth Circuit has held that an action is willful when "there is

substantial evidence in the record to support a finding that the employer knew or suspected" that its actions might violate the FLSA. *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir. 1971). The Fifth Circuit simplified the test to one question: Did the employer know the FLSA was in the picture? *Id.* This standard requires nothing more than that the employer has an awareness of the possible application of the FLSA. *Id.*; *Castillo v. Givens*, 704 F.2d 181, 193 (5th Cir. 1983); see *also Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1324 (11th Cir. 2007) ("The three-year statute of limitations may apply even when the employer did not knowingly violate the FLSA; rather, it may apply when it simply disregarded the possibility that it might be violating the FLSA."). However, an employer that acts "without a reasonable basis for believing that it was complying with the [FLSA]" is merely negligent, not willful. *Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015). Genuine disputes of material fact may exist for the issue of willfulness. *Id.* at 333.

As to the claim of willfulness for Harrison's position as Senior Project Manager, Tyler alleges that its conduct was not willful because it was relying on ExecuTime's previous classification of the project manager position before the buy-out (Dkt. #14 at p. 31). There are two problems with that argument. First, while Harrison received a letter from her previous employer that her Project Manager/Trainer position was exempt under the FLSA, Harrison was not acting in that same position after Tyler bought out ExecuTime. The Senior Project Manager role was also completely new and did not define any specific duties. The second reason that the Court does not accept Tyler's argument is that, after the purchase of ExecuTime, Tyler changed the employment structure that ExecuTime already had in place. New positions were created by Tyler, including positions that broke up ExecuTime's exempt position into two different positions, and that fact takes away any reliance on how ExecuTime previously classified its employees away from Tyler.

Tyler argues that "before and after the acquisition [of ExecuTime], Plaintiff's role was classified as exempt" (Dkt. 14 at p. 4).  However, Tyler only cites a letter that Harrison received, again, while she had a role that was different from the one she had at Tyler.  Tyler's legal counsel states that Tyler has a team of individuals that "regularly review" positions to determine whether they classify under any of the FLSA exemptions (Dkt. #14, Exhibit 4 ¶ 5).  But a question remains whether Tyler's previous litigation and settlements with Implementation Consultants should have raised some red flags with the company and Tyler's monitoring team.  *See Greene*, 526 F. Supp. 3d at 1352.  If Tyler was relying on ExecuTime's prior classifications, lawsuits that arose regarding the "Trainer" aspect of the Project Manager/Trainer position raise a genuine issue regarding willfulness.  Tyler contends that its classification of Harrison as exempt was "not based on legal advice from outside counsel" (Dkt. #29, Exhibit 5 at p. 4).  These actions at the least raise a genuine issue of material fact regarding whether Tyler's behavior should constitute reckless disregard or mere negligent conduct.

## CONCLUSION

It is therefore **ORDERED** that Defendant Tyler Technologies, Inc.'s Motion for Summary Judgment (Dkt. #14) is hereby **GRANTED in part** and **DENIED in part.**

It is further **ORDERED** that Harrison's Failure to Pay Overtime claim for the duration that Harrison was in the Implementation Analyst position is **DISMISSED with prejudice** because she was exempt under the FLSA from receiving overtime pay.  Harrison's Failure to Pay Overtime claim for the duration that Harrison was in the Senior Project Manager position will proceed to trial, including the issue of whether Tyler was acting willfully during that time.

**IT IS SO ORDERED.**

**SIGNED this 2nd day of November, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE